UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| SHIVA AYYADURAI, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-cv-10011-FDS |
| | ) | |
| FLOOR64, INC., a California corporation | ) | *(Leave to File Granted 2/27/2017)* |
| d/b/a TECHDIRT; MICHAEL DAVID | ) | |
| MASNICK, an individual; LEIGH | ) | |
| BEADON, an individual; and DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**MEMORANDUM OF FLOOR64, INC. AND MICHAEL MASNICK
IN SUPPORT OF MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(B)(5) AND 12(B)(6)**

In this action, a public-figure plaintiff is seeking to use the muzzle of a defamation action to silence those who question his claim to historical fame. This Court should not, and under the First Amendment may not, allow his claim to proceed.

## INTRODUCTION

Approximately six years ago, plaintiff Shiva Ayyadurai began promoting himself as the "inventor" of electronic mail. He claimed that in 1978, when he was 14 years old, he created a computer program for use at the University of Medicine and Dentistry of New Jersey that contained all the features that "are now a familiar part of modern email systems." (Complaint ("Compl.") ¶ 13.) He promoted his claim to invention on a website called "inventorofemail.com," in books, on social media, and in interviews.[1] He enlisted others to

_____

[1] See, e.g., THE INVENTOR OF EMAIL ON HOW THE MILITARY INDUSTRIAL COMPLEX TRIED TO STEAL HIS INVENTION, http://www.infowars.com/the-inventor-of-email-on-how-the-military-industrial-complex-tried-to-steal-his-invention/ (last visited Feb. 16, 2017).

2643630v1 20170227 (2635555v1 20170217)

support his story, and trumpeted their statements in press releases. He even trademarked the name "Dr. E-Mail."

Computer historians, scientists, and commentators swiftly disputed Ayyadurai's claim to fame. They pointed out that software allowing remote, linked computers to exchange written messages was developed by university and government researchers in the 1960s, long before Ayyadurai's alleged 1978 "invention." Ayyadurai responded by arguing that these systems did not count as "email," and derided his critics as promoters of "propaganda" and "racist lies." Now he has turned to the courts, bringing this defamation action against a small California company, Floor64, Inc., which operates a technology blog known as Techdirt, as well as two of Techdirt's bloggers.[2]

The Complaint fails to state a claim for which relief can be granted. That is because the posts challenged by Plaintiff are statements of opinion constitutionally protected against a libel claim. The 14 articles and 84 allegedly defamatory statements catalogued in the complaint all say essentially the same thing: that Defendants believe that because the critical elements of electronic mail were developed long before Ayyadurai's 1978 computer program, his claim to be the "inventor of email" is false. The Defendants fully disclosed (and even provided hyperlinks to) the non-defamatory facts upon which they base their conclusion. Compare Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 730 (1st Cir. 1992) (defendant's "full disclosure of the facts underlying his judgment" rendered statement protected opinion). Defendants' use of hyperbolic epithets to criticize Ayyadurai is fully protected by the First Amendment, and provides the reader ample notice that the blog posts convey opinions, not provable facts. Feld v.

---

[2] This motion is brought by the only two defendants that have been served with process: Floor64, Inc. and Michael Masnick (hereafter, "the Defendants.") The third named defendant, Leigh Beadon, has not yet been served.

Conway, 16 F. Supp. 3d 1, 4 (D. Mass. 2014) (statement found to be nondefamatory because it "was made as part of a heated Internet debate").

Ayyadurai's libel claim should be dismissed for an additional reason: He has failed to adequately plead the essential element of "actual malice." As a self-proclaimed public figure, Ayyadurai is required to allege "well-pled facts" that "plausibly support" an inference that at the time of publication, Defendants either knew their statements were false or uttered them with reckless disregard for the truth. Schatz v. Republican State Leadership Comm., 669 F.3d 50, 56 (1st Cir. 2012). Ayyadurai has pleaded no facts to show this subjective state of mind.

Plaintiff's intentional interference with prospective economic advantage and intentional infliction of emotional distress are based upon the same allegations as his libel claim, and therefore fail for the same reasons. Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995).  He also has failed properly to serve defendant Floor64 with process, and therefore all claims against the institutional defendant should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5).

At bottom, this lawsuit is a misbegotten effort to stifle historical debate, silence criticism, and chill others from continuing to question Ayyadurai's grandiose claims. Unless dismissed, this lawsuit will impermissibly chill "debate on public issues" that, under the First Amendment, "should be uninhibited, robust, and wide-open," even when it includes "vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures like Ayyadurai.  N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

## BACKGROUND

### A.  Shiva Ayyadurai and His Claim That He "Invented Email"

Plaintiff Shiva Ayyadurai alleges that he is a "world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur." (Compl. ¶ 1.)  He "holds four degrees from the

Massachusetts Institute of Technology," has "been recognized internationally for his developments" in social media, computer science, medicine, and biology, and he "operates his own research and education center." (Compl. ¶ 2.) According to his Complaint, Ayyadurai is nothing less than "a modern day Da Vinci." (Compl. ¶ 32.)

In 1978, Ayyadurai "created an electronic version of a paper-based interoffice mail system" that included "features [that] are now a familiar part of modern email systems." (Compl. ¶ 13.). He did so at age 14, while working as a research fellow at the University of Medicine and Dentistry of New Jersey ("UMDNJ").  (Compl. ¶¶ 13, 24.)  Plaintiff maintains that this program was the first true email system, and on that basis he asserts that he "invented" email. (Compl. ¶ 1.) In 1982, Plaintiff registered a copyright in a software program he entitled "email"; he alleges that by virtue of that filing he was "legally recognized by the United States government as the inventor of email." (Compl. ¶ 17.)

From all that appears in the Complaint, however, it was not until approximately 19 years later, in 2011, that Plaintiff made any public claim to be the "inventor" of email. That is when *TIME* magazine reported on an interview with Plaintiff in which he explained the "backstory" of his program at UMDNJ.  (Compl. ¶ 1, Ex. E at 1.) Plaintiff's assertion immediately "spark[ed] some debate," with many observing that email systems existed in various forms well before Plaintiff's program. (Compl., Ex. F at 2-4.[3]) According to a *WIRED* magazine article Plaintiff cites in the Complaint (Ex. F), the *Washington Post* received numerous objections after publishing a profile of Plaintiff and his claims, with the result that in February 2012, it "published a mammoth correction, casting considerable doubt over Plaintiff's place in the history of email." (Compl., Ex. F at 3.)

---

[3] Ayyadurai's Complaint cites Ex. F, an article from Wired.com, as evidence that his claim to have invented email is "indisputable." (Compl. ¶ 20.)

Plaintiff continued to press his claim, however.  He appeared on media outlets including *The Huffington Post* and the CBS television show "The Henry Ford's Innovation Nation." [4] (Compl. ¶ 31.) He created his own website—"inventorofemail.com"—in which he extensively touted his assertions. (Compl., Ex. F at 5.)  Plaintiff' former mentor at UMDNJ, Dr. Leslie P. Michelson, wrote or co-wrote at least three articles defending his claims, including one denouncing the "military-industrial-academic complex" for unleashing a campaign of "propaganda" and "racism" aimed at discrediting Plaintiff and subjecting him to a "public 'lynching.'"  (Compl., Exs. B, C at 3, D, F at 5.[5]) Plaintiff also solicited the support of MIT professor Noam Chomsky, who made a public statement on his behalf. (Compl., Ex. F at 2-3, 5.)

**B.     The Defendants' Blog Posts**

Defendant Floor64, Inc. operates a blog called "Techdirt," which offers opinions and insights into news stories about technology, government policy, and the law. Techdirt was started in 1997 by defendant Mike Masnick, who frequently writes for the site. Techdirt and Masnick are among Plaintiff's many critics.[6]

Between September 2014 and November 2016, Techdirt published 14 blog posts responding to media reports about Plaintiff's claims. (Compl. Exs. G-T.) The posts do not dispute any of Plaintiff's assertions concerning what he did while a fellow at UMDNJ. To the contrary, they state that he was an "apparently very bright 14-year-old" who "may have written a wonderful new form of electronic messaging" and "should be quite proud of what he's done." (Compl., Ex. G at 2, 6, Ex. H at 2, Ex. O at 2; <u>see also</u> Ex. M at 4 ("Ayyadurai . . .  was a bright

---

[4] INVENTOR OF EMAIL, https://www.thehenryford.org/explore/innovation-nation/episodes/inventor-of-email/ (last visited Feb. 16, 2017).

[5] It is unclear where (if anywhere) these articles were published. No journal is referenced on any of them, nor is there any other evidence of peer review.

[6] The third defendant, Leigh Beadon, is a writer for Techdirt. He has not yet been served with process.

5

kid who did some impressive programming as a teenager."); Ex. Q at 2 ("Again, it was

impressive that as a kid he basically independently created an electronic mailing system . . . .").)

However, the posts do express Techdirt's opinion that, notwithstanding his accomplishments at

UMDNJ, Plaintiff cannot fairly be called the "inventor" of email, because the essential functions

of email were developed before his work. For example, according to Techdirt's articles:

- An email system called "Mailbox" was created at MIT as early as 1965 (Compl., Ex. G at 2, Ex. O at 2.) Multiple posts provide hyperlinks to allow readers to see the original "Mailbox" computer coding. (Id.)

- Computer scientist "Ray Tomlinson is frequently credited with inventing the modern concept of email for the internet" by, among other things, "establishing the @ symbol (in 1972) as a way of determining both the user and which computer to send the email to." (Compl., Ex. G at 2, Ex. O at 2 (internal quotation marks omitted).)

- According to a 1977 RAND report (frequently cited by Ayyadurai), as well as Requests for Comment ("RFCs")[7] that predate Ayyadurai's work at UMDNJ, email fields—such as "to," "from," "cc," "subject," "message" and "bcc"—were already being used to send emails by computer scientists working on ARPANET, the government-funded precursor to the Internet, for years before Ayyadurai's program was created. (Compl., Ex. G at 5-6, Ex. T at 2.) Techdirt's posts included hyperlinks that led to both the report and the RFCs, thereby allowing readers to assess the underlying data and draw their own conclusions.

From this and other evidence, the Techdirt posts concluded, "[A]ll of the key concepts in email

were being publicly discussed and implemented prior to Ayyadurai writing his email program in

1978."  (Compl., Ex. T at 2.)

The Techdirt posts also addressed Plaintiff's evidentiary bases for his claim. For

example, they noted that Plaintiff's 1982 copyright registration did not establish that he was the

owner of any "invention." Rather, the registration simply recognized that Plaintiff claimed to

have authored the particular code language written for the specific program designed for

---

[7] A Request for Comment "is authored by engineers and computer scientists in the form of a memorandum describing methods, behaviors, research, or innovations applicable to the working of the Internet and Internet-connected systems." REQUEST FOR COMMENTS, https://en.wikipedia.org/wiki/Request_for_Comments (last visited Feb. 16, 2017).

UMDNJ.  The fact that Ayyadurai named this program "email," the posts argued, was irrelevant because "[t]he name of the program and the fact that you can copyright it does not make you the 'inventor' of the concept behind it." (Compl., Ex. G at 3; see also Ex. I at 2, Ex. J at 2, Ex. K at 2-3, Ex. L. at 2-3, Ex. O at 3, Ex. R at 2) (internal quotations omitted).)

Techdirt also observed that, to bolster his claim that email did not exist before 1978, Plaintiff had quoted, out of context, an excerpt from a 1977 RAND report (the "RAND Report") concerning the ARPANET system.  The posts pointed out that two quoted sentences in Plaintiff's literature appeared on separate pages of the RAND Report; by combining them, the posts argued, Plaintiff was misrepresenting the report's contents. (Compl., Ex. G at 4-5, Ex. H at 4, Ex. I at 2, Ex. K at 3.) The posts included a hyperlink to the report, encouraging readers to "[g]o read the primary documentation" themselves and form their own opinion. (Compl., Ex. G at 4, Ex. H at 3.)

The posts denounced Plaintiff as a "fake," "liar," and "fraud" who had put forward a "false," "misleading," and "bogus" claim that he invented email. They also assailed the manner in which Plaintiff dismissed his critics as being "racist." They critiqued the many media outlets that repeated Plaintiff's invention claim without conducting an independent investigation.

Plaintiff's posts are written in the first person. The subhead of each post is frequently sarcastic, obviously intended as humorous. (See, e.g., Compl., Ex. G at 2 ("from the that's-just-wrong dept.," Ex. H at 2 ("really-now? dept").) The tone is casual and often hyperbolic. (Compl., Ex. G at 2 (Plaintiff has gone "absolutely nutty"), Ex. I at 3 ("claim is complete bullshit") (italics omitted).)

### C.     The Present Lawsuit

On January 4, 2017, Plaintiff filed his Complaint, asserting identical claims against all three defendants: libel (Count I), intentional interference with prospective economic advantage ("IIPEA") (Count II), and intentional infliction of emotional distress ("IIED") (Count III). The Complaint identifies 84 allegedly defamatory statements (many of them repetitive of the others), contained in 14 Techdirt posts published between September 2, 2014 and November 7, 2016. (Compl. ¶¶ 34-47.)  For purposes of analysis, the statements can be broken down into five categories:

1.     Statements opining that Plaintiff's claims to have invented email are false;

2.     Statements asserting that Plaintiff misrepresented the significance of his registration of copyright in a computer program called "email";

3.     Statements asserting that Plaintiff incorrectly described the RAND Report;

4.     Statements speculating on Plaintiff's intentions or state of mind; and

5.     Other miscellaneous statements that Plaintiff fails to allege are false or that are simply too vague to constitute defamation.[8]

Plaintiff asserts in conclusory fashion that each of these 84 opinions is "false" (see, e.g., Compl. ¶ 34), but he does not specify exactly what is incorrect in each. He asserts that Defendants knew the statements were false when they were published, but offers no evidence whatsoever to support that assertion. (Id.) Plaintiff also does not identify a single business opportunity or economic benefit that he lost as a result of the statements.[9]

---

[8] To assist the Court, Defendants have listed each of the statements in Exhibit A of this memorandum, assigning each statement to one or of more of those five categories.

[9] Plaintiff demands not only $15 million in compensatory damages, but also "[a]n award of punitive damages." He apparently overlooks the fact that, in Massachusetts, "[a] plaintiff may not recover punitive damages in a defamation action." Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003) (citing Stone v.

8

### D.      Service of Process

On January 8, 2017, Plaintiff caused summonses to Masnick and Floor64, Inc. to be served on Sunnia Lin, the wife of Mike Masnick, at Masnick's home address. (See Exhibit C to this memorandum (Affidavit of Service and Summons, at 5).) Sunnia Lin is not an officer or employee of Floor64, Inc., nor has she been appointed an agent for service of process of that corporation. (Affidavit of Michael Masnick (filed separately and contemporaneously with this motion) ¶ 8.)  To Defendants' knowledge, no service has been attempted on defendant Leigh Beadon.

## ARGUMENT

## I.      THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, BECAUSE THE CHALLENGED STATEMENTS ARE CONSTITUTIONALLY PROTECTED OPINION.

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974). Plaintiff has failed to state a claim upon which relief can be granted, because every one of the statements about which he complains falls in the category of non-actionable opinion protected by the First Amendment.

The Supreme Court has articulated four principles to "assure[] that opinions about matters of public concern . . . receive substantial constitutional protection" from civil claims such as defamation. Phantom Touring, 953 F.2d at 727. First, any statement "'must be provable as false' before there can be defamation liability." Id. (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990); Pan Am Systems v. Atlantic Northeast Rails and Ports, 804 F.3d 59, 65

---

Essex County Newspapers, Inc., 367 Mass. 849, 860–861 (1975) and G.L. c. 231, § 93 ("In no action of slander or libel shall exemplary or punitive damages be allowed, whether because of actual malice or want of good faith or for any other reason.")).

(1st Cir. 2015) ("defamatory statements are not punishable unless they are capable of being proved true or false"). "If it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, the statement is not actionable." Scholz v. Delp, 473 Mass. 242, 251 (2015), cert. denied, 136 S. Ct. 2411 (2016) (internal quotations omitted). Language that is vague, subjective, or not susceptible to precise definition is not actionable. Gray, 221 F.3d at 249 (statement deemed non-actionable opinion where it was nothing more than a "vague and subjective characterization").

Second, because theories and subjective views are constitutionally protected, an opinion cannot be the basis for a defamation claim unless it clearly implies the existence of false and defamatory facts. Or, to put it another way, an opinion is not defamatory where it is based on disclosed, non-defamatory facts. See Phantom Touring, 953 F.2d at 730 (defendant's "full disclosure of the facts underlying his judgment" render statement protected). "'[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.'" Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002) (quoting Partington v. Bugliosi, 56 F.3d 1147, 1156–57 (9th Cir. 1995)); see also Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) ("[A] speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based.").

Third, "rhetorical hyperbole" and other types of "imaginative expression" are not actionable. Phantom Touring, 953 F.2d at 727 (quoting Milkovich, 497 U.S. at 34); see also, e.g., Pan Am Sys., 804 F.3d at 65-66 ("rhetorical hyperbole" and "statements using words in a loose, figurative sense" are protected opinion). This includes not only hyperbole in the allegedly

10

defamatory statements themselves but also exaggerated expression manifest in "'the general tenor of the article'" or the context in which the statements appear. <u>Phantom Touring</u>, 953 F.2d at 727 (quoting <u>Milkovich</u>, 497 U.S. at 21); <u>see also</u> <u>Feld v</u>, 16 F. Supp. 3d at 4 (tweet describing plaintiff as "fucking crazy" did not imply defamatory facts when considered in context of other tweets that were part of same discussion).

Finally, the First Amendment demands that courts "make an independent examination of the whole record, to assure that the foregoing determinations will be made in a manner so as not to constitute a forbidden intrusion o[n] the field of free expression." <u>Phantom Touring</u>, 953 F.2d at 727-28 (quoting <u>Milkovich</u>, 497 U.S. at 17) (internal quotation marks and brackets omitted). This gestalt review acts as a "safety valve," protecting against the risk of infringing on  protected speech. 953 F.2d at 727.

It is the job of the Court to analyze each of the allegedly defamatory statements identified in the Complaint against these important principles and to dismiss all claims that target protected opinion. <u>See</u> <u>Piccone</u>, 785 F.3d at 772 ("Whether a statement constitutes verifiable fact or is non-actionable opinion can be decided by the court as a matter of law."). When so analyzed, it becomes clear that all of the statements at issue are not actionable as a matter of law.

A.   <u>Techdirt's Statements that Plaintiff Falsely Claims to Be The "Inventor" of Email</u>

Most of the statements Plaintiff challenges are attacks upon the credibility of his claim to have "invented" email. These include, for example, several passages in which Plaintiff is called a "fake," a "liar," and a "fraud" who is advancing a "false," "misleading," or "bogus" claim of original inventorship (or words to that effect). (Ex. A hereto, § I.) The First Circuit has routinely dismissed claims targeting such rhetorical hyperbole on the grounds that the opinions do not imply any actionable misstatements of fact.  <u>See, e.g.,</u> <u>Phantom Touring</u>, 953 F.2d at 728

11

(statement that musical was a "fake" and "a rip-off, a fraud, a scandal, a snake-oil job";

affirming dismissal on motion for judgment on pleadings); McCabe v. Rattiner, 814 F.2d 839,

842-43 (1st Cir. 1987) (statement that plaintiff was running a "scam"); Gray, 221 F.3d at 248-49

(2000) (statement that plaintiff "faked" his closeness to the president, which was deemed a

"vague and subjective characterization about what happened"); Freeman v. Town of Hudson,

849 F. Supp. 2d 138, 160-61 (D. Mass. 2012), aff'd, 714 F.3d 29 (1st Cir. 2013) (statement that

plaintiff was a "liar"; recommending that motion to dismiss be granted).

Courts in other circuits have ruled similarly, rejecting defamation claims based on

rhetorical attacks that constitute non-actionable opinions. See, e.g., Underwager v. Channel 9

Australia, 69 F.3d 361, 367 (9th Cir. 1995) (statement that plaintiff was "lying" about his

qualifications); Obsidian Finance Group, LLC v. Cox, 740 F.3d 1284, 1293-94 (9th Cir. 2014)

(statements accusing plaintiff of "fraud" and "deceit on the government"); Doctor's Data, Inc. v.

Barrett, 170 F. Supp. 3d 1087, 1123-24 (N.D. Ill. 2016) (statements that plaintiff's scientific

report was misleading, its test employed a "fraud," and its lab was "shady"); Spelson v. CBS,

Inc., 581 F. Supp. 1195, 1203-05 (N.D. Ill. 1984), aff'd, 757 F.2d 1291 (7th Cir. 1985)

(statements describing medical practitioners as "cancer con-artists," "cancer quacks," and

"unscrupulous charlatans" who commit "fraud" and provide "phony" medicine); Colodny v.

Iverson, Yoakum, Papiano & Hatch, 936 F. Supp. 917, 923-25 (M.D. Fla. 1996) (description of

plaintiff as a "fraud"); Gill v. Delaware Park, LLC, 294 F. Supp. 2d 638, 647 (D. Del. 2003)

(accusation that plaintiff was a "liar," which the court deemed a non-actionable "epithet"); USA

Technologies, Inc. v. Doe, 713 F. Supp. 2d 901, 908-09 (N.D. Cal. 2010) (statement that plaintiff

engaged in "legalized highway robbery" and was a "known liar"); Rizzuto v. Nexxus Products

Co., 641 F. Supp. 473, 481-82 (S.D.N.Y. 1986) (advertisements attacking competitor by using

phrases such as "unscrupulous sales people lying," "lying salesperson," "rip you off, " and "don't be conned"); <u>Boese v. Paramount Pictures Corp.</u>, 952 F. Supp. 550, 554-57 (N.D. Ill. 1996) (statement that "[e]verybody lied, all the way down the line, and that came back to haunt them"); <u>Thomas v. Los Angeles Times Communications, LLC</u>, 189 F. Supp. 2d 1005, 1015-17 (C.D. Cal. 2002) (statement that plaintiff  misrepresented actions during World War II and taught a "sham" course; motion to strike under California anti-SLAPP statute granted); <u>Faltas v. State Newspaper</u>, 928 F. Supp. 637, 647-49, <u>aff'd</u>, 155 F.3d 557 (4th Cir. 1998) (statements that plaintiff would "lie to suit her agenda" and would "present lies as truth"). These cases are consistent with the broader principle that "[t]he law provides no redress for harsh name-calling." <u>Flowers v. Carville</u>, 310 F.3d 1118, 1127 (9th Cir. 2002).

Plaintiff contends that by using the word "fraudulent" and its variants, Defendants "falsely accus[ed] him of a crime," which is defamation "per se." (Compl. ¶ 56.) Statements alleged to be libelous, however, must be "interpreted reasonably," not in a "strained," unnatural manner. <u>King v. Globe Newspaper Co.</u>, 400 Mass. 705, 711–12 (1987). As the cases cited above make plain, "the term 'fraud' has a broad scope; to speak of something as a 'fraud' may mean it is criminally deceptive, but it may also mean simply that it is not what it purports to be." <u>Doctor's Data</u>, 170 F. Supp. 3d at 1123. Here, Defendants used the word "fraudulent" to characterize both Plaintiff's reliance on the copyright registration to claim "inventor" status, and his misquoting of the RAND Report. (<u>See, e.g.</u>, Compl., Ex. I at 2 (stating that Plaintiff and supporters "fraudulently make claims that are easily debunked," including that, by virtue of the copyright, the "US government officially recognized Ayyadurai as the inventor of email in 1982"

(internal quotation marks and italics omitted).)[10] Under no reasonable interpretation of these statements is Plaintiff accused of a crime.

In short, to state a defamation claim, Plaintiff cannot merely complain of being called a "liar"—he must show that the accusation, read in context, conveys a provably false statement of fact.  Biro v. Condé Nast, 883 F. Supp. 2d 441, 463 (S.D.N.Y. 2012) (dismissing claim where plaintiff alleged the defendant called him a "con-man" but "did not challenge the veracity of the underlying facts" (internal quotation marks omitted)).  Plaintiff does not even begin to make such a showing.  Instead of articulating what *facts* in the posts are supposedly untrue, Plaintiff repeatedly attacks the *conclusion* that he is not the "inventor of email." He cites each instance in which the posts expressed that conclusion, as if mere repetition will cure the legal insufficiency of his claim.

No matter how fervently plaintiff may insist that he alone "invented email," the law does not entitle him to recover damages simply because Techdirt has uttered a "subjective characterization" to the contrary. See Gray, 221 F.3d at 249. It is in the very nature of computer science that new ideas and products emerge in an evolutionary way, as various actors modify and improve what has come before. There is no single moment that marks the "invention" of a new

---

[10] Plaintiff also complains that he was called "a fraud," a "fraudster," and a "charlatan" in a Nov. 6, 2016, post titled, "Funniest/Most Insightful Comments of the Week," a collection of published content submitted by third parties to Techdirt.com. (Compl. ¶ 46; Ex. S.)  All of the allegedly defamatory statements in that post were supplied by an "anonymous commenter," not by any of the Defendants. (Id.) Under Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1), websites are shielded "from being 'treated as the publisher or speaker' of material posted by users of the site, which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.'" Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 18 (1st Cir. 2016), cert. denied, No. 16-276, 2017 WL 69715 (U.S. Jan. 9, 2017) (internal quotations omitted). Plaintiff's bare allegation that defendant Leigh Beadon "authored" the post is insufficient to plausibly allege that it was Defendants, not the third-party commenter, who are responsible for that content. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 259 (4th Cir. 2009) (rejecting allegations that website created content as "pure speculation and a conclusory allegation"). Accordingly, Section 230 provides an independent, equally sufficient basis to dismiss all claims based on the statements listed in paragraph 46 and in Exhibit S to the Complaint.

technology. "A computer program is not invented; it is 'written' or 'developed.'" T. Haigh, *Did V.A. Shiva Ayyadurai Invent Email?*, SIGCIS (Aug. 4, 2015), available at http://www.sigcis.org/ayyadurai.[11] Whether any individual person "invented" a given technology is invariably a subjective determination that will vary depending on which features are deemed essential to the product.  The answer will always remain in the eye of the beholder. See Paterson v. Little, Brown & Co., 502 F. Supp. 2d 1124, 1135-36, 1139 (W.D. Wash. 2007) (defendant's statement that supposed inventor of DOS actually "ripped it off" and "cloned" work of prior software writer was "imprecise hyperbole, incapable of defamatory meaning"); Greenspan v. Random House, Inc., 859 F. Supp. 2d 206, 223-24 (D. Mass. 2012), aff'd , 2012 WL 5188792 (1st Cir. Oct. 16, 2012) (dismissing plaintiff's suit against publisher that allegedly made statements belittling plaintiff's contribution to the invention of Facebook).

The debate over who "invented" email is inherently incapable of objective proof. With respect to email, "'there seems to be little disagreement over who wrote what, and approximately when.'" (Compl., Ex. F. at 4 (quoting Tom Van Vleck).) The argument, instead, "'is over what to call things.'" (Id.; see also Compl., Ex. E at 2 (observing that the origins of email are "not exactly a cut-and-dried case").) Writers such as Masnick argue that all of the core features of email were in place by the mid-1970s. Plaintiff and his supporters, by contrast, advocate for a narrow definition of email; they insist that to constitute email, a program must "contain[] all the features we experience today in every email program," and they rely on an 87-item list of features that they say must be satisfied for a program to qualify. (Compl., Ex. D at 7; V.A. Shiva

---

[11] A copy of Haigh's article is attached to this memorandum as Exhibit B. This article is also cited by Techdirt in Exhibit I of the Complaint. When reviewing a defamation claim under Rule 12(b)(6), this court can (and should) consider materials to which allegedly defamatory articles hyperlink.  Biro v. Condé Nast, No. 11-CV-4442 JPO, 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014), aff'd in part, 807 F.3d 541 (2d Cir. 2015) (considering hyperlinks and determining that statements were non-actionable opinion).

Ayyadurai, *Definition of Email*, available at http://www.inventorofemail.com/definition_of_ email.asp (see Table 2).) It is like a debate over the precise moment when the civil rights movement began, or a quarrel about the essential attributes of a perfect cheesecake. These are matters of "personal judgment." See Gray, 221 F.3d at 248. Neither position can be factually proven; one's conclusion depends on what one considers to be the defining attributes of the matter in question.

At its heart, the debate between Techdirt and Ayyadurai is not about facts; it is about the conclusion to be drawn from those facts. It is telling that Ayyadurai does not contest the actual evidence Techdirt cites in its posts. He does not, for example, dispute that the Mailbox program was developed at MIT in the 1960s, nor that Tomlinson established the protocol of the "@" symbol in 1972. Neither does he allege that any of the statements regarding the development of these various email programs somehow defame him. Instead, he attacks Techdirt's *opinion* that because those developments implemented the essential features of "email," therefore Ayyadurai's claimed "inventor" status is unwarranted.

Techdirt, for its part, also does not challenge the facts on which Plaintiff relies. He does not dispute that Ayyadurai implemented a useful program while at UMDNJ (indeed, he applauds it).  (See, e.g., Compl., Ex. G at 6 (Ayyadurai "should be quite proud of what he's done.").) Techdirt's criticism, rather, is definitional. As he sees it, Plaintiff is trying "to redefine what email is" to the point that the definition is so narrow and arbitrary, only Ayyadurai satisfies it. (Compl., Ex. H at 2 (italics omitted).) As the First Circuit Court of Appeals observed in Gray, 221 F.3d at 249, which involved a dispute over historical conclusions: "This is just the kind of subjective judgment that is only minimally about 'what happened' but expresses instead a vague

16

and subjective *characterization* of what happened." (Emphasis added.) As such, it is "protected opinion" incapable of supporting a defamation claim. Id.

Even if Ayyadurai were challenging the sufficiency of the factual basis for Techdirt's opinion, his claim would still fail.  That is because Techdirt has disclosed all of the primary, pre-1978 evidence upon which he relies, leaving readers informed enough to reach their own independent conclusions. See Phantom Touring, 953 F.2d at 730 (defendant's "full disclosure of the facts underlying his judgment" render statement protected opinion). Not only does Techdirt identify his sources, he supplies hyperlinks so that readers can access and review them with a single click. See, e.g., Nicosia v. De Rooy, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1999) (statements were not defamatory where hyperlinks in article directed readers to facts substantiating opinion); Abbas v. Foreign Policy Grp., LLC, 975 F. Supp. 2d 1, 16 (D.D.C. 2013), aff'd, 783 F.3d 1328 (D.C. Cir. 2015) (same). Techdirt never states or implies that he has any undisclosed inside knowledge supporting his conclusion that Plaintiff did not "invent" email. Compare Faltas, 928 F. Supp. at 648 (accusation that plaintiff was a "liar" is protected opinion, because defendant never "insinuate[ed] that [he] ha[d] independent knowledge" apart from what was disclosed in the article). Techdirt's posts simply discuss historical materials that are readily available to the public, and its readers are free to come to a different conclusion. The statements fall comfortably within the category of protected speech that this Court recognized in Feld, 16 F. Supp. 3d at 3 ("An expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is." (internal quotations omitted)).

17

B.      Statements Claiming that Plaintiff Misrepresented His Copyright and the RAND
        Report

Ayyadurai next complains of statements accusing him of "misrepresenting" the import of

his 1982 copyright. (Ex. A hereto, § II.) These statements also do not qualify as defamation,

because they are mere expressions of opinion concerning the meaning of a legal document and

Ayyadurai's claims about it. Specifically, the posts take issue with Ayyadurai's novel assertion

that by virtue of his copyright registration he was "legally recognized by the United States

government as the inventor of email" (Compl. ¶ 17); Techdirt argues that such an assertion

"conflate[s] patent and copyright law" and confuses a copyright in the name of a program with

an intellectual property right to the concept that underlies it. (Compl. Ex. O at 3.) Again, these

are conclusions based on identified, non-defamatory facts, and readers are perfectly free to

disagree. See, e.g., Hellmuth v. Efficiency Energy, L.L.C., No. CV H-14-2945, 2016 WL

642352, at *3 (S.D. Tex. Feb. 18, 2016) ("The correctness of a party's opinion on an undecided

legal issue . . . is not an appropriate basis for a defamation . . . .").[12]

Similarly, Ayyadurai challenges statements that it was misleading of him to take two

passages from the 1977 RAND report from two different sections and combine them with an

ellipsis—something Ayyadurai does not appear to contest he did. Whether Ayyadurai's use of an

ellipsis was "misleading" or "fraudulent," as Techdirt states, is sheer opinion. Besides, the posts

---

[12] Techdirt's analysis of the law happens to be correct. A copyright protects a "medium of expression"
such as literary, musical, or dramatic works, 17 U.S.C. § 102(a), not an "idea, procedure, process, system,
method of operation, concept, principle, or discovery." Id. at § 102(b). Plaintiff's copyright, therefore,
extended only to the specific code language he submitted, not to any of the ideas behind it. Plaintiff
himself recently admitted as much, stating to a reporter that "'[t]he problem with copyright is it only
protects that literal work . . . . It doesn't protect the design and the ideas.'" Hiawatha Bray, He says he
invented e-mail. Dispute him at your own risk, BOSTON GLOBE (February 14, 2017), available at
https://www.bostonglobe.com/business/2017/02/13/says-invented-email-dispute-him-your-own-
risk/wGQn4o6erpIJEs7kk13UyJ/story.html (quoting Plaintiff). Even if Plaintiff had received a patent for
"email" (he did not), that would only entitle him to be recognized as the inventor of the specific invention
precisely articulated in the patent claim. It still would not connote that he invented "email" as that term is
commonly understood. As noted above, the debate over email is a dispute over definitions, which the
issuance of a patent would have done nothing to resolve.

18

provide a hyperlink directly to the report and even encourage readers to "[g]o read the primary documentation" themselves. (Compl., Ex. H at 4.)

C.      Statements Regarding Plaintiff's Motivation

Plaintiff also complains of a series of statements concerning his motivation and intent, such as that he is "blatantly misrepresenting history for his own personal aggrandizing," "relying on the ignorance of reporters," "deliberately" misrepresenting evidence, and "obsessed with his false claim of creating email." (Ex. A hereto, § IV.)  Such statements have routinely been found nonactionable because "there are no objective tests to determine [a person's] internal motivation." Murray v. HuffingtonPost.com, Inc., 21 F. Supp. 3d 879, 886 (S.D. Ohio 2014) (dismissing defamation claim brought against blog); see also Greenspan, 859 F. Supp. 2d at 224 (D. Mass. 2012) (statement that plaintiff "has a personal beef" with someone "cannot objectively be proven as true or false"). Techdirt makes no claim to special insight into Plaintiff's thoughts; rather, he reviewed the available evidence and made an inference, just as any other observer could do. Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1147-48 (8th Cir. 2012) ("[A]nyone is entitled to speculate on a person's motives from the known facts of his behavior." (Internal quotation marks omitted)).

D.      Miscellaneous Statements

Finally, Plaintiff points to various other statements that he alleges are defamatory, all of which can be addressed summarily under the principles stated above.

- Plaintiff complains of posts characterizing his "claims of racism" as "bogus" and "bizarre" (and words to that effect) (Ex. A hereto, §V (a)), but he cannot deny he made such claims. Techdirt, for example, copied and pasted a tweet in which Ayyadurai said that "[w]hite journalists since 2012 have joined in the *lynching*

19

and whitewashing of facts  . . . .” (Compl., Ex. N at 10 (emphasis added).) The statements that Plaintiff’s claims are “bogus” or “bizarre” are expressions of pure opinion.

- Plaintiff claims he is defamed by Techdirt’s use of phrases such as “fabricated controversy.” (Ex. A hereto, § V(b).) Whether a controversy is “fabricated” or not, however, depends upon whether one believes Ayyadurai “invented” email, which is a matter of opinion.[13]

- Plaintiff claims injury from Techdirt posts criticizing the settlement of a defamation action that he brought against the website Gawker. Techdirt decried the settlement as an “abus[e] [of] the legal system” and a “victory for trying to rewrite history and smear the actual truth.” (Ex. A hereto, § V(c).) These statements are just another iteration of Techdirt’s broader point that Ayyadurai did not invent email.

- Plaintiff also attacks posts alleging that his claims have been inconsistent over time and that he “changed the story” and attempted to “rewrite his own history.” (Ex. A hereto, § V(d).)  Plaintiff, however, does not specifically deny that his story changed. At best, his Complaint (charitably construed) could be read as challenging Techdirt’s contention that Plaintiff first stated his “email” program was created in 1980, then later claimed it was invented in 1978. (Compl. ¶ 36(i), Ex. I at 3.)  But the Complaint “provides absolutely no factual underpinning” to support an allegation that this contention was false. “A ‘complaint must include

---

[13] Along the same lines, Plaintiff alleges that Defendants defamed him when they stated that “Ayyadurai is using one of the oldest trolling tricks in the book, in pretending that everything that he is actually doing is actually being done nefariously against him.” (Compl. ¶35(c), Ex. H at 2 (emphasis omitted).) This epithetic statement is a characterization so broad as to be incapable of being proved true or false.

more than a rote recital of the elements of a cause of action, but instead must include factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" <u>Pan Am Systems, Inc. v. Hardenbergh</u>, 871 F. Supp. 2d 6, 16 (D. Me. 2012) (granting motion to dismiss for failure plausibly to allege falsity) (quoting <u>Artuso v. Vertex Pharma., Inc.</u>, 637 F.3d 1, 5 (1st Cir. 2011)).  Moreover, Techdirt hyperlinks to an article, by University of Wisconsin Prof. Thomas Haigh, that includes a picture of an infographic prepared by Ayyadurai in which he claims that he invented email in 1980. <u>Compare</u> Ex. B at 12 <u>with</u> Compl. ¶ 1 ("In *1978*, Dr. Ayyadurai invented email . . . ." (emphasis added)).

- Finally, Plaintiff asserts he is defamed by two other statements: first, that "[Dr. Ayyadurai] claims that those of us debunking his bogus claim refused to look at the primary documents" (Compl. ¶ 35(f), Ex. H at 4) and, second, that "[w]e're curious if Ayyadurai would like to try to present any evidence that a giant defense contractor is paying us off to (1) explain basic copyright law and (2) point to the actual 1977 paper that Ayyadurai himself totally misrepresents." (Compl. ¶ 36(l), Ex. I at 5.)  Here again, however, Plaintiff does not explain what part of these rhetorical statements might be false, let alone defamatory; neither of the statements express any negative facts about Plaintiff and neither would tend to damage his reputation. To the extent that those statements may be construed as claiming that Ayyadurai is misrepresenting copyright law and the RAND Report, they are protected opinions for the reasons set out above.

21

E.     The Overall Tone and Context of the Blogs

The "general tenor" of Techdirt's posts, and the context in which they appeared, further reinforce the conclusion that the posts are non-actionable, constitutionally protected opinion. Phantom Touring, 953 F.2d at 727; see also Amrak Prods., Inc. v. Morton, 410 F.3d 69, 72-73 (1st Cir. 2005) ("Context matters in assessing [defamation] claims: The court must examine the statement in its totality in the context in which it was uttered or published." (Internal quotation marks omitted)).

First, the fact that all of the statements were written on a blog is relevant in assessing context. "Those who operate blogs more often resemble pundits or opinion-writers than beat reporters." Russo, "Are Bloggers Representatives of the News Media Under the Freedom of Information Act?," 40 COLUM. J.L. & SOC. PROBS. 225, 232 (2006).  Indeed, "[t]he dominant mode of blog discourse has been commentary upon the news," id., and various courts have recognized blogs as "a subspecies of online speech" which focuses upon the opinions of the authors as opposed to "provable assertions of fact." Obsidian Fin. Group, 812 F. Supp. 2d at 1223; see also Annot., "First Amendment Protection Afforded to Blogs and Bloggers," 35 A.L.R. 6th 407 (2008) ("[B]logs deal with the opinions of a wide variety of persons . . . .").

Second, the posts are all written in the first person, a style which "puts the reader on notice that the author is giving his views." McCabe, 814 F.2d at 843. In this respect, they resemble letters and op-ed columns, which courts frequently deem to be vehicles for protected opinions. See, e.g., Phantom, 953 F.2d at 729 (article in opinion column found to be protected opinion); Colodny, 936 F. Supp. at 923-24 ("fraud" allegation deemed opinion in part because it was in a letter to the editor).

22

Third, the articles were written in response to a heated debate, dating back to at least 2012, over the origins of email—a debate that included incendiary accusations of racism. Any reasonable reader would have understood that Techdirt was taking a side in that debate. Feld, 16 F. Supp. 3d at 4 (statement found to be nondefamatory partly because it "was made as part of a heated Internet debate"); Obsidian Fin. Group, 812 F. Supp. 2d at 1223 ("Statements made as part of an acknowledged heated debate often negate the impression that the defendant was asserting an objective fact.").

Finally, the posts are replete with hyperbolic, sarcastic, and humorous remarks that were obviously not intended to be taken literally. See Thomas, 189 F. Supp. 2d at 1016 (article found to be stating opinions in part because of its "conversational tone"). For example, the caption for each post parodies that which might be found on a traditional news article, including one that says it is from the "that's-just-wrong department" and another from the "really-now? dept." The language used is casual, snarky, and often profane: Plaintiff is described as "nutty," his views are said to be from "bogustan," and his claims of inventing email are characterized as "bullshit." (Compl., Ex. G at 2, Ex. H at 2, Ex. J at 2, Ex. R at 2.)

In sum, none of the blog posts convey anything other than constitutionally protected opinions. For that reason alone, Plaintiff's libel claim should be dismissed in its entirety.

## III.   PLANTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE HE IS A PUBLIC FIGURE WHO HAS FAILED PLAUSIBLY TO ALLEGE THAT THE DEFENDANTS ACTED WITH ACTUAL MALICE.

Even putting aside the fact that the Complaint does not identify any actionable statements of fact, Plaintiff's claims would still have to be dismissed for failure adequately to plead fault. "Under the Supreme Court's First Amendment jurisprudence, the degree of 'fault' that must be proven in order to support a permissible action for defamation hinges on the plaintiff's status."

Piccone v. Bartels, 40 F. Supp. 3d 198, 207 (D. Mass. 2014), aff'd, 785 F.3d 766 (1st Cir. 2015).

When a plaintiff is a "public figure," he "must prove, by clear and convincing evidence, that the defendant published the false and defamatory material with actual malice,—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Alharbi v. Beck, 62 F. Supp. 3d 202, 206 (D. Mass. 2014) (internal quotation marks omitted) (citing New York Times Co., 376 U.S. at 279–80); Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of United States, Inc., 233 F.3d 24, 27 (1st Cir. 2000). This limitation derives from the principle that discussions concerning public figures and public officials "deserve constitutionally-protected 'breathing space' in a democratic society and thus are subject to a conditional privilege" that is overcome only by a showing of actual malice that is both clear and convincing. Levesque v. Doocy, 560 F.3d 82, 87 (1st Cir. 2009) (quoting New York Times, 376 U.S. at 272). Plaintiff's Complaint falls short because it does not plausibly make out a case that Defendants made their statements while aware of, or in reckless disregard of, their falsity.

      A.     Plaintiff is a Public Figure.

Whether a plaintiff is a public figure is a question of law for the court. Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st Cir. 1998). Ayyadurai makes this question an easy one, because he begins his Complaint by asserting that he is a "world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur" (Compl. ¶ 1) and by describing himself as the inventor of one of the most widely used forms of communication in the world. Carafano v. Metrosplash.com Inc., 207 F. Supp. 2d 1055, 1071 (C.D. Cal. 2002) (citing Carlisle v. Fawcett Publications, Inc., 201 Cal.App.2d 733, 746–47 (1962) for the proposition that "noted inventors" constitute public figures for purposes of the First Amendment). He has also been featured in

24

several nationally circulated publications, including *TIME* magazine and *The Washington Post*. (Compl., Ex. E, Ex. F at 3.)

At the very least, Plaintiff is a limited-purpose public figure, someone who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011) (quoting Gertz, 418 U.S. at 351). As even the articles Plaintiff cites make clear, there is a public controversy concerning the history of email with Plaintiff at its very center: There is "considerable doubt over Ayyadurai's place in the history of email." (Compl., Ex. F at 3.) Ayyadurai has "injected" himself into that controversy by participating in a series of publicized interviews, setting up a website that touts his claims, and soliciting the help of academics who have publicly supported him—all of which occurred before Defendants published the posts. (Compl. ¶ 31, Ex. E, Ex. F at 3, 5.) Because he is a public figure with respect to the ongoing controversy over the origins of email, Plaintiff must plead facts establishing that the Defendants knew that they were publishing false statements about him, or at least proceeded with reckless disregard for the truth. Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 201 (1st Cir. 2006) (citing Gertz, 418 U.S. at 345).

B.     Plaintiff has Failed Plausibly to Allege Actual Malice.

Despite acknowledging his public figure status (Compl. ¶ 1), Plaintiff has wholly failed to plead facts that could show actual malice. Because of "the difficulty in proving actual malice . . . as well as the fact that actual malice must be proven by clear and convincing evidence in order for a plaintiff to succeed," courts have recognized that "Rule 12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's defamation claim." Biro, 963 F. Supp. 2d at 279. A searching review of a plaintiff's actual malice pleadings at the Rule

25

12(b)(6) stage "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." Id.

Therefore, as the First Circuit has made clear, to survive a motion to dismiss, a public figure must allege "well-pled facts"—not mere legal "buzzwords"—that "plausibly support" an inference that the Defendants published with knowledge of falsity or reckless disregard for the truth. Schatz, 669 F.3d at 56 (mere allegations that defendant "had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false" are insufficient). Where factual substantiation is lacking, courts have not hesitated to dismiss defamation claims brought by public figures for failure to plead actual malice. Id. at 58 (affirming dismissal where plaintiff did not "lay out enough facts from which malice might reasonably be inferred"); Shay v. Walters, 702 F.3d 76, 82 (1st Cir. 2012) (affirming dismissal of defamation claim for failure plausibly to allege fault); Melville v. Town of Adams, 9 F. Supp. 3d 77, 110-11 (D. Mass. 2014) (dismissing defamation claim for failure to plead actual malice); Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 377-78 (4th Cir. 2012) (affirming dismissal of defamation claim and holding that "mere recitation of the legal standard" for actual malice "is precisely the sort of allegations that Twombly and Iqbal rejected"); Biro, 936 F. Supp. 2d at 279-80 (collecting additional cases).

While Plaintiff's Complaint includes the "buzzwords" that Defendants made the allegedly defamatory statements "with the knowledge that they were false," it offers no facts to support that naked assertion. (See, e.g., Compl. ¶ 48.)  The sole factual allegation Plaintiff makes on this subject is that Techdirt published its statements despite knowing that another website, Gawker.com, had settled a claim by Ayyadurai in November 2016. (See, e.g., Compl. ¶ 51.) That

26

allegation is plainly insufficient, for two reasons. First, "information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind o[r] his alleged malice at the time of publication." Herbert v. Lando, 781 F.2d 298, 306 (2d Cir. 1986). Therefore, the Gawker settlement is entirely irrelevant to the 10 articles published prior to November 2016. (Compl., Exs. G-P.) Second, and more to the point, a settlement is the compromise of a claim; it does not involve any determination as to the truth or falsity of the statements at issue. An allegation that a different party settled a claim involving different statements does not plausibly raise an inference that the *Defendants* had the subjective state of mind required to render them liable under the actual malice standard.[14]   Accordingly, Plaintiff's libel claim should be dismissed for failure to plead actual malice.

D.     **COUNTS II AND III MUST BE DISMISSED BECAUSE THEY ARE INADEQUATELY PLEADED AND ENTIRELY DERIVATIVE OF PLAINTIFF'S LIBEL CLAIM.**

In Count II, Plaintiff alleges intentional interference with prospective economic advantage (the "IIPEA claim"). In Count III, he alleges intentional infliction of emotional distress (the "IIED claim"). Both claims are meritless. For one, both claims are premised upon the same facts as Plaintiff's libel claims, and a plaintiff cannot perform an end run around the First Amendment simply by "restat[ing] [a] defamation claim under a different heading." Brown, 54 F.3d at 27. As explained above, Defendants' statements were all constitutionally protected opinion and Ayyadurai failed to plead actual malice. Those deficiencies are fatal to his IIPEA and IIED claims. See, e.g., Shay, 702 F.3d at 83 (affirming dismissal of IIED claim where it was based on the same facts as plaintiff's defamation claim, for which fault was insufficiently

---

[14] Nor does Plaintiff's litany of supportive statements at the beginning of his Complaint have any bearing on the actual malice question. (Compl. ¶¶ 18-33.) Such statements, to the extent they are even relevant and accurately conveyed, simply reflect one side of an argument over Plaintiff's place in the history of the development of email communication, and have no bearing on Defendants' subjective state of mind.

2643630v1 20170227 (2635555v1 20170217)

pleaded (citing <u>Hustler Magazine, Inc. v. Falwell</u>, 485 U.S. 46, 56-57 (1988)); <u>Piccone</u>, 785 F.3d

at 774 (dismissing interference with advantageous business relations claim based on same

protected opinions as defamation claim).

      The IIPEA and IIED claims also fail on their own terms. First, to state an IIPEA claim,

Plaintiff must allege that Defendants' statements were made with an "improper motive" as

opposed to simply "reporting on an issue of public concern." <u>Dulgarian v. Stone</u>, 420 Mass. 843,

851-52 (1995). Plaintiff has not made any allegations regarding Defendants' motives, let alone

that they were improper. The Complaint also fails to identify any specific business relationships

or economic opportunities with which the Defendants purportedly interfered. Instead, Plaintiff

makes the wholly conclusory allegation that he "lost contracts and renewals [and] lost

opportunities for investment in his emerging companies" (Compl. ¶ 49), without specifying what

those contracts or opportunities were, who they were with, what basis he has for believing they

would have come to fruition, or what basis he has for believing that the Defendants prevented

them from coming to fruition. <u>See</u> <u>Sherman v. Clear Channel Outdoor, Inc.</u>, 889 F. Supp. 2d 168,

177 (D. Mass. 2012) (dismissing IIPEA claim where plaintiff "failed to allege that a specific

business relationship existed . . . which would support [its] claim" (citing <u>Singh v. BC/BS of</u>

<u>Mass.</u>, Inc., 308 F.3d 25, 47-48 (1st Cir. 2002))).

      Second, to state a viable IIED claim, a plaintiff must allege conduct that is "extreme and

outrageous,  . . . beyond all possible bounds of decency, and . . . utterly intolerable in a civilized

society." <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144-45 (1976) (internal quotation marks

omitted). "The standard for making a claim of intentional infliction of emotional distress is very

high in order to 'avoid [ ] litigation in situations where only bad manners and mere hurt feelings

are involved.'" <u>Doyle v. Hasbro, Inc.</u>, 103 F.3d 186, 195 (1st Cir. 1996) (quoting <u>Agis</u>, 371

Mass. at 145). "[L]iability cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." <u>Foley v. Polaroid Corp.</u>, 400 Mass. 82, 99 (1987) (internal quotation marks omitted) (brackets in original); <u>see also</u> <u>Doyle</u>, 103 F.3d at 189, 195 (affirming dismissal of IIED claim where defendants allegedly made statements to plaintiff such as "I own you" and "I can put you out of business and you won't have a house to live in"). It is insufficient simply to allege "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." <u>Doyle</u>, 103 F.3d at 195 (quoting <u>Foley</u>, 400 Mass. at 99).

Plaintiff's allegations come nowhere near the level needed to establish "extreme and outrageous" conduct. At worst, if one takes his claims at face value, Plaintiff has suffered the indignity of having a blogger call into question the significance of a computer program he wrote nearly 40 years ago. Such conduct is not only "tolerable in a civilized society"—it is at the heart of what the First Amendment protects.

### III. THE CLAIMS AGAINST FLOOR64, INC. SHOULD BE DISMISSED PURSUANT  TO FED. R. CIV. P. 12(B)(5) BECAUSE SERVICE OF THE COMPLAINT WAS IMPROPER.

Ayyadurai's claims against Floor64 should also be dismissed for improper service of process.  Under Fed. R. Civ. P. 4(h)(1)(B), a corporation may be served "by delivering a copy of the summons and of the complaint to an officer" of the company. However,

> service under this part of the rule cannot be made, as it may be made on individuals . . . by leaving a copy of the summons and complaint at the officer's or agent's dwelling house or usual place of abode with a person residing therein . . . . That is the import of the language 'delivering … to' in Rule 4(h)(1)(B).

Wright & Miller, 4A Fed. Prac. & Proc. Civ. § 1101 (4th ed.).

Here, the summons and complaint addressed to Floor64, Inc. were served on Sunnia Lin, Mike Masnick's wife, at their home address. (Ex. C hereto.) Ms. Lin is not an officer of Floor64 nor has she ever been appointed as an agent for purposes of service of process. (Masnick Aff. ¶ 8.) As a result, service of the complaint and summons on her was improper. Tryforos v. Icarian Development Co., S.A., 518 F.2d 1258 (7th Cir. 1975) ("Service on the wife of the president of the corporation does not constitute effective service." (applying former Rule 4(d)(3)).[15]

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety.

FLOOR64, INC. and MICHAEL MASNICK

By their attorneys,

*/s/ Robert A. Bertsche*
Robert A. Bertsche (BBO #554333)
*rbertsche@princelobel.com*
Jeffrey J. Pyle (BBO #647438)
*jpyle@princelobel.com*
Thomas Sutcliffe (BBO #675379)
*tsutcliffe@princelobel.com*
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, Massachusetts 02110
Dated:  February 17, 2017          Tel:  (617) 456-8018

### CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

*/s/ Robert A. Bertsche*
Robert A. Bertsche

---

[15] While Ayyadurai could have satisfied Rule 4 by serving process in accordance with the law of either California or Massachusetts, neither state allows a corporation to be served by leaving the complaint at the defendant's abode. Cal. Civ. Proc. Code § 416.10 (West) (service must be made on ". . . the president, chief executive officer, or other head of the corporation, a vice president, a secretary or assistant secretary, a treasurer or assistant treasurer, a controller or chief financial officer, a general manager, or a person authorized by the corporation to receive service of process"); Mass. Gen. Laws c. 223, § 37 ("service shall be made upon the president, treasurer, clerk, resident agent appointed pursuant to section 49 of chapter 156D, cashier, secretary, agent or other officer in charge of its business, or, if no such officer is found within the county, upon any member of the corporation").