# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON, MASSACHUSETTS

| | |
|---|---|
| SHIVA AYYADURAI, an individual,    ) | |
|    ) | |
|      Plaintiff,    ) | CASE NO. 17-cv-10011-FDS |
|    ) | |
|      v.    ) | ***(Leave to File Granted on 3/13/2017)*** |
|    ) | |
| FLOOR64, INC., a California corporation    ) | |
| d/b/a TECHDIRT; MICHAEL DAVID    ) | |
| MASNICK, an individual; LEIGH    ) | |
| BEADON, an individual; and DOES 1-20,    ) | |
|    ) | |
|    ) | |
|      Defendants.    ) | |
|    ) | |
|    ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS FLOOR64, INC. AND MICHAEL MASNICK'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(5) AND 12(B)(6)

## INTRODUCTION

Plaintiff Dr. Shiva Ayyadurai ("Dr. Ayyadurai" or "Plaintiff") hereby opposes defendants Floor64, Inc. d/b/a Techdirt and Michael David Masnick's (collectively, "Defendants") motion to dismiss.  The Court should deny Defendants' motion in its entirety because:

1. The Defendants' defamatory statements are presented in a factual nature, not opinion, and therefore cannot shield Defendants from liability.

2. Dr. Ayyadurai has alleged the requisite malice.

3. Dr. Ayyadurai has adequately pled claims for intentional interference with prospective economic advantage and intentional infliction of emotional distress.

4. Defendant Floor64, Inc. was properly served with Summons and Complaint in this case.

Defendants contend that the internet now constitutes fair game to repeatedly call someone a liar and a fraud, in a deliberate campaign to destroy that person's reputation through numerous separate articles disseminated to millions of people worldwide.  That is not the law.  Defendants must be held accountable for their malicious, defamatory statements that have severely harmed Dr. Ayyadurai's personal and professional reputation.

Dr. Ayyadurai, as a teenager in 1978, invented the system of email that we use today, with an inbox, outbox, cc and various electronic folders.  His goal at the time was to replicate (electronically) a secretary's desk, which had physical boxes and papers, including inbox, outbox, etc.  He also wanted to make that electronic system so easy to use that anyone could master it, as contrasted with the system of computers and technology at the time (1978), which were highly technical and very difficult for most people to use.  Dr. Ayyadurai went on to receive four degrees from the Massachusetts Institute of Technology (MIT), including a PhD.

Despite this great accomplishment, Defendants have decided to destroy Dr. Ayyadurai's personal and professional reputation.  Now Defendants seek immunity by claiming they were merely expressing an opinion.  However, Defendants' defamatory statements present factual issues that cannot be resolved at this stage of the case.  Has Dr. Ayyadurai lied to and defrauded people in his assertion that he invented email (an assertion that has been backed by numerous PhD's in the technology community and numerous members of the major media, including *TIME* magazine, *Wired* magazine, and CBS)?  Has Dr. Ayyadurai built his entire reputation on the fake claim he invented email?  For his part, Dr. Ayyadurai counters that he invented email, has not lied or defrauded anyone, and has not built his entire reputation on inventing email; consequently, Defendants' statements that Dr. Ayyadurai is a liar and fraud are false on their face.

Defendants' defamatory statements about Dr. Ayyadurai also directly attack his personal and business ethics.  Such a wide-ranging attack on Dr. Ayyadurai's integrity, which goes above and beyond any discussion about email and the severity and scope of Defendants' statements, illustrates their malicious intent in publishing the articles, namely, to destroy Dr. Ayyadurai.

For all of the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.  However, if the Court is inclined to grant Defendants' motion in any respect, it should grant Dr. Ayyadurai leave to amend.

## **BACKGROUND**

Dr. Ayyadurai is a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur.  [Doc. 1 (Complaint) at ¶ 1.]  In 1978, Dr. Ayyadurai invented email: the electronic mail system as we know it today.  *Id.*  While working as a Research Fellow at the University of Medicine and Dentistry of New Jersey, Dr. Ayyadurai created a computer program that was an

electronic version of a paper-based interoffice mail system, which allowed mail to be sent electronically and consisted of the Inbox, Outbox, Drafts, Folders, Memo, Attachments, Carbon Copies, Blind Carbon Copies, Return Receipt, Address Book, Groups, Forward, Compose, Edit, Reply, Delete, Archive, Sort, Bulk Distribution, and the Memo, with the now ubiquitous terms "To:," "From:," "Date:," "Subject:," "Body:," "Cc:," and "Bcc:". *Id.* at ¶ 13. These features are now a familiar part of modern email systems. *Id.*

Dr. Ayyadurai named his computer program "email." [Doc. 1 at ¶ 16.] He was the first person to create this term because he was inventing the "electronic" (or "e") version of the interoffice paper-based "mail" system. *Id.* His naming of "email" also arose out of the limited parameters of the programming language and operating system, which limited program names to all capital letters and a five-characters: thus, his selection of the letters "E" "M" "A" "I" "L." *Id.*

On November 15, 2011, *TIME* magazine published an article titled "The Man Who Invented Email," outlining the backstory of email and Dr. Ayyadurai's invention of it. [Doc. 1 at ¶ 19, Ex. E.] In June 2012, *Wired* magazine reported: "Email … the electronic version of the interoffice, inter-organizational mail system, the email we all experience today, was invented in 1978 by [Dr. Ayyadurai]…The facts are indisputable." [*Id.* at ¶ 20, Ex. F.] In July 2015, CBS reported on *The Henry Ford Innovation Nation*: "Next time your fingers hit the keyboard to write a quick email, you might want to say, thank you to Shiva Ayyadurai….he is credited with inventing email….in the late 1970s." [*Id.* at ¶ 21.] Several other testimonials from prominent experts in the technology industry are set forth in paragraphs 22 through 33 of the Complaint.

Since at least 2014, Defendants have engaged in an ongoing campaign to destroy Dr. Ayyadurai's personal and professional reputation by publishing no less than fourteen (14) false

and highly defamatory articles about him on their website at www.techdirt.com (collectively, the "Defamatory Articles").  [Doc. 1 at ¶ 3.]  The Defamatory Articles falsely state, among other things, that Dr. Ayyadurai is a "fraud," "liar" and a "fake."  Some examples of the egregious false statements of fact about Dr. Ayyadurai, which Defendants knew to be false at the time the Defamatory Articles were printed and published, or had reckless disregard for the truth, include:

- Dr. Ayyadurai is perpetuating a "fake story" with respect to his claims of invention of email.  [September 2, 2014 Article]
- "[Dr.] Ayyadurai has built up his entire reputation around the (entirely false) claim that he 'invented' email."  [September 2, 2014 Article]
- "[The Huffington Post article] is nothing more than a PR campaign for a liar." [September 3, 2014 Article]
- "Instead, the only one whose entire 'identity' is built off a fake claim to have invented email is…Dr. Ayyadurai."  [September 3, 2014 Article]
- "There's no controversy at all.  Ayyadurai is simply making false claims …"  [September 8, 2014 Article]
- Headline: "Fake Inventor of Email."  [September 9, 2014 Article]
- "Ayyadurai, however, has cleverly used misleading (to downright false) claims to make what appears on its face to be a credible story, fooling a number of gullible reporters." [September 9, 2014 Article]
- "… [Dr. Ayyadurai is] a guy who's basically staked his entire life on the misleading to false claim that he 'invented' email."  [March 8, 2016 Article]
- "In 2012, [Dr. Ayyadurai] fooled the Washington Post and, astoundingly, the Smithsonian."  [March 8, 2016 Article]
- "[Dr. Ayyadurai is] blatantly misrepresenting history for his own personal aggrandizing." [November 2, 2016 Article]
- "… Shiva Ayyadurai's claim that he invented email is complete bullshit.  It's not true. Not even remotely."  [November 3, 2016 Article]
- "Ayyadurai is a liar. He is a fraud. He is a charlatan. He is an unimportant nobody who has contributed nothing and deserves to be remembered as a posing, self-aggrandizing asshole -- nothing more."  [November 6, 2016 Article]
- "…Shiva Ayyadurai, a guy who didn't invent email but has built his entire reputation on the false claim that he did…."  [November 7, 2016 Article]
- "Meanwhile, it appears that throughout all of this, Ayyadurai continues to fool people." [November 7, 2016 Article]

A detailed listing of the false and defamatory statements about Dr. Ayyadurai can be found in the Complaint and attached exhibits of the Defamatory Articles.  [Doc. 1 at ¶¶ 34-47,

Exs. G-T.][1]

As a result of Defendants' wrongful actions, anyone who searches Dr. Ayyadurai on the internet will see Defendants' false and libelous stories about him in the first page of search results across the world.  [Doc. 1 at ¶ 50.]  Thus, third parties who would otherwise have hired or partnered with Dr. Ayyadurai likely will decline, and have declined, to do so believing Defendants' false and libelous statements about him to be true.  *Id.*  These statements also resulted in a wave of efforts by others to discredit Dr. Ayyadurai and erase him from the history of electronic communications, attacks on Wikipedia that remove reference to his contributions, and discrediting his other ongoing scientific contributions unrelated to email technology.  *Id.*

Overall, Defendants' publication of the false and defamatory statements about Dr. Ayyadurai has caused him substantial harm, including Dr. Ayyadurai losing contracts and renewals, losing opportunities for investment in his emerging companies, and suffering substantial personal and professional reputational harm.  [Doc. 1 at ¶ 49.]

## <u>ARGUMENT</u>

**1.  Standards on motions to dismiss.**

Plaintiffs pursuing defamation claims need only allege enough to meet the notice

---

[1] Defendants have attempted to categorize the alleged defamatory statements by including an exhibit with their motion that divides various statements into categories invented by Defendants.  [*See* Doc. 13-1.]  Defendants' defamatory statements cannot be so easily segregated because they were all part of Defendants' larger campaign to destroy the personal and professional reputation of Dr. Ayyadurai.  When two or more articles would likely be received and perused by their audience together, the meaning of each statement must be viewed in light of all of the articles.  *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 187 (2d Cir. 2000) (stating that two articles in the same issue of newspaper, both about the plaintiff, should be read together).  That is definitely the case here, especially considering that Defendants have dedicated a page on their website collecting and making available the full text of all of their articles about Dr. Ayyadurai (https://www.techdirt.com/blog/?tag=shiva+ayyadurai).

pleading standard as set forth in Rule 8 of the Federal Rules of Civil Procedure ("FRCP") and not the heightened pleading requirements of FRCP Rule 9. *N. Shore Pharm. Servs., Inc. v. Breslin Assocs. Consulting LLC*, 491 F. Supp. 2d 111, 124 (D. Mass 2007) (citing *Davidson v. Cao*, 211 F. Supp. 2d 264, 276 (D. Mass. 2002)).  On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiff is afforded every "reasonable inference" in its favor, as the Court "must accept as true all well-pleaded facts." *Raytheon Co. v. Continental Cas. Co.*, 123 F. Supp. 2d 22, 26 (D. Mass. 2000).  Dismissal is only appropriate if the complaint "presents no set of facts justifying recovery." *Id.*  The highly deferential standard at this early stage of litigation requires just that Plaintiff set forth factual allegations that are "either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Id.* at 27.

For this reason, the Court should not look to the merits of the case, because "Plaintiff is [only] required to submit 'a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Dantone v. Bhaddi*, 570 F. Supp. 2d 167, 170 (D. Mass. 2008); citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 2.  The defamatory statements are actionable statements of fact.

Defendants' main argument is that the statements complained of are mere opinions.  In truth, however, they are defamatory statements of fact.[2]

---

[2]  "A false statement that 'would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community,' would be considered defamatory." *Phelan v. May Dept. Stores Co.,* 443 Mass. 52, 56 (2004) (quoting from *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849 (1975)); *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-630 (2003) (to prove defamation, plaintiff must demonstrate that (1) defendant made a false statement "of and concerning" plaintiff to third party; (2) the statement could

a. Standards regarding statements of opinion or fact.

Regarding an assertion that an alleged defamatory statement is one of opinion, the relevant question is "not whether challenged language may be described as an opinion, but whether it reasonably **would be understood** to declare **or imply** provable assertions of fact." *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 727 (1st Cir. Mass. 1992) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)) (emphasis added).

The distinction between statements of fact and opinion is not one that invariably can, or needs to be, made at the pleading stage. *See King v. Globe Newspaper Co.*, 400 Mass. 705, 709 (1987) ("Of course, it is much easier to recognize the significance of the distinction between statements of opinion and statements of fact than it is to make the distinction in a particular case."). Unless a statement unambiguously constitutes either fact or opinion, the determination of whether a statement is a factual assertion or pure opinion is a **question of fact**. *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 263 (1993); *Myers v. Boston Magazine, Inc.*, 380 Mass. 336, 339 (1980); *Reilly v. Assoc. Press*, 59 Mass. App. Ct. 764, 774 (2003); *Friedman v. Boston Broadcasters, Inc.*, 402 Mass. 376, 379 (1988). Opinions that imply an assertion of fact are **put before the jury** to determine whether or not the statements are defamatory. *N. Shore Pharm. Servs.*, 491 F. Supp. 2d (holding that statements that the plaintiff was "incompetent" and "not to be trusted" were not statements of opinion); *Myers v. Boson Magazine, Inc.*, 380 Mass. at 339-340 (where "allegedly libelous remarks could have been understood by the average reader in

---

damage plaintiff's reputation in community; (3) defendant was at fault for making the statement; and (4) the statement caused plaintiff economic loss or is actionable without proof of economic loss). Here, Defendants only attack the fault element of Dr. Ayyadurai's defamation claim (addressed below) and assert the defense of opinion.

either sense, the issue must be left to the jury's determination"; citing *Good Gov't Group of Seal Beach, Inc. v. Superior Court*, 22 Cal.3d 672, 682 (1978)).

      b.  <u>Defendants' defamatory statements go well beyond opinion because they attack Dr. Ayyadurai's personal and professional reputation.</u>

The crux of Defendants' argument is that their statements are mere opinion. They are not. First, calling a person a "liar" and a "fraud" is not merely opinion but a factual assertion that the claims made by the person are untrue or fraudulent. Such charges are factually provable.

Second, the numerous statements by Defendants, setting forth facts attacking Dr. Ayyadurai personally, are factual likewise. Defendants' defamatory statements that Dr. Ayyadurai is a "liar" and a "fraud" who has built his "entire reputation" upon "bogus" claims and who has deceived reporters into writing "fake" news stories go well beyond mere opinion.

Dr. Ayyadurai invented email, a claim documented in at least two magazine articles (*TIME* and *Wired*) published long before the Defamatory Articles. [*See* Doc. 1 at ¶ 1.] Whether Dr. Ayyadurai has lied about his actions and deceived reporters into writing those articles is a question of fact. Dr. Ayyadurai obviously asserts that he has not lied or deceived anyone. Defendants claim otherwise.[3] Either Dr. Ayyadurai lied or he did not; that is a factual

---

    [3] In fact, certain acknowledgements by Defendants show that Dr. Ayyadurai has not lied about his contribution to the invention of email. [*See* Doc. 1 at Ex. M ("may have written a wonderful new form of electronic messaging"); Ex. Q ("Again, it was impressive that as a kid he basically independently created an electronic mailing system…."]. Notwithstanding, Defendants call Dr. Ayyadurai a liar and a fraud by primarily asserting that the technology to send electronic messages existed before Dr. Ayyadurai invented email. The problem with Defendants' assertion is that Dr. Ayyadurai does not claim to be the inventor of electronic messaging. Rather, Dr. Ayyadurai was the first person to create a system of integrated computer programs that comprised an electronic version of the paper-based interoffice mail system (inbox, outbox, folders, attachments, etc.), the first to call it "email," and the first to obtain U.S. Copyrights for

determination, not a matter of opinion.

Additionally, Dr. Ayyadurai has not built his entire reputation on the "fake" claim of inventing email.  Dr. Ayyadurai holds four degrees from MIT: a B.S. in Electrical Engineering and Computer Science, an M.S. in Visual Studies, an M.S. in Mechanical Engineering, and a Ph.D. in Biological Engineering.  [Doc. 1 at ¶ 2.]  Dr. Ayyadurai has been recognized internationally for his developments in early social media portals, email management technologies, and contributions to medicine and biology.  *Id.*  He has been a speaker at numerous international forums, where he has discussed email, science, medicine and technology, among other topics.  *Id.*  Dr. Ayyadurai also operates his own research and education center: the International Center for Integrative Systems in Cambridge, Massachusetts, and also serves as Chairman & CEO of CytoSolve, Inc.  *Id.*

Obviously, Dr. Ayyadurai has a well-respected personal and professional reputation exclusive of his invention of email.  Attacking Dr. Ayyadurai's personal and professional reputation is not opinion, it is defamation *per se*.  It is also a provable assertion of fact whether Dr. Ayyadurai has built his "entire reputation" upon his claim to have invented email.

Overall, whether Dr. Ayyadurai is a liar, a fake, and a fraud, as Defendants have called him over the course of 14 articles read by millions of people, is a question of fact.  Recently, Judge Mastroianni opined that a statement saying a plaintiff had lied is a factual assertion: "But that *is* an objective fact capable of being proved true or false, which can be viewed as defamation under Supreme Court rationale."  *McKee v. Cosby*, 2017 WL 652452, at *8, n. 13 (D. Mass. Feb.

---

email.  On this basis, Dr. Ayyadurai claims to be the inventor of email: the electronic mail system as the world knows it today.

16, 2017) (emphasis in original) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. … Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'")).[4]

Defendants' defamatory statements do not simply state that Dr. Ayyadurai's claim to having invented email may be wrong.  Defendants' statements imply knowledge of facts that Dr. Ayyadurai has spoken an untruth.  Defendants go the next step and attack Dr. Ayyadurai's personal and professional reputation.  Whether Dr. Ayyadurai is a liar, who based his entire reputation on the false claim of inventing email, is an objective fact capable of being proved true or false.  Therefore, a Rule 12(b)(6) motion is inappropriate for resolving this claim.

The article cited by Defendants and included with their motion highlights the difference between attacking Dr. Ayyadurai's email invention claim compared to attacking Dr. Ayyadurai's personal and professional reputation.  As Exhibit B to their motion (Doc. 13-2), Defendants attach the article entitled "Did V.A. Shiva Ayyadurai Invent Email?" written by Thomas Haigh (SIGCIS) (Aug. 4, 2015), available at http://www.sigcis.org/ayyadurai (Defendants refer to the article for the statement therein stating: "A computer program is not invented; it is 'written' or 'developed.'").  Mr. Haigh's article analyzes Dr. Ayyadurai's email invention claim and reaches a contrary conclusion.  But, while disagreeing with Dr. Ayyadurai, Mr. Haigh's article does not

---

[4] Defendants cite a list of opinions from other circuits finding that calling someone a liar, or similar attacks, can be non-actionable opinions.  However, this Court does not need to even look at other circuits when *McKee* has clearly stated that such an attack is an objective fact capable of being proved true or false.

attack Dr. Ayyadurai's personal and professional reputation or ethics.  Mr. Haigh does not call Dr.

Ayyadurai a liar or a fraud, does not proclaim that Dr. Ayyadurai built his entire reputation on the

claim of email invention, and does not claim that Dr. Ayyadurai lied to, defrauded, or improperly

misled anyone.  In this respect, Defendants' statements and campaign to destroy Dr. Ayyadurai's

reputation are from the antithesis of Mr. Haigh's article.

Lastly, Defendants never used any cautionary terms to lead readers to believe that their

statements were opinion.  Cautionary terms that suggest opinion rather than fact may be given

weight.  *Lyons*, 415 Mass. at 263 (finding statement nondefamatory where it was couched as

"suspicion").  Here, Defendants never couched their statements as opinion.  Defendants used the

word "opinion" is once, in 14 articles, only when referencing statements made **by Gawker**

**Media** and Dr. Ayyadurai's subsequent lawsuit against Gawker Media.  [See Doc. 1 at Ex. O.]

Nowhere else do Defendants' statements refer to them as being "opinion."  Likewise, Defendants

only once use a phrase stating that they think or believe something in reference to Dr. Ayyudurai:

"Anyway, I'd like to think this story is now over, but somehow I get the feeling that Ayyadurai

will continue to press his bogus claims again and again and again."  Even that statement does not

tell the reader that Defendants' underlying statements are opinions, only a hope that their

statements have had the effect of silencing Dr. Ayyadurai.  [Doc. 1 at Ex. L.]

Thus, the average reader would believe Defendants are stating facts, not opinion.  At the

very least, the issue poses a triable question of fact for the jury to determine.

    c. <u>Defendants' defamatory statements fail to disclose all facts, requiring the trier</u>
<u>of fact to determine underlying, unstated facts.</u>

Defendants' attempt to support their opinion argument by asserting that the Defamatory

Articles disclose all of the facts upon which they base their opinions.  Again, the Court should reject Defendants' hollow assertion.

The "First Amendment does not inoculate all opinions against the ravages of defamation suits.  A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable." *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir.1997); *see also Milkovich*, 497 U.S. at 19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

For example, in *McBirney v. Paine Furniture Co.*, No. 960031, 11 Mass. L. Rptr. 123, 1999 WL 1411359 (Mass. Super. Dec. 10, 1999), the plaintiff's former employer told third parties at a trade show that plaintiff was "burnt out," "defeated," and "no longer had the capacity to work at Paine."  The court ruled that under the circumstances the statements were "not merely expression of opinion but rather evaluative pronouncements." *Id.* at *9.  The court stated that "[i]t was reasonable for a jury to conclude that those members of the furniture industry to whom Shearer published his remarks understood those statements to mean that he had observed conduct of McBirney that justified the critical depiction of him." *Id.*

In *Pavement Restoration Eng'g, Inc. v. Patterson Indus. Ltd.*, No. 041632, 2007 WL 4633321, at *4 (Mass. Super. Dec. 3, 2007), the court held that email statements criticizing the plaintiff's business ethics ("We are not comfortable with his credibility and choose not to deal directly with him for business….") implied that there were defamatory facts on which the statements were based. *See also Orlando v. Cole*, 76 Mass. App. Ct. 1112, 921 N.E.2d 566

(unpublished) (2010) (finding that statements that a lawyer's conduct was "deceitful" and "fraudulent" were sufficiently defamatory to survive a motion to dismiss, as the statements were not opinion and appeared to be based on undisclosed defamatory facts).

Here, despite Defendants' assertion to the contrary, their Defamatory Articles and campaign to destroy Dr. Ayyadurai's reputation do not disclose all facts. For example, Defendants repeatedly make statements that "[Dr.] Ayyadurai has built up his entire reputation around the (entirely false) claim that he 'invented' email." [September 2, 2014 Article.] However, Defendants do not state the facts upon which they rely to make this statement. Defendants failed to note that Dr. Ayyadurai has achieved a sterling reputation, which has nothing to do with his invention of email. [*See* Doc. 1 at ¶ 2 (stating, inter alia, Dr. Ayyadurai has also been recognized internationally for his contributions to medicine and biology).]

At best, Defendants' defamatory statements are not "pure" opinion. Therefore, dismissal is not warranted. *See Levinsky's*, 127 F.3d at 127 (stating that it is well established that "only 'pure' expressions of opinion, meaning those that do not imply the existence of undisclosed facts, are barred from supporting a defamation claim").

d.   Defendants' defamatory statements are not protected hyperbole.

Finally, Defendants attempt to support their opinion argument by asserting that the Defamatory Articles are merely hyperbole. However, Defendants' argument is undercut by Defendants' portrayal of themselves as serious contributors to technology industry news.

Defendants' website is far from a place for hyperbole. Rather, Defendants tout themselves as serious contributors to the news of the technology industry. Defendants' "About Us" page states:

> [T]he Techdirt blog uses a proven economic framework to analyze and offer insight into news stories about changes in government policy, technology and legal issues that affect companies' ability to innovate and grow. … Floor64 has been generating insights and developing insight platforms for over 10 years -- and doing so in unique and innovative ways designed to help drive businesses forward, rather than keeping them tied to the past.

[https://www.techdirt.com/about.php.][5]

While the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts (*see, e.g.*, *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974) (holding use of the word "traitor" to define a worker who crossed a picket line was not actionable); *Greenbelt Co-op. Publishing Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (holding the characterization of a developer's negotiating position as "blackmail" did not suggest commission of a crime), such a determination must be made through a reasonable person's eyes:

> The First Amendment does not allow courts to distort the reality of events under the guise of protecting freedom of expression.  Thus, a reviewing court must evaluate a speaker's statement as it was given and must resist the temptation to replace what was actually said with some more innocuous alternative.  The determination of whether a statement is hyperbole depends primarily upon whether a reasonable person could interpret the statement to provide actual facts about the individual or institution it describes.

*Levinsky's*, 127 F.3d at 131 (holding that statement: "you are sometimes put on hold for 20 minutes—or the phone is never picked up at all" was not hyperbole); *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (stating that to determine whether or not a statement is opinion or

---

[5] Defendants' motion attempts to characterize the Defamatory Articles as mere humorous blogs written in response to a heated debate.  However, Defendants are not some random chat room commenter.  Rather, Defendants were the ones to start any "debate" under the guise of being experts, and Defendants were the ones to make any debate "heated" by going beyond the discussion of the invention of email to more expansively defame Dr. Ayyadurai's reputation.

hyperbole, "a court must examine the statement in its totality and in the context in which it was uttered or published.  The court must [also] consider the words used ... [and] all of the circumstances surrounding the statement").

Accordingly, any reasonable reader would view Defendants' Defamatory Articles as statements of facts about issues in technology.  Further, Defendants' website and articles discuss current topics in the technology industry, and Defendants' Defamatory Articles impugn Dr. Ayyadurai's business reputation.  "Statements about a person's vocational reputation … are particularly likely to be defamatory."  *Dellorusso v. Montiero*, 47 Mass. App. Ct. 475, 478 (1999) (finding defamatory meaning in statement that plaintiff's "work habits … are inconsistent with School Department standards").  Therefore, no reasonable reader would view the defamatory statements as hyperbole.

### e.   The authorities cited by Defendants are easily distinguishable.

In *Feld v. Conway*, 16 F. Supp. 3d 1 (D. Mass. 2014), relied upon by Defendants, the District Court had no problem dismissing a defamation claim based defendant single tweet on Twitter, finding: "[t]he phrase 'Mara Feld ... is fucking crazy,' when viewed in that context, cannot reasonably be understood to state actual facts about plaintiff's mental state."  *Id.* at 4.

Wholly unlike *Feld*, Defendants published 14 false and highly defamatory articles about Dr. Ayyadurai over the course of many years under their "insight"-ful technology website.  Further, Defendants went well beyond calling Dr. Ayyadurai "crazy"; they definitively stated that Dr. Ayyadurai is a liar who based his entire reputation on fake and bogus claims and the deception of others to support him.  No readers of the Defamatory Articles would understand Defendants' statements like the quip in *Feld v. Conway*.  They would more likely see the articles

are recitals of facts about Dr. Ayyadurai.

Defendants also rely on *Freeman v. Town of Hudson*, 849 F. Supp. 2d 138 (D. Mass. 2012), *aff'd*, 714 F.3d 29 (1st Cir. 2013) in a shallow attempt to say that the District Court has dismissed claims based on the statement that the plaintiff was a "liar." However, that case dealt with one instance in which a defendant "called Mr. Freeman a 'liar' and stated: 'If I was a farmer, I would not put the fox in charge of the henhouse because all the hens will disappear.'" *Id.* at 161. The Court found that the plaintiff's defamation allegations were conclusory and not reasonably susceptible to defamatory meaning. *Id.* That is definitely not the case here, where Defendants engaged in a protracted and deliberate campaign to attack Dr. Ayyadurai's reputation with repeated statements and articles stating Dr. Ayyadurai is a liar and fraud.

Finally, *Phantom Touring, Inc. v. Affiliated Publications* involved two productions of "Phantom of the Opera" that defendant called one of those productions "fake" and "phony." The First Circuit held that the adjectives reflected subjective aesthetic judgments protected as opinion. *Phantom Touring*, 953 F.2d at 728. Here, Defendants called Dr. Ayyadurai a fake and throughout numerous articles proclaimed that he lied and deceived people in support of his claim to having invented email and upon which he built his entire reputation. These are not mere subjective aesthetic judgments; they are actionable statements of fact about Dr. Ayyadurai and his (alleged) dishonest character.[6]

---

[6] Defendants also cite *Greenspan v. Random House, Inc.*, 859 F. Supp. 2d 206 (D. Mass. 2012), *aff'd sub nom. Greenspan v. Ramdom House, Inc.*, No. 12-1594, 2012 WL 5188792 (1st Cir. Oct. 16, 2012) for the proposition that dismissal is proper when a publisher made statements belittling a plaintiff's contribution to the creation of Facebook. However, *Greenspan* is completely inappliacable because the District Court was analyzing whether the omission of the plaintiff's contributions to Facebook had a defamatory meaning: "Essentially Greenspan

f.   Dismissing the Complaint before factual discovery is inappropriate.

At minimum, Dr. Ayyadurai should be afforded the opportunity to develop the record

through discovery so that this Court may assess the totality of circumstances to make an

appropriate determination under the applicable standard.  *See Phantom Touring*, 953 F.2d at 727.

Because, as discussed at length above, the statements made are "capable of being read in

a defamatory way," dismissal is inappropriate at this earliest stage.  *Pan Am Sys. v. Atl. Northeast*

*Rails & Ports, Inc.*, 804 F.3d 59, 72 (1st Cir. 2015); *see S. Middlesex Opportunity Council, Inc. v.*

*Town of Framingham*, No. CIVA 07-12018-DPW, 2008 WL 4595369, at *22 (D. Mass. Sept. 30,

2008) ("The Defendants in question may have intended these statements to be mere opinion or

hyperbole, but the test is 'an objective test-i.e., inquiry into a reasonable recipient's

understanding of the words rather than the speaker's intent.'") (*citing Phelan*, 443 Mass. at 57

[quoting *New England Tractor-Trailer v. Globe Newspaper Co.*, 395 Mass. 471, 479-80 (1985)]).

### 3.   Dr. Ayyadurai has alleged the requisite malice.

a.   Standards on malice.

Actual malice may be proven by inference, because it is unlikely that Defendants will

admit to their willful or reckless behavior.  *See Bose Corp. v. Consumers Union*, 692 F.2d 189,

196 (1st Cir. 1982) , *aff'd*, 466 U.S. 485 (1984).  Where a defendant's state of mind is at issue,

for example, where actual malice must be shown, pre-trial discovery **must be permitted** to

---

contends that the harm resulting from the omissions was that he was robbed of his proper
recognition for his role in the origins of Facebook; that is not a claim of defamation."  *Id.* at 223.
Here, there is no dispute that Defendants have done much more than merely belittle Dr.
Ayyadurai's contribution to the invention of email.  Defendants attack Dr. Ayyadurai's personal
and professional reputation with affirmative statements that he is a liar and a fraud.  Defendants'
statements are undoubtedly defamatory.

determine the defendant's state of mind at the time the defamatory statements were made. *Nat'l Ass'n of Gov't Emps. v. Cent. Broad. Corp.*, 379 Mass. 220, 232-233 (1979).[7]

      b.  <u>The statements in the articles evidence Defendants' malicious intent.</u>

As Defendants acknowledge in their Motion, the Defamatory Articles do not dispute any of Dr. Ayyadurai's assertions concerning what he did while a fellow at UMDNJ and state that he was an "apparently very bright 14-year-old" who "may have written a wonderful new form of electronic messaging" and "should be quite proud of what he's done." [Doc. 13 at pp. 5-6 (citing Compl., Ex. G at 2, 6, Ex. H at 2, Ex. O at 2; see also Ex. M at 4 ("Ayyadurai . . . was a bright kid who did some impressive programming as a teenager."); Ex. Q at 2 ("Again, it was impressive that as a kid he basically independently created an electronic mailing system….")]

Further, Defendants acknowledge that a number of prominent and reliable sources have supported Dr. Ayyadurai's claim to have invented email. [*See, e.g.,* Doc. 13 at pp. 4-5 (referencing prior *TIME* and *WIRED* magazine articles and academic articles defending Dr. Ayyadurai's claims).] For Defendants to then call Dr. Ayyadurai a fraud and a liar shows an intent to defame Dr. Ayyadurai's reputation. Defendants went even further and stated that Dr. Ayyadurai built his "entire reputation" on perpetrating the supposed "fraud" of having invented email. Again, Defendants have not engaged in an objective debate about who invented email; rather, Defendants repeatedly attacked Dr. Ayyadurai's reputation. This evidences Defendants' knowledge, or at least reckless disregard, that their statements were false.

Defendants' failure to speak to Dr. Ayyadurai or the authors of the various articles

---

[7] Assuming arguendo that Dr. Ayyadurai is required to plead or prove actual malice, his allegations adequately show Defendants' malice to overcome the higher standard.

supporting his claims further evidences Defendants' malice.  "[T]he purposeful failure to investigate known witnesses may be proof of actual malice."  *Murphy v. Boston Herald, Inc.*, 449 Mass. 42, 60 (2007); *see also Lyons*, 390 Mass. at 57–58 ("A major basis for inferring actual malice involves examination of the sources used by the reporter … Whether [defendant's] reliance on these sources was proper in the context of this case presents a material issue of fact which should be determined by the trier of fact").

Here, Defendants published lengthy articles attacking Dr. Ayyadurai and the Huffington Post for publishing a number of articles supporting Dr. Ayyadurai.  [Doc. 1-8 at Exs. G and H.]  However, conveniently absent from Defendants' article is any mention of trying to consult any of the individuals they attack.  This further evidences Defendants' constitutional malice.[8]

Lastly, as detailed below, the Court should allow Dr. Ayyadurai to conduct discovery and not dismiss this case, if it thinks Defendants' malice is not sufficiently pled, because Defendants' intent and knowledge can only be ascertained through discovery.

**4.  Dr. Ayyadurai has adequately alleged the other claims, which are separate and distinct from the defamation claims.**

a.  <u>Dismissal of the defamation claim does not automatically doom the others.</u>

There is no *per se* bar to prosecuting claims for defamation, intentional interference with

---

[8]  Defendants attempt to minimize the impact of Dr. Ayyadurai's settlement of similar claims against Gawker Media.  But Defendants fail to mention that Dr. Ayyadurai sued Gawker Media over three defamatory articles calling him a "fraud," that case resolved when Gawker Media permanently removed all three articles, and Gawker Media paid him $750,000 in damages. Therein, Defendants' insistence on publishing addition articles and further defaming Dr. Ayyadurai after his settlement with Gawker Media does show Defendants' intent from the start – proceed with a campaign to tarnish Dr. Ayyadurai's personal and professional reputation despite all evidence to the contrary.  Such a campaign at least amounts to a reckless disregard for the truth, and probably worse.

prospective business advantage, and intentional infliction of emotional distress based on the same statements; Defendants' contrary assertion is unsubstantiated.  Defendants' reliance on *Brown v. Hearst Corp.*, 54 F.3d 21 (1st Cir. 1995), for the proposition that the other claims must be dismissed as duplicative of the defamation claim, is unpersuasive.  There, the court simply stated that the plaintiff could not state a claim for intentional infliction of emotional distress after it found the defendant was not negligent in reporting a news story.  *Id.* at 27.  Further, that ruling was on a motion for summary judgment, not a motion to dismiss.

Defendants' reliance on *Shay v. Walters*, 702 F.3d 76 (1st Cir. 2012) is of even less help to Defendants.  That case involved a claim for negligent infliction of emotional distress where the court found that the defendant had not acted negligently.  *See id.* at 83.  Similarly, Defendants' reliance on *Piccone v. Bartels*, 785 F.3d 766 (1st Cir. 2015) is also unhelpful because the plaintiffs did not challenge the district court's conclusion that their interference with advantageous business relations claim could not proceed in the absence of a viable defamation claim.  *Id.* at 774.  Dr. Ayyadurai makes no such concession.

Here, the claims for intentional interference with business advantage and intentional infliction of emotional distress stand alone from the defamation claim.  For example, even if the Court were to accept Defendants' opinion defense, Defendants would not be automatically shielded from liability based on their campaign to destroy Dr. Ayyadurai's reputation.

> b. The Complaint adequately pleads intentional interference with prospective
>    economic advantage.

Defendants argue that Dr. Ayyadurai has not adequately pled Defendants' "improper motive" or Dr. Ayyadurai's specific business relationships.  Defendants are wrong.

As an initial matter, a plaintiff may satisfy the pleading requirement on an intentional interference claim by showing an improper motive **or** improper conduct; malice or ill will is not required. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 814-816 (1990) (we adopt the word "improperly" in place of the word "maliciously"). Here, Dr. Ayyadurai has alleged both.

Defendants engaged in an ongoing campaign to damage Dr. Ayyadurai's personal and professional reputation over the course of years by publishing false and defamatory articles about Dr. Ayyadurai. [*See* Doc. 1 at ¶ 3.] This was not an isolated incident. Further, Defendants knew that Dr. Ayyadurai, being a scientist, inventor, business owner, and entrepreneur, had business relationships that would certainly be interfered with if Defendants attacked the core ethics and reputation of Dr. Ayyadurai (which they did). [*See* Doc. 1 at ¶¶ 63, 64.] Accordingly, Defendants' motive and conduct was improper.[9]

Additionally, Dr. Ayyadurai has adequately alleged that he lost prospective business. As a direct result of Defendants' conduct, Dr. Ayyadurai lost contracts and renewals, lost opportunities for investment in his emerging companies, suffered substantial personal and professional reputational harm and suffered substantial harm to his career, business and income. [Doc. 1 at ¶ 49.] These allegations adequately put Defendants on notice and suffice to maintain a claim for intentional interference.[10]

---

[9] Defendants' reliance on *Dulgarian v. Stone*, 420 Mass. 843 (1995) is misplaced. There, on a motion for summary judgment, the plaintiff could not show that any of the defendants' statements were false. *Id.* at 852. Accordingly, the court had no problem finding that the plaintiff had not alleged any improper motive or means.

[10] Defendants' reliance on *Sherman v. Clear Channel Outdoor, Inc.*, 889 F. Supp. 2d 168 (D. Mass. 2012) is also unhelpful. The District Court found that the plaintiff did not allege that a specific business relationship existed because the interference only "severely compromise[d]" a proposal that may or may not have been accepted anyway. *Id.* at 177. Here, Dr. Ayyadurai has

### c.   The Complaint adequately pleads intentional infliction of emotional distress.

Defendants argue that Dr. Ayyadurai has not adequately pled conduct that is "extreme and outrageous" to justify a claim for intentional infliction of emotional distress.  Once again, Defendants are wrong.

In determining whether conduct is extreme and outrageous, Defendants' own cited case states, "[b]ecause reasonable men could differ on these issues, we believe that 'it is for the jury, subject to the control of the court,' to determine whether there should be liability in this case." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145-146 (1976) (citing Restatement (Second) of Torts s 46, comment h (1965)).

The District Court previously rejected a caseholding that statements that the plaintiff was "incompetent" and "not to be trusted" were not statements of opinion and that the issue of whether conduct was extreme and outrageous was for the jury to decide: "A reasonable jury also could conclude that the Omnicare Parties' actions were extreme and outrageous.  For example, the jury may determine, after viewing all of the circumstances, that the Omnicare Parties engaged in a pattern of conduct amounting to a concerted effort to drive Mr. Breslin out of business."  *N. Shore Pharmacy Servs.*, 491 F. Supp. 2d at 133.

The same is true here.  A reasonable jury could conclude that Defendants' prolonged campaign to defame and discredit Dr. Ayyadurai through numerous defamatory articles amounted to extreme and outrageous conduct.  Dismissal of this claim is unwarranted.

---

alleged business relationships that would have existed but for Defendants' actions.

## IN THE ALTERNATIVE, DR. AYYADURAI SHOULD BE GIVEN LEAVE TO AMEND

### 1.  Standards.

"The court should freely give leave [to amend] when justice so requires."  Fed.R.Civ.P.

15(a)(2).  This phrase is interpreted as an affirmation of the liberal approach to pleading taken by

the modern rules (*see, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962)) and as an encouragement

to judges to decide a plaintiff's claims on the merits whenever possible.  *See Conley v. Gibson*,

355 U.S. 41, 48 (1957).  "[T]he liberal amendment policy of Rule 15(a) is a mandate to be

heeded."  *Espinosa v. Sisters of Providence Health Sys.*, 227 F.R.D. 24 (D. Mass. 2005).  "Rule

15(a) requires that leave to amend be given freely in the absence of any apparent or declared

reason such as undue delay, bad faith or dilatory motive, or undue prejudice to the opposing

party."  *Chiara v. Dizoglio*, 59 F.Supp.2d 193, 198 (D. Mass. 1999).

### 2.  Leave to amend is appropriate here if necessary.

If this Court believes that Dr. Ayyadurai has not adequately pled any of his claims, it

should grant him leave to amend.  Further, if this Court finds that Dr. Ayyadurai has not

sufficiently alleged actual malice, dismissal is still inappropriate since that issue can only be

properly addressed after the parties are able to conduct discovery.

## DEFENDANT FLOOR64, INC. WAS PROPERLY SERVED

Defendants assert that Defendant Floor64, Inc. was not properly served.  Defendants'

position ignores Dr. Ayyadurai's compliance with California substitute service requirements.

A corporation may be served in any judicial district of the United States by "following

state law for serving summons in an action brought in courts of general jurisdiction in the state

where the district is located or where service is made."  Fed.R.Civ.P. 4(e)(1) and 4(h)(1)(A).

Pursuant to California law, a corporation may be served by serving its designated agent via substitute service by: (1) leaving a copy of the summons and complaint during usual office hours in the office of the person designated as agent for service of process, or if no physical address is known, at the agent's usual mailing address, with a person "who is apparently in charge thereof"; and (2) mailing a copy of the summons and complaint to the person to be served at the place where the copy of the summons and complaint were left.  Cal. Code Civ. Proc. § 415.20(a).

Dr. Ayyadurai has complied with these procedures.  The California Secretary of State records reflect that Defendant Masnick is designated as the agent for service of process for Defendant Floor64, Inc., and the address designated for service is 102 Wycombe Ave., San Carlos, CA 94070 (the "Designated Address").  Frackman Decl., Ex. 1.  Dr. Ayyadurai's process server attempted to serve Mr. Masnick, as registered agent for Defendant Floor64, Inc. at the Designated Address, which was also apparently the residence of Mr. Masnick and his wife, Sunnia Lin.  As reflected by the previously filed Affidavit of Service of Summons and the Affidavit of Mailing (which was omitted from Defendants' filing), the process server personally served Sunnia Lin with a copy of the Summons and Complaint at the Designated Address and subsequently mailed a copy to the same address.  [Doc. 8-1 and 8-2.]

There can be no dispute that Sunnia Lin, Mr. Masnick's wife [Doc. 16, Masnick Decl., ¶ 8], was "apparently in charge" of the Designated Address, their household, at least while Mr. Masnick was not present. "The California 'person apparently in charge' standard is lower than the federal 'managing or general agent' standard in Fed.R.Civ.P. 4(h)." *Zond, LLC v. Fujitsu Semiconductor Ltd.,* 53 F. Supp. 3d 394, 399 (D. Mass. 2014).  Under California law, the requirement is satisfied when the "relationship with the person to be served makes it more likely

than not that they will deliver process to the named party." *Bein v. Brechtel-Jochim Grp., Inc.* (1992) 6 Cal.App.4th 1387, 1393 (gate guard found to be apparently in charge for purposes of substitute serving resident and business within gated community); *see also, Khourie, Crew & Jaeger v. Sabek, Inc.* (1990) 220 Cal.App.3d 1009, 1013 (only person who responded to process server's attempt to enter premises held to be "apparently in charge"). "Moreover, for substitute service 'it does not matter whether the person who received the papers was authorized to accept service of process." *Zond*, 53 F.Supp.3d at 399-400 (quoting *Falco v. Nissan N. Am. Inc.*, 987 F. Supp. 2d 1071, 1079 (C.D. Cal. 2013)).

Accordingly, Dr. Ayyadurai properly served Defendant Floor64, Inc. via substitute service on Sunnia Lin at the address designated for service for Floor64's registered agent and thereafter mailing a copy of these papers to the same address.[11]

## CONCLUSION

For the foregoing reasons, the Court should deny this motion in its entirety. If the Court is inclined to grant the motion in any respect, it should grant Dr. Ayyadurai leave to amend.

---

[11] Defendant Floor64, Inc. may continue to contest the validity of service by arguing that the Designated Address was a residence rather than an office for its registered agent. This argument fails for several reasons. First, a business entity may be served via substitute service at a residence. *See, Bein,* 6 Cal.App.4th at 1393-1394 (business entity and individual properly served via substitute service at individual's residence). Second, the Designated Address also serves as an office for Mr. Masnick, and he is there far more often than his office at Defendant Floor64, Inc.'s physical location. A prior blog post by Mr. Masnick details the set up for his office at the Designated Address and further states: "[T]his is my home office setup. We do have a real 'office,' but by tradition most of us don't commute in to work that often. I'm usually there once (maybe twice) a week…." Frackman Decl., Ex. 2. Third, the substitute service rule also permits a plaintiff to leave papers at a registered agent's mailing address with the person who is apparently in charge thereof. Cal. Code Civ. Proc. § 415.20(a). As the Designated Address is unquestionably a mailing address for Mr. Masnick, there can be no dispute that Defendant Floor64, Inc. was validly served via substitute service.

Dated:  March 17, 2017

Respectfully submitted,

**CORNELL DOLAN, P.C.**

By:  _/s/ Timothy Cornell_____
Timothy Cornell
BBO # 654412
One International Place, Suite 1400
Boston, Massachusetts 02110
Tel: (617) 535-7763
Fax: (617) 535-7721
tcornell@cornelldolan.com


**HARDER MIRELL & ABRAMS LLP**


By:  ___/s/ Charles J. Harder_____
Charles J. Harder
(Admitted *Pro Hac Vice*)
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Tel: (424) 203-1600
Fax: (424) 203-1601
charder@hmafirm.com

*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first class mail to any non-registered participants.

_____/s/ Charles Harder_____
Charles J. Harder