# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON, MASSACHUSETTS

| | | |
|---|---|---|
| SHIVA AYYADURAI, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 17-cv-10011-FDS |
| | ) | |
| v. | ) | *(Leave to File Granted on 3/13/2017)* |
| | ) | |
| FLOOR64, INC., a California corporation | ) | |
| d/b/a TECHDIRT; MICHAEL DAVID | ) | |
| MASNICK, an individual; LEIGH | ) | |
| BEADON, an individual; and DOES 1-20, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS FLOOR64, INC. AND MICHAEL MASNICK'S SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO THE CALIFORNIA ANTI-SLAPP STATUTE

{00078448;6}

## **INTRODUCTION**

Plaintiff Dr. Shiva Ayyadurai ("Dr. Ayyadurai") hereby opposes Defendants Floor64, Inc. d/b/a Techdirt and Michael David Masnick's (collectively, "Defendants") special motion to strike the Complaint pursuant to California's anti-SLAPP statute, Cal. Civ. Proc. Code, § 425.16.  The Court should deny Defendants' motion in its entirety because:

1. Defendants concede that Massachusetts' anti-SLAPP statute does not apply.

2. California's anti-SLAPP statute is equally inapplicable.

3. Even if California's anti-SLAPP statute does apply, the specific speech at issue in the Complaint, which involves Defendants' attacks on Dr. Ayyadurai's integrity and reputation, does not involve a matter of public interest, regardless of whether Dr. Ayyadurai's invention of email is a matter of public interest.

4. Even if California's anti-SLAPP statute does apply, Dr. Ayyadurai has established "minimal merit" for his claims.

Defendants are asking the Court to ignore Massachusetts choice-of-law principles to apply California law to this case.  In doing so, Defendants seek to abuse California's anti-SLAPP statute.  "The [California] legislature and the courts have found that the [California] anti-SLAPP statute has as much potential for abuse as the frivolous SLAPP suits it was enacted to summarily resolve."  *Martin v. Inland Empire Utilities Agency*, 198 Cal.App.4th 611, 621–22 (2011) ("The Legislature finds and declares that there has been a **disturbing abuse** of Section 425.16, the California anti-SLAPP statute, which has **undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances**, contrary to the purpose and intent of Section 425.16.") (emphasis added); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 96 (dis.

opn. of Brown, J.) ("The **cure has become the disease**—SLAPP motions are now just the **latest form of abusive litigation**.") (emphasis added).

One of the ways the California anti-SLAPP statute has been abused by defendants is through the right to an automatic interlocutory appeal. Cal. Civ. Proc. Code § 425.16(i). This allows a defendant to file a meritless anti-SLAPP motion, immediately appeal the denial of the motion, and thereby stay the case in the trial court for an extended period of time, often up to two years. Meanwhile, the plaintiff's evidence grows stale during the lengthy stay, and the plaintiff is forced to incur substantial fees to oppose the meritless appeal, following the meritless motion. Thus, if this Court applies the California anti-SLAPP statute, Defendants likely would attempt to immediately appeal the ruling, for the purposes of delaying the action and driving up Dr. Ayyadurai's legal fees and costs.

The Court should therefore reject Defendants' effort to apply the California anti-SLAPP statute to this case. Dr. Ayyadurai is a long-standing Massachusetts resident who has been harmed in Massachusetts by Defendants' intentionally defamatory attacks over the internet. Accordingly, this Court should only apply the laws and procedures of Massachusetts (and applicable federal laws and procedures).

Even if this Court were to find that California's anti-SLAPP statute applies to this case, which it should not, Dr. Ayyadurai has established the necessary *prima facie* case to survive scrutiny under that statute. As shown herein, and in opposition to Defendants' motion to dismiss,[1] Defendants engaged in an intentional campaign to destroy Dr. Ayyadurai's reputation.

---

[1] Defendants concurrently filed a motion to dismiss along with this special motion to strike. Due to the overlapping legal issues in both motions, Dr. Ayyadurai respectfully incorporates his opposition to Defendants' motion to dismiss into this opposition.

Defendants published at least 14 separate articles, disseminated to millions of people worldwide, falsely labeling Dr. Ayyadurai a liar and a fraud for legitimately claiming to be the inventor of email. Defendants' wide-ranging attack on Dr. Ayyadurai's integrity and reputation, going well beyond any reasonable discussion on the invention of email, and the severity and scope of Defendants' statements, illustrate their malicious intent in publishing the articles.

Finally, even if an anti-SLAPP motion under California law could properly be brought in this case (which it cannot), Dr. Ayyadurai is not required to definitively prove that he invented email. Although he can ultimately do so, Dr. Ayyadurai is only required to refute the false statement that he is a "fraud" or "liar" by truthfully setting forth (as he has done) his contributions to the system of email that we use today.

## STATEMENT OF FACTS

### 1. Dr. Ayyadurai is a domiciliary of Massachusetts and has been since 1981.

Dr. Ayyadurai has resided in Massachusetts continuously since he moved here in September 1981 to attend the Massachusetts Institute of Technology ("MIT"). Ayyadurai Decl., ¶ 2. Dr. Ayyadurai obtained the following degrees from MIT: (a) B.S. in Electrical Engineering and Computer Science, 1986; (b) M.S. in Visual Studies, 1989; (c) M.S. in Mechanical Engineering, 1990; and (d) Ph.D. in Biological Engineering, 2007. *Id*., ¶ 7, Ex. A1.

Dr. Ayyadurai has been continuously employed in Massachusetts since 1981, has had a Massachusetts driver's license continuously since at least 1983, and has had at least one car registered in Massachusetts continuously since in or about 1983. Ayyadurai Decl., ¶ 2. Dr. Ayyadurai owns three residential properties in Massachusetts: (a) a single-family home in Belmont, which he acquired in or about 1987; (b) a condominium in Cambridge, which he

acquired in or about 1994; and (c) another single-family home in Belmont, which he acquired in or about 2002. *Id.*, ¶ 3. He has owned each of these properties continuously since they were acquired and paid all applicable property taxes in Massachusetts during his ownership. *Id.* Dr. Ayyadurai has never owned any real property, been issued a driver's license, registered a car, or owned and operated a company in any state in the United States but Massachusetts. *Id.*, ¶ 6.

Dr. Ayyadurai has owned and operated the following Massachusetts-based companies: (a) Information Cybernetics, Inc., from 1995 to 2008; (b) Millennium Productions, Inc., from 1994 to 1999; (c) EchoMail, Inc., from 1998 to the present; (d) DCCI, LLC, from 2002 to the present; (e) General Interactive, LLC, from 2006 to the present; (f) CytoSolve, Inc., from 2011 to the present; and (g) Systems Health, LLC, from 2014 to the present. Ayyadurai Decl., ¶ 4. He also founded a Massachusetts-based non-profit research and education center, the International Center for Integrative Systems, in 2010 and has continuously operated it since that time. *Id.*, ¶ 5.

**2.   Dr. Ayyadurai is the inventor of email.**

In or about the fall of 1978, at the age of fourteen, Dr. Ayyadurai began working as a Research Fellow at the College of Medicine and Dentistry of New Jersey ("CMDNJ"). Ayyadurai Decl., ¶ 11; Michelson Decl., ¶¶ 5-6. As part of his fellowship, Dr. Ayyadurai was assigned the project of creating an electronic system that replicated the interoffice paper-based mail system used at CMDNJ at the time. *Id.* Initially, he visited various offices at CMDNJ to investigate the existing paper-based mail system. *Id.* As part of this investigation, he interviewed approximately a dozen secretaries to learn how they were using the paper-based system. *Id.*

By late 1978, Dr. Ayyadurai created a system of integrated computer programs that comprised an electronic version of the paper-based interoffice mail system. Ayyadurai Decl., ¶

12; Michelson Decl., ¶¶ 6-7.  Dr. Ayyadurai's system incorporated the key components of modern-day email, including, an Inbox, Outbox, Drafts, Folders, Attachments, Carbon Copies, Blind Carbon Copies, Return Receipt, Address Book, Groups, Forward, Compose, Edit, Reply, Delete, Archive, Sort, Bulk Distribution, and the Memo, with its now ubiquitous terms "To:," "From:," "Date:," "Subject:," "Body:," "Cc:," "Bcc:".  *Id*.  As with modern-day email, Dr. Ayyadurai's system was database driven, network-based, guaranteed the delivery of electronic messages, had a fully-functioning user interface that allowed users to compose, read, exchange and manage their electronic mail, a username for each user and a management console to create and manage user accounts and attend to maintenance operations.  Michelson Decl., ¶ 7.

Dr. Ayyadurai wrote nearly 50,000 lines of computer code, across thirty-five interconnected computer programs, to create this system.  Ayyadurai Decl., ¶ 13; Michelson Decl., ¶ 8.  He designed the system to be accessible to ordinary people with little or no computer experience, at a time when computers were mainly used by highly-trained technical experts. Ayyadurai Decl., ¶ 13.  As but one illustration of the system's functionality, it allowed a user to search their electronic inbox for an email message they received a week ago, open the attached file, respond to the original sender in the body of the memo, edit the file and then use the electronic address book to forward the edited file to a group of people along with a separate memo requesting their comments.  *Id*.

Dr. Ayyadurai named his system of computer programs "email."  Ayyadurai Decl., ¶ 14; Michelson Decl., ¶ 8.  He used this term because his system was an "electronic" (or "e") version of the interoffice paper-based "mail" system.  *Id.*  He also chose "email" because of the limited parameters of the programming language, FORTRAN IV, and Hewlett-Packard operating system

being used by CMDNJ at the time, which limited program names to all capital letters and a five-character limit: thus, his selection of the letters "E" "M" "A" "I" "L."  *Id.*

By late 1979, hundreds of people across CMDNJ were using email to compose, read, manage and exchange electronic messages.  Ayyadurai Decl., ¶ 15; Michelson Decl., ¶ 9.  At the time, software inventions could not be protected through patents.  Ayyadurai Decl., ¶ 19.  It was not until 1994 that the U.S. Court of Appeals for the Federal Circuit ruled that computer programs were patentable as the equivalent of a "digital machine."  *Id.*  However, the Computer Software Act of 1980 allowed software to be protected by copyright, to a certain extent.  *Id.*

Accordingly, in or about 1981, upon the suggestion of Dr. Paul E. Gray, who was then the President of MIT, Dr. Ayyadurai registered his invention with the U.S. Copyright Office as "EMAIL," which he described as a "Computer Program for Electronic Mail System." Ayyadurai Decl., ¶ 19.  Along with his application for this Copyright, Dr. Ayyadurai submitted the nearly 50,000 lines of code he wrote for email.  *Id.*, Ex. A9.  On August 30, 1982, Dr. Ayyadurai was issued the first U.S. Copyright registration for "EMAIL."  *Id.*, ¶ 20, Ex. A10.  Several days prior thereto, on August 27, 1982, Dr. Ayyadurai was also issued a copyright for an "EMAIL USER'S MANUAL," which he described as an "OPERATING MANUAL FOR ELECTRONIC MAIL SYSTEM PROGRAM."  *Id.*, ¶ 21, Ex. A11.  Along with Dr. Ayyadurai's application for this Copyright, he submitted a user's manual for email.  *Id.*, Ex. A12.

In sum, Dr. Ayyadurai was the first person to create an electronic version of the paper-based interoffice mail system (i.e. inbox, outbox, folders, attachments); the first person to call it "email"; and the first to obtain U.S. copyrights for email.  Ayyadurai Decl., ¶¶ 9-27, Exs. A2-A15; Michelson Decl., ¶¶ 5-14; Exs. B2-B3; Nightingale Decl., ¶¶ 4-9, Ex. C3.  Thus, he

invented email: the electronic mail system as it is known throughout the world today. *Id*.

Opponents of Dr. Ayyadurai, including Defendants, have generally relied upon a combination of twelve separate arguments to support their claim that Dr. Ayyadurai did not invent email. Each of these arguments has been addressed, and is conclusively refuted, in Exhibit B3 to the Michelson Decl., pp. 58-83 and Exhibit C to the Nightingale Decl., pp. 17-43.

One of the primary arguments made by Dr. Ayyadurai's opponents is that the United States government, through the ARPANET community, is the inventor of email. Michelson Decl., ¶¶ 13; Ex. B3; Nightingale Decl., ¶¶ 7-8, Ex. C3. This is incorrect. *Id*. At the time Dr. Ayyadurai invented email, the research conducted by the U.S. government, including ARPANET, was focused on building reliable computer networks that facilitated the transmission of electronic messages, primarily for use in military applications. *Id.* The U.S. government was not interested in creating, nor did it create, an electronic system that replicated the paper-based interoffice mail system in existence at the time. *Id.* Dr. Ayyadurai has not, and does not, claim to be the inventor of electronic messaging, which includes a broad set of methods of exchanging text messages using electronic and electrical devices, such as Morse code, dating back more than a century. Ayyadurai Decl., ¶ 22; Michelson Decl., ¶ 14; Nightingale Decl., ¶ 9.

On November 15, 2011, *TIME* magazine published an article entitled "The Man Who Invented Email," which outlines the story of Dr. Ayyadurai's invention. Ayyadurai Decl., ¶ 23, Ex. A13. In June 2012, *Wired* magazine reported: "Email … the electronic version of the interoffice, inter-organizational mail system, the email we all experience today, was invented in 1978 by [Dr. Ayyadurai] … The facts are indisputable." *Id.*, ¶ 24, Ex. A14. In July 2014, *The Wall Street Journal* published an article entitled "V.A. Shiva Ayyadurai on the Future of Email: It

Gets Better," which credits Dr. Ayyadurai as "Email's Inventor." *Id*., ¶ 25, Ex. 15.  In July 2015, CBS reported on *The Henry Ford Innovation Nation*: "Next time your fingers hit the keyboard to write a quick email, you might want to say, thank you to Shiva Ayyadurai…. he is credited with inventing email …. in the late 1970s." *Id*., ¶ 26.  Several testimonials from prominent experts in the technology industry are set forth in paragraphs 22 through 33 of the Complaint. *Id*., ¶ 27.

### 3. **Defendants have engaged in an ongoing campaign to defame Dr. Ayyadurai.**

Since at least 2014, Defendants have engaged in an ongoing campaign to damage Dr. Ayyadurai's reputation and career by publishing no less than fourteen false and highly defamatory articles about Dr. Ayyadurai on www.techdirt.com (collectively, the "Defamatory Articles").  Doc. 1 at ¶ 3; Ayyadurai Decl., ¶ 28.  The Defamatory Articles falsely state, among other things, that Dr. Ayyadurai is a "fraud," "liar" and a "fake."  The Defamatory Articles also falsely state that Dr. Ayyadurai has lied to and defrauded people in his claim to being the inventor of email and that he has built his entire reputation on that claim.  *Id*.  The most egregious false statements of fact about Dr. Ayyadurai, which Defendants knew to be false at the time the Defamatory Articles were published, or had reckless disregard for the truth, include:

- Dr. Ayyadurai is perpetuating a "fake story" with respect to his claims of invention of email.  [September 2, 2014 Article]
- "[Dr.] Ayyadurai has built up his entire reputation around the (entirely false) claim that he 'invented' email."  [September 2, 2014 Article]
- "[The Huffington Post article] is nothing more than a PR campaign for a liar." [September 3, 2014 Article]
- "Instead, the only one whose entire 'identity' is built off a fake claim to have invented email is…Dr. Ayyadurai."  [September 3, 2014 Article]
- "There's no controversy at all.  Ayyadurai is simply making false claims …"  [September 8, 2014 Article]
- Headline: "Fake Inventor of Email."  [September 9, 2014 Article]
- "Ayyadurai, however, has cleverly used misleading (to downright false) claims to make what appears on its face to be a credible story, fooling a number of gullible reporters." [September 9, 2014 Article]

- "… [Dr. Ayyadurai is] a guy who's basically staked his entire life on the misleading to false information that he 'invented' email."  [March 8, 2016 Article]
- "In 2012, [Dr. Ayyadurai] fooled the Washington Post and, astoundingly, the Smithsonian."  [March 8, 2016 Article]
- "[Dr. Ayyadurai is] blatantly misrepresenting history for his own personal aggrandizing." [November 2, 2016 Article]
- "… Shiva Ayyadurai's claim that he invented email is complete bullshit.  It's not true. Not even remotely."  [November 3, 2016 Article]
- "Ayyadurai is a liar. He is a fraud. He is a charlatan. He is an unimportant nobody who has contributed nothing and deserves to be remembered as a posing, self-aggrandizing asshole -- nothing more."  [November 6, 2016 Article]
- "…Shiva Ayyadurai, a guy who didn't invent email but has built his entire reputation on the false claim that he did…."  [November 7, 2016 Article]
- "Meanwhile, it appears that throughout all of this, Ayyadurai continues to fool people." [November 7, 2016 Article]

Each false and defamatory statement is listed in the Complaint and contained in the

Defamatory Articles attached thereto.  Doc. 1 at ¶¶ 34-47, Exs. G-T; Ayyadurai Decl., ¶ 28;

Stonerock Decl., Exs. D1-D14.[2]

   **4.  Defendants have severely damaged Dr. Ayyadurai.**

As a direct result of Defendants' publication of the Defamatory Articles, Dr. Ayyadurai

has suffered substantial personal and professional reputational harm and substantial harm to his

career, business and income, including the loss of: contracts and renewals; opportunities for

investment in his emerging companies; speaking and book tour engagements; a position at MIT

---

[2] Defendants have attempted to categorize the alleged defamatory statements by including an exhibit with their motion that divides various statements into categories invented by Defendants.  *See* Doc. 13-1.  Defendants' defamatory statements cannot be so easily corralled and segregated because they were all part of Defendants' larger campaign to impugn the personal and professional reputation of Dr. Ayyadurai.  When two or more articles would likely be received and perused by their audience together, the meaning of each statement should be viewed in light of all of the articles.  *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 187 (2d Cir. 2000) (stating that two articles in the same issue of newspaper, both about the plaintiff, should be read together).  That is definitely the case here, especially considering that Defendants have created a page on their website that collects and contains the full text of all their articles about Dr. Ayyadurai (https://www.techdirt.com/blog/?tag=shiva+ayyadurai).

as a visiting scientist; existing and potential book deals; and revenue from the sale of his book, entitled "The Email Revolution."  Ayyadurai Decl., ¶ 30.

The vast majority of the harm suffered by Dr. Ayyadurai has occurred in Massachusetts, where he has resided for over thirty-five years.  Ayyadurai Decl., ¶ 31.  However, the wide dissemination of the Defamatory Articles through the internet has also caused damage to Dr. Ayyadurai worldwide.  *Id.*  Anyone who searches Dr. Ayyadurai's name on Google or other search engines sees Defendants' false and libelous stories about him in the first page of search results.  *Id.*  As a result, persons who would otherwise have hired or partnered with Dr. Ayyadurai likely will decline, and have declined, to do so; because they believe Defendants' false and libelous statements about him to be true.  *Id.*

The Defamatory Articles have also caused a wave of attacks by others to discredit Dr. Ayyadurai and erase him from the history of electronic communications, including the removal of Wikipedia references to his contributions to email, citing the Defamatory Articles as the basis for removal, and to discredit his other ongoing scientific contributions. Ayyadurai Decl., ¶ 32.

The Defamatory Articles have also caused Dr. Ayyadurai severe emotional distress, including constant anxiety, depression, loss of sleep and loss of motivation to take care of his health and well-being.  Ayyadurai Decl., ¶ 33.  He has lost friendships and personal relationships and been forced to engage in a constant battle to protect his reputation with friends, family, business partners, colleagues and acquaintances, among others.  *Id.*

**ARGUMENT**

**1.  California's anti-SLAPP statute does not apply in this Court or in this case.**

In cases involving multistate defamation of an individual, a Massachusetts federal district

court sitting in diversity should apply the rule established by Section 150(2) of the Restatement

(Second) of Conflicts of Laws (the "Second Restatement").  *See Green v. Cosby*, 138 F. Supp. 3d

114, 124 (D. Mass. 2015).  Section 150(2) provides that "when a natural person claims that he

has been defamed by an aggregate communication, the state of most significant relationship will

usually be the state where the person was domiciled at the time, if the matter complained of was

published in that state."  In this case, there is no dispute that the defamatory statements at issue

were "published nationally, so the court applies the law of the state in which each Plaintiff was

domiciled when the alleged publication occurred."  *Id.*; *see also Davidson v. Cao*, 211 F. Supp.

2d 264, 274 (D. Mass. 2002) (defamatory statements published online and available globally);

*Neelon v. Krueger*, 63 F. Supp. 3d 165, 173-174 (D. Mass. 2014); *Continental Cablevision, Inc.

v. Storer Broad. Co.*, 653 F. Supp. 451, 455 (D. Mass. 1986); *McKee v. Cosby*, 2017 WL 652452,

at *4 (D. Mass. Feb. 16, 2017); Second Restatement, § 150(2), cmt. b.

Defendants' extensive reliance upon the Ninth Circuit's decision in *Sarver v. Chartier*,

813 F.3d 891, 898 (9th Cir. 2016) [Doc. 15 at p. 5] is misplaced.  To begin, the Ninth Circuit's

decision is not binding authority in this jurisdiction.  *See, e.g., United States v. Baez*, 878 F.

Supp. 2d 288, 295 (D. Mass. 2012), *aff'd*, 744 F.3d 30 (1st Cir. 2014).  Beyond that, Defendants

falsely assert that *Sarver* stands for the proposition that "the anti-SLAPP statute of the speaker's

jurisdiction should control, not that of the state where the plaintiff happens to reside."  [Doc. 15

at p. 5 (emphasis in original).]  However, *Sarver* actually acknowledged that "[i]n cases of

defamation, [the Second Restatement factors] normally would call for application of the law of

the plaintiff's domicile."  *Sarver*, 813 F.3d at 898 (quoting *Hanley v. Trib. Publ'g Co.*, 527 F.2d

68, 70 (9th Cir. 1975)).  The only reason *Sarver* chose to apply the anti-SLAPP law of

California, rather than looking to the law of New Jersey, was because it found that the evidence plaintiff presented was "insufficient to establish the state [of New Jersey] as his legal domicile… In sum, other than Sarver's own assertion, we have little basis to conclude that New Jersey was indeed his legal domicile at the time *The Hurt Locker* was released." *Id.*, 813 F.3d at 898.[3]

By contrast, Dr. Ayyadurai's declaration demonstrates that all of the conceivably relevant indicia of domicile establish that he was and is a domiciliary of Massachusetts. Thus, the choice of law analysis is governed by Section 150(2) of the Second Restatement[4] and should be resolved in favor of applying Massachusetts' anti-SLAPP statute – a law to which Defendants grudgingly concede that Dr. Ayyadurai's claims "likely are not subject." Doc. 15 at p. 4.[5]

It is, therefore, unnecessary for this Court to undertake any analysis of the factors enumerated in Section 145 of the Second Restatement. However, should the Court do so, it is equally clear that the law of Massachusetts should apply to this case.

The factors of foremost relevance are those found in Section 145(2)(a) and (b) – the places "where the injury occurred" and "where the conduct causing the injury occurred."[6] In this

---

[3] At the conclusion of the Ninth Circuit's conflict-of-laws analysis, it identified Sarver's domicile as "wherever that may be" in finding that the presumption which exists under Section 150(2) of the Second Restatement had been overcome. *Id.* at 900.

[4] Section 150(2), which is entitled "Multistate Defamation," states: "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state."

[5] The very language of Mass. Gen. Laws c. 231, § 59H, quoted in footnote 2 of Defendants' brief, makes clear that the media-generated defamation claims at issue in this case bear no relationship whatsoever to the "right to petition" governmental bodies whose protection is the *sine qua non* of Massachusetts' anti-SLAPP statute. *See Fustolo v. Hollander*, 455 Mass. 861, 871 (2010); *N. Am. Expositions Co. Ltd. P'ship v. Corcoran*, 452 Mass. 852, 862 (2009). Recognizing this, Defendants concede that the Massachusetts anti-SLAPP statute does not apply, and are "shopping" for more favorable law by seeking to apply California law.

[6] "Contacts to be taken into account in applying the principles of § 6 to determine the law

case, those two places are the same; Massachusetts.  Because Dr. Ayyadurai is a domiciliary of Massachusetts, whose reputation has been severely injured by Defendants' 14 Defamatory Articles, Massachusetts is the state where "the injury occurred."

In *Calder v. Jones*, 465 U.S. 783 (1984), plaintiff Shirley Jones, an actress who lived and worked in California, was the subject of a libelous story published by the *National Enquirer*. The U.S. Supreme Court concluded that "the brunt of the harm, in terms of respondent's emotional distress and the injury to her professional reputation, was suffered in California.  In sum, California is the focal point both of the story and of the harm suffered." *Id.* at 789.  The same holds true in the case of Dr. Ayyadurai.  Massachusetts is the state where the "brunt of the harm" to Dr. Ayyadurai has occurred, and will continue to occur.  Massachusetts is also the state "where the conduct causing the injury occurred" because it is the focal point of the Defamatory Articles and the harm suffered by Dr. Ayyadurai.

It is also unnecessary for this Court to undertake an analysis of the even more general choice-of-law principles found in Section 6 of the Second Restatement.  However, should this Court elect to examine those factors, the *Sarver* case is instructive, at the very least from an *expressio unius est exclusio alterius* perspective.  In other words, whereas the *Sarver* Court (813 F.3d at 899) was confronted by a state with a robust anti-SLAPP statute (California) and another state that had declined "to create a specific anti-SLAPP cause of action" (New Jersey), Massachusetts affirmatively elected to enact an anti-SLAPP statute that **excludes** "free speech"

---

applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Second Restatement Section 145(2).  Here, the third and fourth factors are irrelevant or, at best for Defendants, neutral.

claims, limiting its protection only to "a party's exercise of its right of petition."[7] Thus, this Court should recognize and enforce the expectations of its domiciliaries whose claims and injuries do not arise from any petitioning activity by any of these Defendants.[8]

The remaining cases relied upon by Defendants are inapposite, in addition to being non-binding authority in this jurisdiction. In *Global Relief Foundation v. New York Times Co.*, 2002 WL 31045394 (N.D. Ill. Sept. 11, 2002), the district court merely assumed *arguendo* that the anti-SLAPP statute (a law it characterized as only "a procedural rule"), if applicable, would have been satisfied since the plaintiff "has made a prima facie case of defamation." *Id.* at *11-*12.

---

[7] In this regard, it is worth nothing that California's anti-SLAPP statute, Code of Civil Procedure Section 425.16, was first enacted in 1992 – two years before the passage of Mass. Gen. Laws ch. 231, § 59H. Thus, the Massachusetts Legislature was well aware of the broad contours of other states' anti-SLAPP statutes and should be presumed to have deliberately decided to constrict the breadth of its own anti-SLAPP law.

[8] While Dr. Ayyadurai acknowledges that the First Circuit has held that anti-SLAPP laws govern state-law claims brought in federal court, it did so only with respect to the anti-SLAPP statute of Maine. *Godin v. Schencks*, 629 F.3d 79, 92 (1st Cir. 2010). In *Bargantine v. Mechanics Cooperative Bank*, 2013 WL 6211845 (D. Mass. Nov. 26, 2013), the District Court aptly noted that "*Godin* considered only Maine's anti-SLAPP statute and its holding has not been extended to the anti-SLAPP laws of other states within the First Circuit." *Id.* at *3. And though *Bargantine* itself agreed to "extend *Godin*'s holding and find the Massachusetts anti-SLAPP statute applicable as substantive law to diversity cases brought in federal court," it did so **only** because it had previously determined that the Massachusetts anti-SLAPP statute is "in all respects identical to the Maine statute." *Id.* The opposite is true (and, absent any further directive from the First Circuit, a contrary result is certainly conceivable) when comparing the Massachusetts and California anti-SLAPP statutes.

Moreover, there is currently a circuit split concerning the viability of anti-SLAPP motions in federal court. *Compare Abbas v. Foreign Policy Group LLC*, 783 F.3d 1328 (D.C. Cir. 2015) (D.C.'s anti-SLAPP statute not available in federal court) with *Makaeff v. Trump University LLC*, 736 F.3d 1180 (9th Cir. 2013) (refusing to reconsider, en banc, the circuit's anti-SLAPP precedents since 2003 despite a plea by Judge Alex Kozinski). Recently, in *Traveler's Casualty Insurance Co. of America v. Hirsh*, 831 F.3d 1179, 1186 (9th Cir. 2016), Judge Alex Kozinski passionately reasserted his objections in *Makaeff* to hearing anti-SLAPP motions in federal court: "We were wrong in *Newsham* and *Batzel*, and wrong not to take *Makaeff* en banc to reverse them. But it's not too late to correct these mistakes. Cases like this one have no place on our docket, and we should follow the D.C. Circuit in extirpating them. Our ink and sweat are better spent elsewhere."

*Chi v. Loyola University Medical Center*, 787 F.Supp.2d 797 (N.D. Ill. 2011) is a case that relies

upon the doctrine of *dépeçage* that does not appear to have been adopted in Massachusetts in any

case involving either defamation or an analysis of Section 150(2) of the Second Restatement.[9]

And since *Chi* does not involve multistate defamation, it does not even cite (much less discuss)

the defamee-domicile presumption embodied in Section 150(2) of the Second Restatement.[10]

Finally, *Dawe v. Corrections USA*, 2009 WL 1420969 (E.D. Cal. May 20, 2009) is likewise not a

multistate defamation action; ruling in the context of a Rule 12(b)(6) motion, the District Court

noted that "[n]either party has provided the court with information about in what states the e-

mail was published, nor is this alleged in plaintiff's complaint." *Id.* at *8.

Meanwhile, in a non-binding but instructive opinion, *Adelson v. Harris*, 973 F. Supp. 2d

467, 477–78 (S.D.N.Y. 2013), the Court held that Nevada's anti-SLAPP statute applied, rather

than the District of Columbia's, because the plaintiff was domiciled there, stating:

> Nevada's interest in this case is significant and incontrovertible. [Plaintiff] is a
> Nevada citizen, and the [Plaintiff's] business empire is based in Nevada. Nevada
> has an interest in protecting its citizens from tortious conduct. The District of
> Columbia also has an interest in this case—protecting the First Amendment rights
> of its citizens. While this interest is important, it is not, without more, sufficient to
> overcome the presumption that the law of Plaintiff's domicile should apply in this
> type of case.

Similarly, California's anti-SLAPP statute should not be applied to this case and

Defendants' motion should be denied on this basis alone.

---

[9] Defendants' citation of *Choate, Hall & Stewart v. SCA Servs., Inc.*, 378 Mass. 535 (1979), is irrelevant.  The case does not involve defamation, does not use the term *dépeçage*, and the discussion to which Defendants cite has nothing whatsoever to do with a jurisdictional dispute based upon choice-of-law principles but rather with an issue of contract interpretation.

[10] Given its reliance upon the inapplicable *dépeçage* doctrine and its similarity to the facts of *Chi*, which do not implicate any multistate defamation issues, *Diamond Ranch Academy, Inc. v. Filer*, 117 F.Supp.3d 1313, 1322-1324 (D. Utah 2015), adds nothing of relevance to this Court's analysis of Defendants' motion.

### 2.   Dr. Ayyadurai's claims do not arise from a matter of public interest.

Even if California's anti-SLAPP statute applies to this case, which it does not,

Defendants have failed to meet their initial burden of showing that Dr. Ayyadurai's claims arise

from a matter of public interest.  Under California Code of Civil Procedure § 425.16, a

defendant meets this burden by demonstrating that the act underlying the plaintiff's claims falls

into one of the categories in section 425.16, subdivision (e).  *Braun v. Chronicle Publishing Co.*,

52 Cal.App.4th 1036, 1043 (1997).  Defendants contend that Dr. Ayyadurai's claims arise from

"conduct [by the Defendants] in furtherance of the exercise of the constitutional right . . . of free

speech in connection with . . . an issue of public interest."  Cal. Civ. Proc. Code, § 425.16 (e)(4).

California law holds that an abstract public interest in general subject matter may not

support an anti-SLAPP motion.  Rather, there must be a public interest in the specific speech or

conduct alleged in the complaint: "The fact that 'a broad and amorphous public interest' can be

connected to a specific dispute is not sufficient to meet the statutory requirements of the anti-

SLAPP statute."  *World Fin'l Group, Inc. v. HBW Ins. & Fin'l Services, Inc.*, 172 Cal.App.4th

1561, 1570 (2009) (holding that abstract public interest in employees' mobility (being free of

covenants not to compete) did not support an anti-SLAPP motion against a complaint charging

employees with misappropriating their employer's trade secrets).

For example, while labor disputes can be a valid subject of public interest, flyers

prepared by a labor union engaged in a labor dispute defaming a company's vice-president did

not involve an issue of public interest and were thus not governed by the statute.  *See Price v.*

*Operating Engineers Local Union No. 3*, 195 Cal.App.4th 962, 973 (2011).  Likewise, when a

union accused a supervisor of dishonesty and favoritism in supervising staff at a public

university, the supervisor's slander suit against the union was held not to be subject to dismissal

as a SLAPP suit since not every workplace dispute is a matter of "public interest." *See Rivero v.*

*Amer. Fed. of State, County & Mun. Employees, AFL–CIO*, 105 Cal.App.4th 913, 924 (2003).

The court in *Weinberg v. Feisel* identified the following "guiding principles" for

determining whether the anti-SLAPP statute applies:

> First, public interest does not equate with mere curiosity…. Second, a matter of
> public interest should be something of concern to a substantial number of people.
> … Thus, a matter of concern to the speaker and a relatively small, specific
> audience is not a matter of public interest. … Third, there should be some degree
> of closeness between the challenged statements and the asserted public interest
> …; the assertion of a broad and amorphous public interest is not sufficient….
> Fourth, the focus of the speaker's conduct should be the public interest rather than
> a mere effort to gather ammunition for another round of [private] controversy. …
> Finally, those charged with defamation cannot, by their own conduct, create their
> own defense by making the claimant a public figure.

*Weinberg v. Feisel*, 110 Cal.App.4th 1122, 1132–1133 (2003) (citations omitted).[11]

---

[11] Defendants rely upon the decision by the California Court of Appeal in *Nygard, Inc. v. Uusi–Kerttula*, 159 Cal.App.4th 1027 (2008). There, the Court affirmed the trial court's granting of defendants' anti-SLAPP motions. However, five years later, the very same district and division of the Court of Appeal reached a contrary result in *Albanese v. Menounos*, 218 Cal.App.4th 923 (2013). In that case, Albanese, a celebrity stylist, alleged that she had worked with Menounos, a television personality, on the Access Hollywood set. She subsequently saw Menounos at an industry event, where Menounos "'loudly accused [Albanese] of stealing by claiming, "Dolce and Gabbana won't lend to me anymore because they said you never returned anything."'" *Id.* at 926. Albanese sued Menounos for defamation and related torts, and Menounos filed an anti-SLAPP motion, urging that the complaint arose from conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest. *Id.* at p. 927. The trial court denied the motion, and Menounos appealed.

The California Court of Appeal affirmed. Although it acknowledged some public interest in Albanese as a celebrity stylist and style expert, it found there was "no evidence of a public controversy concerning Albanese, Menounos, or Dolce and Gabbana." The court explained: "Even if Albanese is rather well known in some circles for her work as a celebrity stylist and fashion expert, there is no evidence that the public is interested in this private dispute concerning her alleged theft of unknown items from Menounos or Dolce and Gabbana. In short, there is no evidence that any of the disputed remarks were topics of public interest." *Id.* at 936.

The court further rejected Menounos's contention that *Nygard* created a rule that a

In this case, regardless of whether Dr. Ayyadurai's invention of email is a matter of public interest, his reputation and integrity is not a matter of public interest.  As shown herein, Defendants' attacks on Dr. Ayyadurai go far beyond the issue of who invented email.  Defendants impugn Dr. Ayyadurai's reputation by labeling him a liar and a fraud who has built his "entire reputation" upon "bogus" claims and who has deceived people into writing "fake" news stories.

Overall, it is obvious that the Defamatory Articles are nothing more than a personal smear campaign by Defendants meant to manufacture a controversy where none existed. Defendants have not satisfied any, let alone all, of the principles set forth in *Weinberg*.  As such, Defendants' attempt to transform their private controversy into a matter of public interest fails.

### 3. **Dr. Ayyadurai has established the merit of his claims.**

#### a. Standards for California anti-SLAPP motions.

If California law applies to this case, and defendant has met its threshold burden, a plaintiff is only required to establish that his claims have "minimal merit" to defeat the motion. *Soukup v. Law Offices of Herbert Hafif*, 39 Cal.4th 260, 291 (2006).  In order to meet this burden, a plaintiff must establish a reasonable "probability" of prevailing on his claims.  Cal.

---

statement about any person in the public eye is a matter of public interest.  It explained: "*Nygard* did not redefine what constitutes a matter of public interest. *Nygard* must be read in the context of the evidence, which showed there was an '"extensive interest" in *Nygard*—"a prominent businessman and celebrity of Finnish extraction"—among the Finnish public,' as well as a 'particular interest among the magazine's readership in "information having to do with Mr. Nygard's famous Bahamas residence which has been the subject of much publicity in Finland."' [Citation.]  *Nygard* **does not stand for the proposition that any statement about a person in the public eye is a matter of public interest.**" *Id.* at 935-936. (Emphasis added.)  The court continued: "If we were to adopt Menounos's overly broad definition of a public issue, we would obliterate the requirement that 'there should be a degree of closeness between the challenged statements and the asserted public interest.  The assertion of a broad and amorphous public interest is not sufficient. Moreover, the focus of the speaker's conduct should be the public interest, not a private controversy.' [Citation.]" *Id.*

Code Civ. Pro. §425.16(b)(1).  In determining whether or not a reasonable probability has been

shown, the court will consider the pleadings and evidentiary submissions of both parties, but the

court "does not weigh credibility or compare the weight of the evidence."  *HMS Capital, Inc. v.*

*Lawyers Title Co.*, 118 Cal.App.4th 204, 212 (2004).  The court should determine whether the

plaintiff's evidence would, if credited, be sufficient to meet the burden of proof.  *Wilcox v. Sup.*

*Ct.*, 27 Cal.App.4th 809, 823-825 (1994) (analogous to motions for nonsuit or directed verdict).

The court should "**accept as true** the evidence favorable to the plaintiff" and evaluate the

defendant's evidence only to determine if it defeats the evidence submitted by the plaintiff as

matter of law.  *HMS Capital*, 118 Cal.App.4th at 212. (Emphasis added.)  "An anti-SLAPP-suit

motion is not a vehicle for testing the strength of a plaintiff's case, or the ability of a plaintiff, so

early in the proceedings, to produce evidence supporting each theory of damages asserted in

connection with the plaintiff's claims.  It is a vehicle for determining whether a plaintiff, through

a showing of minimal merit, has stated and substantiated a legally sufficient claim. [Citations.]"

*Wilbanks v. Wolk*, 121 Cal.App.4th 883, 906 (2004).

    b.  Dr. Ayyadurai's claim for defamation.

    i.  **The Defamatory Articles are defamatory.**

"A false statement that 'would tend to hold the plaintiff up to scorn, hatred, ridicule or

contempt, in the minds of any considerable and respectable segment in the community,' would be

considered defamatory."  *Phelan v. May Dept. Stores Co.*, 443 Mass. 52, 56 (2004) (quoting from

*Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975)); *Ravnikar v. Bogojavlensky*,

438 Mass. 627, 629-630 (2003) (to prove defamation, plaintiff must demonstrate that (1)

defendant made false statement "of and concerning" plaintiff to third party; (2) statement could

damage plaintiff's reputation in community; (3) defendant was at fault for making statement; and

(4) statement caused plaintiff economic loss or is actionable without proof of economic loss).

Here, there can be no dispute that Defendants' statements are defamatory.  Defendants'

statements directly attack Dr. Ayyadurai's integrity and personal and professional reputation.

"Statements about a person' vocational reputation…are particularly likely to be defamatory."

*Dellorusso v. Montiero*, 47 Mass. App. Ct. 475, 478 (1999) (finding defamatory meaning in

statement that plaintiff's "work habits … are inconsistent with School Department standards").

### ii.   The Defamatory Articles are false.

Dr. Ayyadurai is **not** a liar and a fraud who built his "entire reputation" upon "bogus"

claims that he invented email and who has deceived people into writing "fake" news stories.

Ayyadurai Decl., ¶¶ 7-8, 11-29, Ex. A1.  Dr. Ayyadurai holds four degrees from the

Massachusetts Institute of Technology.  Ayyadurai Decl., ¶ 7.  He has been recognized

internationally for his developments in early social media portals, email management

technologies, and contributions to medicine and biology.  *Id*, ¶ 8, Ex. A1.  He has been a speaker

at numerous international forums, where he has discussed email, science, medicine and

technology, among other topics.  *Id.*  Dr. Ayyadurai operates a non-profit research and education

center and serves as Chairman and CEO of CytoSolve, Inc.  *Id.*, ¶ 4-5, 8.

Dr. Ayyadurai has a well-respected personal and professional reputation beyond just his

invention of email. Ayyadurai Decl., ¶¶ 4-5, 7-8, 29, Ex. A1.  Further, as set forth in detail above,

Dr. Ayyadurai has not lied about inventing email.  Ayyadurai Decl., ¶¶ 9-28, Exs. A2-A12;

Michelson Decl., ¶¶ 5-14; Exs. B2-B3; Nightingale Decl., ¶¶ 4-9, Ex. C3.  Certain statements by

Defendants show that Defendants are aware that he has not lied.  Doc. 1 at Ex. M ("may have

written a wonderful new form of electronic messaging"); Ex. Q ("Again, it was impressive that

as a kid he basically independently created an electronic mailing system….")

### iii.   The Defamatory Articles evidence Defendants' malicious intent.

Actual malice may be proven by inference, as it is unlikely that Defendants will admit to

willful or reckless behavior.  *See Bose Corp. v. Consumers Union*, 692 F.2d 189, 196 (1st Cir.

1982).[12]  Assuming *arguendo* that Dr. Ayyadurai must plead or prove actual malice, he can easily

do so, particularly under the "minimal merits" standard of California's anti-SLAPP statute.

As Defendants acknowledge in their moving papers, the Defamatory Articles do not

dispute any of Dr. Ayyadurai's assertions concerning what he did while a fellow at CMDNJ and

state that he was an "apparently very bright 14-year-old" who "may have written a wonderful

new form of electronic messaging" and "should be quite proud of what he's done."  Doc. 13 at

pp. 5-6 (citing Compl., Ex. G at 2, 6, Ex. H at 2, Ex. O at 2; see also Ex. M at 4 ("Ayyadurai . . .

was a bright kid who did some impressive programming as a teenager."); Ex. Q at 2 ("Again, it

was impressive that as a kid he basically independently created an electronic mailing system….")

Further, Defendants acknowledge that a number of respected individuals support Dr.

Ayyadurai's invention of email.  *See, e.g.,* Doc. 13 at pp. 4-5 (referencing prior *TIME* and

*WIRED* magazine articles and academic articles defending Dr. Ayyadurai's claims).  Therefore,

for Defendants to call Dr. Ayyadurai a fraud and a liar evidences an intent to defame Dr.

Ayyadurai's personal and professional reputation.  Defendants go even further, stating that Dr.

---

[12] A defamation plaintiff may rely on inferences from circumstantial evidence to show actual malice.  *Reader's Digest Assn. v. Sup. Ct.,* 37 Cal.3d 244, 257-258 (1984).  "A failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication."  *Id.*

Ayyadurai built his "entire reputation" on perpetuating the supposed "fraud" of having invented email. Again, Defendants have not engaged in an objective debate about who invented email; rather, Defendants repeatedly attacked Dr. Ayyadurai's personal and business reputation. This evidences Defendants' knowledge of falsity, or at least their reckless disregard for the truth.

Defendants' failure to contact Dr. Ayyadurai, his proponents, or the authors of the articles supporting Dr. Ayyadurai, further evidences their malice. For example, Defendants published lengthy articles attacking Dr. Ayyadurai and the Huffington Post for publishing a number of articles supporting Dr. Ayyadurai. Doc. 1-8 at Exs. G and H. However, absent from these articles is any mention of an attempt to consult the individuals they attack. Defendants never contacted Dr. Leslie P. Michelson, a percipient witness who supervised Dr. Ayyadurai's invention of email. Defendants also never contacted Dr. Debbie Nightingale, an eminent systems scientist, who conducted a detailed analysis and concluded that Dr. Ayyadurai is the inventor of email. This reflects Defendants' malicious intent to defame Dr. Ayyadurai. *See Lyons v. New Mass Media, Inc.*, 390 Mass. 51, 57–58 (1983) ("A major basis for inferring actual malice involves examination of the sources used by the reporter … Whether [defendant's] reliance on these sources was proper in the context of this case presents a material issue of fact which should be determined by the trier of fact"); *Murphy v. Boston Herald, Inc.*, 449 Mass. 42, 60 (2007) ("the purposeful failure to investigate known witnesses may be proof of actual malice").[13]

---

[13] Defendants minimize the impact of Dr. Ayyadurai's settlement of similar claims against Gawker Media. However, Defendants fail to mention that Dr. Ayyadurai sued Gawker Media in the U.S. District Court for the District of Massachusetts, Case No. 1:16-cv-10853-JCB, over three defamatory articles calling him a "fraud," and the case resolved when Gawker Media permanently removed all three articles and paid him $750,000. Ayyadurai Decl., ¶ 34. Defendants' decision to publish additional articles defaming Dr. Ayyadurai **after** his settlement with Gawker Media demonstrates their intent from the start, *i.e.* to undertake a campaign to

Finally, where a defendant's state of mind is at issue – for example, where actual malice must be shown – pre-trial discovery should be permitted to determine the defendant's state of mind at the time the defamatory statements were made. *Nat'l Ass'n of Gov't Emps. V. Cent. Broad. Corp.*, 379 Mass. 220, 232-233 (1979). Thus, if this Court determines that Dr. Ayyadurai is required to plead or prove actual malice, and that he has not adequately done so, it should permit Dr. Ayyadurai to undertake constitutional malice discovery into Defendants' state of mind, before ruling on this motion. *See e.g., Behunin v. Schwab,* 2017 WL 977095, at *2 (Cal. Ct. App. Mar. 14, 2017) (Prior to ruling on anti-SLAPP motion, trial court permitted discovery regarding "whether [defendants] published the statements with malice").

### iv.   The Defamatory Articles have harmed Dr. Ayyadurai.

Dr. Ayyadurai has been seriously damaged as a direct and proximate cause of the falsity of the statements made by Defendants. Doc. 1 at ¶ 60; Ayyadurai Decl., ¶¶ 28-33. The false statements attribute conduct, characteristics and conditions incompatible with the proper exercise of Dr. Ayyadurai's business and duties as an inventor, scientist and entrepreneur. *Id.* Because the statements were widely disseminated on the Internet, they were also intended to and did hold Dr. Ayyadurai up to ridicule and to damage his social and business relationships. *Id.*

### v.   The Defamatory Articles are not opinion or rhetorical hyperbole.

As detailed in Dr. Ayyadurai's opposition to Defendant's motion to dismiss, Defendants' intentionally defamatory statements do not qualify as either opinion or rhetorical hyperbole.

### c.   Dr. Ayyadurai's claim for intentional interference with economic advantage.

A claim for intentional interference with an advantageous business relationship must

---

tarnish Dr. Ayyadurai's personal and professional reputation despite all evidence to the contrary. Such a campaign at least amounts to a reckless disregard for the truth, and probably worse.

assert that (1) plaintiff had a business relationship or anticipated a contract of economic benefit,

(2) defendant knew of the relationship, (3) defendant interfered with the relationship through an

improper motive or means, and (4) plaintiff suffered a loss as a result of defendant's conduct.

*Am. Private Line Servs., Inc. v. E. Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir.1992).  A plaintiff

may satisfy the third element by showing an improper motive **or** improper conduct; malice or ill

will is not required.  *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 814-816 (1990)

("we adopt the word 'improperly' in place of the word 'maliciously'").

Again, Defendants engaged in an ongoing campaign to damage Dr. Ayyadurai's personal

and professional reputation over the course of years by publishing false and defamatory articles

about Dr. Ayyadurai.  Doc. 1 at ¶ 3; Ayyadurai Decl., ¶ 28.  This was not an isolated incident.

Further, Defendants knew that Dr. Ayyadurai, being a scientist, inventor, business owner, and

entrepreneur, had business relationships that would certainly be interfered with if Defendants

attacked the core ethics and reputation of Dr. Ayyadurai (which they did).  Doc. 1 at ¶¶ 63, 64;

Ayyadurai Decl., ¶¶ 28-33.  Accordingly, Defendants' motive and conduct was improper.

Additionally, Dr. Ayyadurai has lost contracts and renewals, lost opportunities for

investment in his emerging companies, suffered substantial reputational harm and suffered

substantial harm to his career, business and income.  Doc. 1 at ¶ 49; Ayyadurai Decl., ¶¶ 28-33.

    d.  <u>Dr. Ayyadurai's claim for intentional infliction of emotional distress.</u>

"To sustain a claim of intentional infliction of emotional distress, a plaintiff must show

(1) that the defendant intended to cause, or should have known that his conduct would cause,

emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the

defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe

distress." *Sena v. Commonwealth*, 417 Mass. 250, 263–64 (1994) citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45 (1976).  Here, the Defamatory Articles have caused Dr. Ayyadurai severe emotional distress, and the ramifications the false content has had on his personal life and professional reputation have been immense.  Doc. 1 at ¶ 71; Ayyadurai Decl., ¶ 33.

Defendants argue that their conduct is not "extreme and outrageous."  However, the District Court of Massachusetts previously rejected the same argument in a similar case, wherein the Court found that statements that the plaintiff was "incompetent" and "not to be trusted" were not statements of opinion and that the issue of whether conduct was extreme and outrageous was for the jury to decide: "A reasonable jury also could conclude that the Omnicare Parties' actions were extreme and outrageous.  For example, the jury may determine, after viewing all of the circumstances, that the Omnicare Parties engaged in a pattern of conduct amounting to a concerted effort to drive Mr. Breslin out of business." *N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC*, 491 F. Supp. 2d 111, 133 (D. Mass. 2007); *see also Agis*, 371 Mass. at 145-146 ("[b]ecause reasonable men could differ on these issues, we believe that 'it is for the jury, subject to the control of the court,' to determine whether there should be liability in this case."); *Womack v. Eldridge*, 215 Va. 338, 342 (1974).

The same is true here.  A reasonable jury could conclude that Defendants' campaign to defame and discredit Dr. Ayyadurai over the course of years through numerous defamatory articles amounted to extreme and outrageous conduct.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to strike in its entirety.

Dated: March 17, 2017

Respectfully submitted,

**CORNELL DOLAN, P.C.**

By:  /s/ Timothy Cornell

Timothy Cornell
BBO # 654412
One International Place, Suite 1400
Boston, Massachusetts 02110
Tel: (617) 535-7763
Fax: (617) 535-7721
tcornell@cornelldolan.com

**HARDER MIRELL & ABRAMS LLP**

By:   /s/ Charles Harder

Charles J. Harder
(Admitted *Pro Hac Vice*)
132 S. Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Tel: (424) 203-1600
Fax: (424) 203-1601
charder@hmafirm.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first class mail to any non-registered participants.

        /s/ Charles Harder
        Charles J. Harder