**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**BOSTON, MASSACHUSETTS**

| | | |
|---|---|---|
| SHIVA AYYADURAI, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 17-cv-10011-FDS |
| | ) | |
| v. | ) | |
| | ) | |
| FLOOR64, INC., a California corporation | ) | |
| d/b/a TECHDIRT; MICHAEL DAVID | ) | |
| MASNICK, an individual; LEIGH | ) | |
| BEADON, an individual; and DOES 1-20, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT *LEIGH BEADON'S* MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**

**<u>INTRODUCTION</u>**

Plaintiff Dr. Shiva Ayyadurai ("Dr. Ayyadurai" or "Plaintiff") hereby opposes the motion to dismiss filed by Defendant Leigh Beadon ("Beadon") (collectively with Defendants Floor64, Inc. d/b/a Techdirt and Michael David Masnick, "Defendants").

Because Beadon's motion to dismiss adopts and relies on the motion to dismiss, and memorandum in support thereof, previously filed by Defendants Floor64, Inc. and Michael Masnick, and because the two motions to dismiss involve nearly identical arguments, Dr. Ayyadurai likewise adopts and relies upon his memorandum in opposition to Defendants Floor64, Inc.'s and Michael Masnick's motion to dismiss.  [Doc. 30.]

The Court should deny Beadon's motion to dismiss because:

1. Section 230 of the Communications Decency Act ("Section 230") does **not** provide immunity to Beadon from Dr. Ayyadurai's claims because Beadon separately published false and defamatory statements about Dr. Ayyadurai in the body of an article he alone subsequently authored and had published.

2. Beadon's defamatory assertions are materially false statements of fact, not opinions, and therefore cannot shield Beadon from liability.

3. All of Defendants' defamatory articles, not just the one authored and published by Beadon, must be considered collectively because all of the defamatory articles were part and parcel of an integrated, intentional campaign to destroy Dr. Ayyadurai's reputation.

4. Dr. Ayyadurai has alleged the requisite malice.

5. Dr. Ayyadurai has adequately pled claims for intentional interference with prospective economic advantage and intentional infliction of emotional distress.

Beadon's only arguments in addition to those previously presented by Defendants Floor64, Inc. and Michael Masnick are: (1) Section 230 bars Dr. Ayyadurai's claims as to Beadon himself; and (2) Beadon should only be held responsible for the one article Beadon authored and published.  Both arguments are unpersuasive.

**First**, Section 230 does **not** provide immunity to Beadon from Dr. Ayyadurai's claims because Beadon separately published false and defamatory statements about Dr. Ayyadurai in the body of an article he himself subsequently authored and published.

**Second**, the Court should view collectively all of the defamatory statements and articles from all Defendants because they constitute an integrated, intentional campaign to destroy Dr. Ayyadurai's reputation.

Defendants' contention that the Internet now constitutes a playing field for repeatedly calling someone a liar and a fraud, in a deliberate campaign to destroy that person's reputation through numerous separate articles disseminated to millions of people worldwide, is wrong. Defendants, including Beadon, must be held accountable for their own maliciously defamatory statements that have severely harmed Dr. Ayyadurai's personal and professional reputation.

For all of the foregoing reasons, the Court should deny Beadon's motion to dismiss in its entirety.  However, if the Court is inclined to grant Beadon's motion to dismiss in any respect, Dr. Ayyadurai should be granted leave to amend.

## **BACKGROUND**

Dr. Ayyadurai, as a teenager in 1978, invented the system of email that we use today, with an inbox, outbox, cc and various electronic folders.  His goal at the time was to replicate (electronically) a secretary's desk, which had physical boxes and papers, including an inbox,

{00079269;1}                                                    2

outbox, etc.  He also wanted to make that electronic system so easy to use that anyone could master it, as contrasted with the system of computers and technology at the time (1978), which were highly technical and very difficult for most people to utilize.  Numerous PhD's in the technology community and numerous members of the major media (including *TIME* magazine, *Wired* magazine and CBS) have supported Dr. Ayyadurai's assertion that he invented email.[1]

Since at least 2014, Defendants have engaged in an ongoing campaign to destroy Dr. Ayyadurai's personal and professional reputation by publishing no less than fourteen (14) false and highly defamatory articles about him on their website at www.techdirt.com (collectively, the "Defamatory Articles").  [Doc. 1 at ¶ 3.]  The Defamatory Articles falsely state, among other things, that Dr. Ayyadurai is a "fraud," a "liar" and a "fake."  Some examples of the egregiously false statements of fact about Dr. Ayyadurai, which Defendants knew to be false at the time the Defamatory Articles appeared, or were nevertheless published with reckless disregard for their truth, include:

- Dr. Ayyadurai is perpetuating a "fake story" with respect to his claims of invention of email.  [September 2, 2014 Article]
- "[Dr.] Ayyadurai has built up his entire reputation around the (entirely false) claim that he 'invented' email."  [September 2, 2014 Article]
- "[The Huffington Post article] is nothing more than a PR campaign for a liar." [September 3, 2014 Article]
- "Instead, the only one whose entire 'identity' is built off a fake claim to have invented email is…Dr. Ayyadurai."  [September 3, 2014 Article]
- "There's no controversy at all.  Ayyadurai is simply making false claims …"  [September 8, 2014 Article]
- Headline: "Fake Inventor of Email."  [September 9, 2014 Article]
- "Ayyadurai, however, has cleverly used misleading (to downright false) claims to make what appears on its face to be a credible story, fooling a number of gullible reporters."

---

[1] Additional background information, including references to the Complaint, are found in Dr. Ayyadurai's opposition to Defendants Floor64, Inc.'s and Michael Masnick's motion to dismiss.  [Doc. 30 at pp. 2-5.]

[September 9, 2014 Article]

- "… [Dr. Ayyadurai is] a guy who's basically staked his entire life on the misleading to false claim that he 'invented' email."  [March 8, 2016 Article]
- "In 2012, [Dr. Ayyadurai] fooled the Washington Post and, astoundingly, the Smithsonian."  [March 8, 2016 Article]
- "[Dr. Ayyadurai is] blatantly misrepresenting history for his own personal aggrandizing." [November 2, 2016 Article]
- "… Shiva Ayyadurai's claim that he invented email is complete bullshit.  It's not true. Not even remotely."  [November 3, 2016 Article]
- "Ayyadurai is a liar. He is a fraud. He is a charlatan. He is an unimportant nobody who has contributed nothing and deserves to be remembered as a posing, self-aggrandizing asshole -- nothing more."  [November 6, 2016 Article]
- "…Shiva Ayyadurai, a guy who didn't invent email but has built his entire reputation on the false claim that he did…."  [November 7, 2016 Article]
- "Meanwhile, it appears that throughout all of this, Ayyadurai continues to fool people." [November 7, 2016 Article]

A detailed listing of the false and defamatory statements about Dr. Ayyadurai can be found in the Complaint and in the Defamatory Articles attached as exhibits thereto.  [Doc. 1 at ¶¶ 34-47, Exs. G-T.]

On November 6, 2016, Beadon himself authored and published one of the Defamatory Articles on the Techdirt website (the "November 6 Article").  [Doc. 1 at ¶ 46.]  Therein, Beadon promulgated the following false and defamatory statements about Dr. Ayyadurai:

- ". . . Ayyadurai's bogus, lying, totally false claims."
- Characterizing Dr. Ayyadurai as a "fraudster."
- "Ayyadurai is particularly annoying because of his bogus claims of racism. . . ."
- "Ayyadurai's claims are annoying and absolutely false. . . ."
- "Ayyadurai is a liar. He is a fraud. He is a charlatan."
- "He is an unimportant nobody who has contributed nothing and deserves to be remembered as a posing, self-aggrandizing asshole - nothing more."

[Doc. 1 at ¶ 46; *see also* Doc. 1, Ex. S.]

Defendants' publication of the false and defamatory statements about Dr. Ayyadurai, including those by Beadon himself, has caused Dr. Ayyadurai substantial harm, including lost

contracts and renewals, lost opportunities for investment in his emerging companies, and substantial personal and professional reputational harm.  [Doc. 1 at ¶ 49.]

## ARGUMENT

### 1.  Standards on motions to dismiss.

Plaintiffs pursuing defamation claims need only allege enough to meet the notice pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure ("FRCP"), not the heightened pleading requirements of FRCP Rule 9.  *N. Shore Pharm. Servs., Inc. v. Breslin Assocs. Consulting LLC*, 491 F. Supp. 2d 111, 124 (D. Mass 2007) (citing *Davidson v. Cao*, 211 F. Supp. 2d 264, 276 (D. Mass. 2002)).  On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiff is afforded every "reasonable inference" in its favor, as the Court "must accept as true all well-pleaded facts."  *Raytheon Co. v. Continental Cas. Co.*, 123 F. Supp. 2d 22, 26 (D. Mass. 2000).  Dismissal is only appropriate if the complaint "presents no set of facts justifying recovery."  *Id.*  The highly deferential standard at this early stage of litigation requires no more than that Plaintiff set forth factual allegations that are "either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory."  *Id.* at 27.

For this reason, the Court should not look to the merits of the case, because "Plaintiff is [only] required to submit 'a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Dantone v. Bhaddi*, 570 F. Supp. 2d 167, 170 (D. Mass. 2008); citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 2.   Section 230 of the Communications Decency Act does not immunize Beadon from liability.

Beadon argues that he is immune from liability under Section 230 because certain defamatory statements in the November 6 Article originally appeared as a comment to another article on Techdirt's website.[2]   Assuming *arguendo* that these defamatory statements originated with a third party, Beadon's independent decision to separately incorporate and publish those statements in the body of his own November 6 Article qualifies him as an "information content provider" under Section 230, thereby depriving him of immunity from Dr. Ayyadurai's claims.

An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.'" *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) citing 47 U.S.C. § 230(f)(3).   "…[I]f a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408–09 (6th Cir. 2014); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) ("*Roommates*") ("section 230 provides immunity only if the interactive computer service does not 'creat[e] or develop[ ]' the information 'in whole or in part.'")

---

[2] The defamatory statements in the November 6 Article were apparently first posted to Techdirt in a comment at the end of the defamatory November 3, 2016, article.  *See* https://www.techdirt.com/articles/20161103/11502935958/heres-truth-shiva-ayyadurai-didn't-inventemail.shtml?threaded= false#c376 (Comment No. 28).  That comment was nominally authored by "Anonymous Coward."  Dr. Ayyadurai is not presently aware of Anonymous Coward's true identity, as he has not had an opportunity to conduct any discovery.  Thus, it is certainly possible that Anonymous Coward is a pseudonym used by Beadon himself.

Further, "the party responsible for putting information online may be subject to liability, even if the information originated with a user." *Roommates*, 521 F.3d at 1165. "Providing immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part.'" *Id.* at 1171; *see also People v. Bollaert*, 248 Cal. App. 4th 699, 719 (2016), *citing Roommates*, 521 F.3d at 1167 ("[T]he Ninth Circuit majority declined to read the statutory term 'development' so narrowly as to apply only to content that originated entirely with the Web site.")

Neither the First Circuit nor any federal court in Massachusetts has addressed the meaning of the term "development" in the context of Section 230. However, "the leading case [on the subject] is *Roommates*." *Jones*, 755 F.3d at 410. There, the Ninth Circuit stated: "we interpret the term 'development' as referring…to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Roommates*, 521 F.3d at 1167-68. For example, "a website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word 'not' from a user's message reading '[Name] did not steal the artwork' in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune." *Id.* at 1169.

Here, Beadon took an anonymous user's statements, which were buried in comments to an earlier defamatory article, and prominently published them in the body of a new article that he alone authored and published on Techdirt three days later. [Doc. 1 at ¶ 46, Ex. S.] By separately publishing these defamatory statements in a different section of the Website, in a different

context, and on a different date, Beadon materially contributed to the creation and development of a new defamatory article for which he is the information content provider.[3]

Beadon's conduct is readily distinguishable from the non-binding authorities upon which Beadon exclusively relies, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 402–03 (6th Cir. 2014) and *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 316–17 (D.D.C. 2011).   Neither of these cases involved a separate publication of a user submission, in a different section of a website, in a different context, and on a different date.

In *Jones*, the plaintiff sought to hold defendants, Dirty World LLC and Nik Richie, liable for the **original** publication of statements submitted by third-party users to defendants' website. *Jones*, 755 F.3d at 403-405.   The Court found that "Richie…does not materially change, create, or modify any part of the user-generated submission…"   *Id*. at 403.   Thus, the Court held that defendants were not exempted from protection under Section 230 simply because the statements "were selected for publication" by defendants.   *Id*. at 415-416.

In *Parisi*, the plaintiffs sought to hold three online booksellers, Books–A–Million, Inc. ("BAM"), Barnes & Noble, Inc. ("BAN") and Amazon.com, Inc., liable for the **original** publication of a third-party promotional statement on their websites.   *Parisi*, 774 F. Supp. 2d at 312.   The court found that plaintiffs' claims against BAM were barred by Section 230, stating: "[N]owhere does the plaintiff allege that BAM had any role or responsibility whatsoever in even

---

[3] Beadon's incorporation of these earlier defamatory statements in his November 6 Article also constitutes a republication of those statements, thereby triggering separate liability.   *See Firth v. State*, 98 N.Y.2d 365 (2002) ("Republication…occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely 'a delayed circulation of the original edition' (Citations)… Thus, for example, repetition of a defamatory statement in a later edition of a book, magazine or newspaper may give rise to a new cause of action.")

editing the promotional statement, let alone creating or developing it." *Id*. at 316.  The Court found that plaintiffs' claims against BAN and Amazon were barred by Section 230 because the promotional statement was uploaded by a third party without any editing (except for Amazon's removal of a duplicative paragraph).  *Id*. at 316.

Beadon's conduct is far more analogous to that of the defendants in *Perkins v. Linkedin Corp.*, 53 F.Supp.3d 1222, 1249 (N.D.Cal. 2014), and *Fraley v. Facebook, Inc.*, 830 F.Supp.2d 785, 802 (N.D.Cal. 2011), where the defendants copied information provided to them by users for one purpose and subsequently published that information for a different purpose in a separate context.

In *Perkins*, the plaintiffs filed a class-action against LinkedIn arising out of emails that LinkedIn sent to third parties using the plaintiffs' names and likenesses.  *Perkins*, 53 F.Supp.3d at 1225-1226.  LinkedIn argued that it was immune from liability under Section 230 because "Plaintiffs had already provided the essential content that LinkedIn only republished in the…emails." *Perkins*, 53 F. Supp. 3d at 1247–48.  In rejecting this argument, the Court held:

> Plaintiffs have sufficiently alleged that LinkedIn was responsible "at least in part" for creating or developing the reminder emails endorsing LinkedIn. (Citation)  As discussed above, Plaintiffs allege that LinkedIn generated the text, layout, and design of the …emails and deprived Plaintiffs any opportunity to edit those emails, which Plaintiffs had no knowledge were being circulated on their behalf.

*Perkins*, 53 F.Supp.3d at 1249.

In *Fraley*, the plaintiffs filed a class-action against Facebook arising out of third-party advertisements on Facebook that used the plaintiffs' names, likenesses and identities.  *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 790.  In holding that Facebook was not immune under Section 230, the Court stated:  "Plaintiffs allege not only that Facebook rearranged text and

images provided by members, but moreover that by grouping such content in a particular way with third-party logos, Facebook transformed the character of Plaintiffs' words, photographs, and actions into a commercial endorsement to which they did not consent." *Id*. at 802.

Like the publications that received no Section 230 immunity in *Perkins* and *Fraley*, Beadon copied the content originally published by an anonymous third-party user and later published it for a different purpose in a different context.

In any event, however, it is wholly premature to dismiss Dr. Ayyadurai's claims against Beadon on the grounds of Section 230 immunity.  As stated above, Dr. Ayyadurai is unaware of the true identity of the pseudonymous user who originally published the defamatory statements. Moreover, Dr. Ayyadurai has not had an opportunity to confirm when the original content was published, whether it was modified prior to being copied by Beadon and whether that user (in the event it was not Beadon himself) consented to Beadon's separate publication.

The Complaint alleges that the defamatory statements in the November 6 Article were authored by Beadon.  [Motion, p. 7; Complaint, ¶ 46]  This allegation is sufficient to defeat Beadon's claim to immunity under Section 230 at this stage of the proceedings.  *See Huon v. Denton*, 841 F.3d 733, 743 (7th Cir. 2016) (court denied motion to dismiss where plaintiff "adequately pleaded that at least some of the allegedly defamatory comments were authored by [defendant's] employees—thus making [Defendant] an 'information content provider' under § 230(f).")  In *Huon*, the Court stated: "Discovery is the proper tool for [Plaintiff] to use to test the validity of his allegations, and if he is unable to marshal enough facts to support his claim the…Defendants can move for summary judgment."  *Huon*, 841 F.3d at 742–43.

**3. The Court should view all of the defamatory statements and articles from all Defendants collectively because they constitute an integrated, intentional campaign to destroy Dr. Ayyadurai's reputation.**

Beadon argues that the Court should view the November 6 Article as somehow divorced from the other 13 articles referenced in the Complaint, and that Beadon be held liable only for the November 6 Article. However, Defendants' Defamatory Articles cannot be so readily disaggregated because they were all part and parcel of Defendants' larger campaign to destroy the personal and professional reputation of Dr. Ayyadurai.

As an initial matter, Beadon offers no support for the proposition that a court should grant a motion to dismiss as to one aspect of a claim if that aspect does not dispose of the entire claim. Beadon's baseless argument should be ignored.

"Rule 12(b)(6) is not the appropriate vehicle to strike objectionable portions of a complaint." *Hill v. United States*, 751 F. Supp. 909, 910–11 (D. Colo. 1990).

Beadon's argument provides no justification to dismiss any claim. The November 6 Article is but one part of the integrated libel claim brought by Dr. Ayyadurai and is specifically referenced therein. [*See* Doc. 1 at ¶ 56.] Because Beadon does not contest publishing the November 6 Article [*see* Doc. 28 at pp. 2-3], this Court cannot dismiss Dr. Ayyadurai's libel claim in its entirety even if it were true (which discovery will explore) that Beadon played no role in any of the other 13 Defamatory Articles.

In fact, it is totally unclear what Beadon even seeks with this argument. Overall, it appears to be some kind of plea to go easy on Beadon. It certainly does not warrant granting a motion to dismiss.

Even if the Court considers this argument, Beadon fails to demonstrate why liability cannot be imposed upon all Defendants for all of the Defamatory Articles.

When two or more articles would likely be received and perused by their audience together, the meaning of each statement must be viewed in light of all of the articles.  *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 187 (2d Cir. 2000) (stating that two articles in the same issue of newspaper, both about the plaintiff, should be read together).

In *Murphy v. Boston Herald, Inc.*, 449 Mass. 42 (2007), the court held that, where a defamatory statement made by one newspaper reporter was repeated by several other writers at the same newspaper, the newspaper was liable for each republication without a showing of actual malice on the part of each subsequent writer.   "An original publisher of defamatory material is liable for subsequent republication where 'the repetition was authorized or intended by the original defamer, or the repetition was reasonably to be expected.'"  *Id.* at 65 (citing Restatement (Second) of Torts § 576 (1977)).

The same logic applies here.  When multiple website authors repeat the same defamatory statements, in a clear campaign to destroy a person's reputation, liability for those statements attaches to all of those involved.  In fact, Defendants created and continue to maintain a dedicated page on their website that collects and makes available the full text of all their defamatory articles about Dr. Ayyadurai - https://www.techdirt.com/blog/?tag=shiva+ayyadurai. The 14 Defamatory Articles thus constitute an indivisible collective designed and intended by Defendants to destroy Dr. Ayyadurai's reputation.

Beadon's citation of *Catalfo v. Jensen*, 628 F. Supp. 1453 (D.N.H. 1986), does not alter these facts.  ***First***, *Catalfo* is obviously not binding on this Court; it has not been cited by this or

any other Massachusetts court.[4]  **Second**, *Catalfo* involved a summary judgment motion heard only after the parties had been able to conduct discovery regarding each defendant's involvement in the defamatory story at issue.  **Third**, the facts of *Catalfo* are entirely inapposite.  The one defendant who prevailed on summary judgment offered proof (including affidavits from the other defendants) that he was a free-lance photographer at the time of the publication, and was not even a staff photographer; he was only responsible for the non-defamatory photographs that accompanied the article, not for any of the actual defamatory text of the article.  *Id.* at 1455.

Beadon does not purport to be a free-lancer, and he did actually author and publish properly alleged defamatory content.  Finally, *Catalfo* highlights the fact that, at the very least, Dr. Ayyadurai must be permitted to conduct discovery concerning the extent to which all of Techdirt writers were involved in the creation and promulgation of each of the 14 Defamatory Articles.  The Court must not strike any issues from the case at its very outset simply because a defendant tries to minimize his liability when no discovery has yet occurred.

**4.  The defamatory statements are actionable statements of fact.**

Beadon repeats the arguments of the other Defendants that the defamatory statements complained of are mere opinions.  Because Beadon's argument is identical to that of Defendants Floor64, Inc. and Michael Masnick, and because the false and defamatory statements authored

---

[4]  The only time *Catalfo* has been cited in a defamation case, the court used it, contrary to Beadon's position, to hold that "... every person who directly or indirectly publishes or assists in the publication of an actionable defamatory statement is liable for the resultant injury."  *Sprague v. Walter*, 357 Pa. Super. 570, 591 n.9 (1986), *aff'd*, 518 Pa. 425 (1988).  Here, at the very least, Beadon indirectly assisted in the publication of all of the Defamatory Articles by perpetuating the campaign against Dr. Ayyadurai.  Beadon's own article was preceded and followed by other Defamatory Articles in whose creation and publication Beadon may well have played a part. This is further grist for the discovery mill.

and published by Beadon include those found in the other articles (namely that Dr. Ayyadurai is a "liar" and a "fraud"), Dr. Ayyadurai adopts and relies upon his memorandum in opposition to Defendants Floor64, Inc.'s and Michael Masnick's motion to dismiss.  [Doc. 30 at pp. 6-17.]

To summarize those arguments, calling a person a "liar" and a "fraud" is not merely opinion but a factual assertion that the claims made by the person are untrue or fraudulent.  Such charges are factually provable.  Recently, Judge Mastroianni opined that a statement saying a plaintiff had lied is a factual assertion: "But that *is* an objective fact capable of being proved true or false, which can be viewed as defamation under Supreme Court rationale."  *McKee v. Cosby*, 2017 WL 652452, at *8, n.13 (D. Mass. Feb. 16, 2017) (emphasis in original) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. … Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'")).

Defendants' defamatory statements, including those published by Beadon, do not simply state that Dr. Ayyadurai's claim to having invented email may be wrong.  Defendants' statements imply knowledge of facts that Dr. Ayyadurai has spoken an untruth.  Defendants also go the next step in their attack upon Dr. Ayyadurai's personal and professional reputation.  Whether Dr. Ayyadurai is a liar who based his entire reputation on the false claim of inventing email is yet another objective fact capable of being proved true or false.  Therefore, a Rule 12(b)(6) motion is inappropriate for resolving this claim.

Further, Defendants' defamatory statements, including those published by Beadon, do not disclose all of the facts upon which they base their "opinions."  "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 19.

 Here, despite Beadon's assertion to the contrary, the November 6 Article, including the user comment, does not disclose all facts.  Rather, they only disclose facts favorable to Defendants.[5]  For example, they do not disclose that Dr. Ayyadurai received the first U.S. Copyright registration for "Email" and "Computer Program for Electronic Mail System."  [*See* Doc. 1 at ¶ 17.]  They likewise do not disclose that numerous PhD's in the technology community and numerous members of the major media, including *TIME* magazine, *Wired* magazine and CBS, have supported Dr. Ayyadurai's assertion that he invented email.  [*Se,* Doc. 1 at ¶¶ 18-33.]

At best, the false and defamatory statements in the November 6 Article are not "pure" opinion.  Therefore, dismissal is not warranted.  *See Levinsky's, Inc. v. Wal–Mart Stores*, Inc., 127 F.3d 122, 127 (1st Cir. 1997) (stating that it is well established that "only 'pure' expressions of opinion, meaning those that do not imply the existence of undisclosed facts, are barred from supporting a defamation claim").

Finally, the false and defamatory statements in the November 6 Article are not mere hyperbole.  Again, Defendants portray themselves as serious contributors to technology industry

---

[5] In fact, Beadon's motion seems to concede that the November 6 Article, including the user comment, does not disclose all of the facts – only "numerous facts."  [Doc. 28 at p. 11.]

news.  Defendants' "About Us" page states:

> [T]he Techdirt blog uses a proven economic framework to analyze and offer insight into news stories about changes in government policy, technology and legal issues that affect companies' ability to innovate and grow. … Floor64 has been generating insights and developing insight platforms for over 10 years -- and doing so in unique and innovative ways designed to help drive businesses forward, rather than keeping them tied to the past.

[https://www.techdirt.com/about.php.][6]

While the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts, such a determination must be made through a reasonable person's eyes:

> The First Amendment does not allow courts to distort the reality of events under the guise of protecting freedom of expression.  Thus, a reviewing court must evaluate a speaker's statement as it was given and must resist the temptation to replace what was actually said with some more innocuous alternative.  The determination of whether a statement is hyperbole depends primarily upon whether a reasonable person could interpret the statement to provide actual facts about the individual or institution it describes.

*Levinsky's*, 127 F.3d at 131 (holding that statement: "you are sometimes put on hold for 20 minutes—or the phone is never picked up at all" was not hyperbole); *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (stating that to determine whether or not a statement is opinion or hyperbole, "a court must examine the statement in its totality and in the context in which it was uttered or published.  The court must [also] consider the words used ... [and] all of the circumstances surrounding the statement").

---

[6] Defendants attempt to characterize the Defamatory Articles as mere humorous blogs written in response to a heated debate.  However, Defendants are not random chat room commenters.  Rather, Defendants were the ones to start any "debate" under the guise of being experts, and Defendants were the ones to make any debate "heated" by going beyond the discussion of the invention of email to more expansively defame Dr. Ayyadurai's reputation.

A reasonable reader would view Defendants' Defamatory Articles, including the November 6 Article, as statements of facts about issues in technology.  Further, Defendants' website and articles discuss current topics in the technology industry, and Defendants' Defamatory Articles impugn Dr. Ayyadurai's business reputation.  "Statements about a person's vocational reputation … are particularly likely to be defamatory."  *Dellorusso v. Montiero*, 47 Mass. App. Ct. 475, 478 (1999) (finding defamatory meaning in statement that plaintiff's "work habits … are inconsistent with School Department standards").  Therefore, no reasonable reader would view the defamatory statements as hyperbole.  And, in any event, such a fact-intensive determination is uniquely unsuitable for resolution by means of a Rule 12(b)(6) motion.

**5.  Dismissing the Complaint before factual discovery is inappropriate.**

At minimum, Dr. Ayyadurai should be afforded the opportunity to develop the record through discovery so that this Court may assess the totality of circumstances to make an appropriate determination under the applicable standard.  *See Phantom Touring*, 953 F.2d at 727.

As previously discussed, since the statements made are "capable of being read in a defamatory way," dismissal is inappropriate at this earliest stage.  *Pan Am Sys. v. Atl. Northeast Rails & Ports, Inc.*, 804 F.3d 59, 72 (1st Cir. 2015); *see S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, No. CIVA 07-12018-DPW, 2008 WL 4595369, at *22 (D. Mass. Sept. 30, 2008) ("The Defendants in question may have intended these statements to be mere opinion or hyperbole, but the test is 'an objective test-i.e., inquiry into a reasonable recipient's understanding of the words rather than the speaker's intent.'") (*citing Phelan*, 443 Mass. at 57 [*quoting New England Tractor-Trailer v. Globe Newspaper Co.*, 395 Mass. 471, 479-80 (1985)]).

{00079269;1}                                                17

### 6.   Dr. Ayyadurai has alleged the requisite malice.

Beadon wholly adopts the argument of Defendants Floor64, Inc. and Michael Masnick

that Dr. Ayyadurai has failed to adequately allege that any Defendant acted with actual malice.

Because Beadon's argument is identical to that of Defendants Floor64, Inc. and Michael

Masnick, Dr. Ayyadurai adopts and relies upon his memorandum in opposition to Defendants

Floor64, Inc.'s and Michael Masnick's motion to dismiss.  [*See* Doc. 30 at pp. 17-19.]  *See also*

*Bose Corp. v. Consumers Union*, 692 F.2d 189, 196 (1st Cir. 1982), *aff'd*, 466 U.S. 485 (1984)

(holding that actual malice may be proven by inference, because it is unlikely that Defendants

will admit to their willful or reckless behavior); *Nat'l Ass'n of Gov't Emps. v. Cent. Broad. Corp.*,

379 Mass. 220, 232-233 (1979) (holding that where a defendant's state of mind is at issue, for

example, where actual malice must be shown, pre-trial discovery must be permitted to determine

the defendant's state of mind at the time the defamatory statements were made).

### 7.   Dr. Ayyadurai has adequately alleged claims for intentional interference with business advantage and intentional infliction of emotional distress.

Beadon also wholly adopts the argument of Defendants Floor64, Inc. and Michael

Masnick that Dr. Ayyadurai has failed to adequately allege claims for intentional interference

with business advantage and intentional infliction of emotional distress.  Because Beadon's

argument is identical to that of Defendants Floor64, Inc. and Michael Masnick, Dr. Ayyadurai

adopts and relies upon his memorandum in opposition to Defendants Floor64, Inc.'s and Michael

Masnick's motion to dismiss.  [*See* Doc. 30 at pp. 19-22.]

## IN THE ALTERNATIVE, DR. AYYADURAI MUST BE GIVEN LEAVE TO AMEND

### 1.  Standards.

"The court should freely give leave [to amend] when justice so requires."  Fed.R.Civ.P. 15(a)(2).  This phrase is interpreted as an affirmation of the liberal approach to pleading taken by the modern rules (*see, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962)) and as an encouragement to judges to decide a plaintiff's claims on the merits whenever possible.  *See Conley v. Gibson*, 355 U.S. 41, 48 (1957).  "[T]he liberal amendment policy of Rule 15(a) is a mandate to be heeded."  *Espinosa v. Sisters of Providence Health Sys.*, 227 F.R.D. 24 (D. Mass. 2005).  "Rule 15(a) requires that leave to amend be given freely in the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive, or undue prejudice to the opposing party."  *Chiara v. Dizoglio*, 59 F.Supp.2d 193, 198 (D. Mass. 1999).

### 2.  If necessary, leave to amend should be given.

If for any reason this Court believes that Dr. Ayyadurai has not adequately pled any of his claims, it should grant him leave to amend.  Further, if this Court finds that Dr. Ayyadurai has not sufficiently alleged actual malice, dismissal is still inappropriate since that issue can only be properly addressed after the parties are able to conduct discovery.

## CONCLUSION

For the foregoing reasons, the Court should deny Beadon's motion to dismiss in its entirety.  If the Court is inclined to grant the motion in any respect, it should grant Dr. Ayyadurai leave to amend.

Dated: March 28, 2017                    Respectfully submitted,

                                         **CORNELL DOLAN, P.C.**

                                         By: __/s/ Timothy Cornell_____
                                         Timothy Cornell
                                         BBO # 654412
                                         One International Place, Suite 1400
                                         Boston, Massachusetts 02110
                                         Tel: (617) 535-7763
                                         Fax: (617) 535-7721
                                         tcornell@cornelldolan.com

                                         **HARDER MIRELL & ABRAMS LLP**

                                         By: ___/s/ Douglas E. Mirell_____
                                         Douglas E. Mirell
                                         (Admitted *Pro Hac Vice*)
                                         132 S. Rodeo Drive, Fourth Floor
                                         Beverly Hills, California 90212
                                         Tel: (424) 203-1600
                                         Fax: (424) 203-1601
                                         charder@hmafirm.com

                                         *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first class mail to any non-registered participants.

                                         _____/s/ Douglas E. Mirell_____
                                         Douglas E. Mirell