UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————————

| | |
|---|---|
| SHIVA AYYADURAI, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 17-cv-10011-FDS |
| | ) |
| FLOOR64, INC., a California corporation | ) |
| d/b/a TECHDIRT; MICHAEL DAVID | ) |
| MASNICK, an individual; LEIGH | ) |
| BEADON, an individual; and DOES 1-20, | ) |
| | ) |
| Defendants. | ) |

—————————————————————————

**REPLY IN SUPPORT OF
DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE**

INTRODUCTION

Nowhere in Plaintiff's 77 pages of opposition briefing or his hundreds of pages of supporting materials does he identify a single provably false and defamatory statement of fact that Defendants published about him. Instead, Plaintiff repeatedly insists—all case law to the contrary—that Defendants can be held liable merely for using epithets such as "liar," "fake," and "bogus"[1] to describe him and his claim to be the "inventor" of email.[2] His aim, as he recently

---

[1] Plaintiff has no problem using such hyperbole himself. In a 2014 tweet, reprinted in one of the posts at issue, Plaintiff suggested, entirely without basis, that Techdirt was being "paid off" by BBN, the defense contractor that contributed to the development of email. (Compl. Ex. I.) In 2016, he asserted that anyone who disagrees with his claim to have invented email is promoting "racist lies." (Compl. Ex. N.)

[2] Plaintiff's purported sensitivity to such opprobrium is curious, given his recent decision to enter the rough-and-tumble of national electoral politics. See Lauren Dezenski, "New Name in Warren Senate Race Mix," *Politico.com*, Feb. 27, 2017 (reporting Plaintiff's announcement of his candidacy for the U.S. Senate seat currently held by Sen. Elizabeth Warren (available at http://www.politico.com/tipsheets/massachusetts-playbook/2017/02/new-name-in-warren-senate-race-mix-aca-top-of-mind-for-baker-in-dc-trumps-mass-sheriffs-218927)); see also www.shiva4senate.com. The lawsuit he has brought, however, is more than a curiosity. It is a blatant attempt to punish and suppress free speech.

affirmed on Twitter,[3] is to use the financial burden of this lawsuit to force the "shutdown" of

Defendants' website, Techdirt.com. On the allegations set out in Plaintiff's Complaint, that result

is constitutionally forbidden.

This lawsuit must be dismissed because both the First Amendment and the California

Anti-SLAPP law protect "vehement, caustic," and even "unpleasantly sharp attacks" on public

figures—speech that is integral to our "profound national commitment to the principle that

debate on public issues . . . be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan,

376 U.S. 254, 270 (1964); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 51–52 (1988);

Baumgartner v. United States, 322 U.S. 665, 673-674 (1944) ("One of the prerogatives of

American citizenship is the right to criticize public men and measures."); Cohen v. California,

403 U.S. 15, 25-26 (1971) (First Amendment protects expression that "conveys not only ideas

capable of relatively precise, detached explication, but otherwise inexpressible emotions as

well"); Flowers v. Carville, 310 F.3d 1118, 1127 (9th Cir. 2002) (the law "provides no redress

for harsh name-calling"). This lawsuit, which was "brought primarily to chill the exercise of free

speech" through "the threat of severe economic sanctions," Castillo v. Pacheco, 150 Cal. App.

4th 242, 249-50 (2007) (applying California anti-SLAPP law), should be brought to an end, now.

ARGUMENT

## I.    THE COURT SHOULD APPLY THE ANTI-SLAPP LAW OF CALIFORNIA.

"The purpose behind an anti-SLAPP law is to encourage the exercise of free speech."

Chi v. Loyola Univ. Med. Ctr., 787 F. Supp. 2d 797, 803 (N.D. Ill. 2011). Accordingly, "[a] state

---

[3] On February 19, 2017, Plaintiff tweeted a link to an online article about this case and stated: "Great analysis by @drjaniceduffy on why #FakeNewsMedia like TechShit need to be shutdown for their FAKE NEWS." (A true copy of the tweet is attached as Exhibit A to this Reply.) The article to which Plaintiff linked (Ex. B hereto) expresses the hope that Techdirt will meet a fate similar to that of Gawker, the internet publishing company recently bankrupted by a legal judgment and then sold. In the author's words: "Do I wish this to happen to Techdirt? Hell yes!" (Ex. B.)

has a strong interest in having its own anti-SLAPP law applied to the speech of its own citizens, at least when, as in this case, the speech initiated within the state's borders." Id. Many courts have thus held that "[t]he residence of the party seeking protection under the anti-SLAPP law . . . has great weight in the analysis" of which state's law to apply. Diamond Ranch Acad., Inc. v. Filer, 117 F. Supp. 3d 1313, 1324 (D. Utah 2015). Here, California, the home state of both the sole corporate defendant and the individual defendant who wrote 13 of the 14 blog posts, plainly has a stronger interest in the application of its anti-SLAPP law than does Massachusetts.

In attempting to resist the application of California law, Plaintiff clings to a single sentence in Section 150 of Restatement (Second) of Conflict of Laws: "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state." Whatever value this principle may have in choosing which substantive defamation law to apply, it is not determinative of anti-SLAPP choice of law.[4] So held the Ninth Circuit Court of Appeals in Sarver v. Chartier, 813 F.3d 891, 898 (9th Cir. 2016), when it acknowledged the presumption contained in Section 150 but held that it does not "end our inquiry," because consideration must still be given to "the factors enumerated in section 145 of the Second Restatement, which presents the 'general rule' that informs all torts." Those factors are (1) the place of injury, (2) the place where the conduct occurred, (3) the domicile of the parties, and (4) the place where their relationship (if any) was centered. Sarver, 813 F.3d 891,

---

[4] As the comments to Section 150 make clear, the law of the state where the plaintiff resides will not control if, "with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws, § 150, cmt. b (emphasis supplied). Whether such an interest exists "should be determined in light of the choice-of-law principles stated in § 6," and the extent of each state's interest must be determined "on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and of the particular issue involved." Id., citing Restatement (Second) Conflict of Laws, § 145, cmt. c-d. Thus, far from being the end of the analysis, as Plaintiff would have it, Section 150 cross-references the other choice of law principles that must be applied in all tort cases.

898. In light of the "multistate nature" of the alleged reputational harm (as in this case),[5] the California location of the allegedly wrongful conduct (as here), the fact that California offered more robust anti-SLAPP protection than did the Plaintiff's home state (same), and the absence of any relationship between the parties (ditto), the court ruled that California had "the most significant relationship to this litigation, which is sufficient to overcome any presumption of Sarver's domicile, wherever that may be." Id. at 900.[6]

Plaintiff next tries to distinguish cases that that have applied the anti-SLAPP law of the speakers' jurisdiction, but he mischaracterizes their holdings. For example, the federal district court in Global Relief Foundation v. New York Times Co., No. 01 C 8821, 2002 WL 31045394, at *10–11 (N.D. Ill. Sept. 11, 2002), did not "merely" assume that if an anti-SLAPP motion could be brought it would be unsuccessful, as Plaintiff suggests. (Opposition, Doc. No. 31, at 14.) Rather, it held that, assuming anti-SLAPP motions could be brought in federal court,[7] the

_____

[5] Backtracking from his Complaint's allegation of worldwide reputational harm, (Compl. ¶¶ 2, 50), Plaintiff newly asserts in a declaration that the "brunt" of his injury was felt in Massachusetts. (Ayyadurai Decl. ¶ 31.) This Court should not permit him to disavow the allegations of his Complaint, but regardless, the factors set out in Section 145 of the Restatement compel application of California anti-SLAPP law. Curiously, Plaintiff also relies on Calder v. Jones, 465 U.S. 783 (1984), which found that the *National Enquirer* was subject to *personal jurisdiction* in California. Personal jurisdiction analysis, which has to do with the foreseeability and fairness of requiring a party to appear in a court in a different state, considers different factors than choice-of-law analysis, which examines which state has the greater interest in the issue being litigated.

[6] Plaintiff asserts, erroneously, that the "only reason" the Ninth Circuit applied California law in Sarver was that there was insufficient evidence that the plaintiff resided in New Jersey. (Opposition, Doc. No. 31, at 12-13.) To the contrary, the Court specifically held that the California anti-SLAPP law would apply even "assuming *arguendo* that New Jersey was Sarver's domicile." Sarver, 813 F.3d at 900.

[7] Plaintiff briefly suggests that that the California anti-SLAPP statute should not apply in federal courts in this Circuit. (Opposition, Doc. No. 31, at 15 n.8.) This argument is foreclosed by Godin v. Schencks, 629 F.3d 79, 89 (1st Cir. 2010), where the First Circuit held that Maine's anti-SLAPP law applies in federal court because it is substantive and not inconsistent with the Federal Rules of Civil Procedure. Plaintiff offers no reason why the First Circuit would treat the California law any differently, and the very factors the Godin court considered in its determination regarding Maine's statute are true of the California statute as well. Like the Maine statute, the California law "shifts the burden to plaintiff to defeat the special motion," and "determines the scope of plaintiff's burden"—namely, to show a probability of

anti-SLAPP law of California (the speakers' residence) would apply rather than that of Illinois (the plaintiff's domicile) because California "has a great interest in determining how much protection to give California speakers." Id. Similarly, Plaintiff asserts that the facts of Diamond Ranch Academy, Inc. v. Filer, 117 F. Supp. 3d 1313 (D. Utah 2015), are distinguishable because they "do not implicate any multistate defamation issues." (Opposition, Doc. No. 31, at 15 n.10.) But Filer did, in fact, involve "multistate defamation": Like this case, allegedly defamatory statements about a non-California plaintiff were published on a California-based website. Id.

Plaintiff asserts that the Court cannot apply the anti-SLAPP law of California while adopting the substantive defamation law of Massachusetts because the courts of the Commonwealth have not applied "the doctrine of *dépeçage*" in "any case involving either defamation or an analysis of Section 150(2) of the Second Restatement" and have not even "use[d] the term *dépeçage*," and therefore the principle is "inapplicable." (Opposition, Doc. No. 31, at 15 & n.9.) Plaintiff fails to contend with the many Massachusetts decisions that have applied different states' laws to different issues in a single case. As the Supreme Judicial Court has held, "[T]here is nothing unusual about the laws of different States applying respectively to various phases of a single transaction or incident." Choate, Hall & Stewart v. SCA Servs., Inc., 378 Mass. 535, 542 (1979). Indeed, "there is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction." Pevoski v. Pevoski, 371 Mass. 358, 360 (1976) (holding that while "standards of conduct" are "more likely" to be controlled by the "law of the place of the tort," the "disposition of other issues" must turn "on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented");

---

success on the merits. Godin, 629 F.3d at 89; Cal. Civ. Proc. Code § 425.16. Also like the Maine statute, the California anti-SLAPP law is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right," and thus cannot be displaced by federal procedural rules. Godin, 629 F.3d at 87.

see also Schulhof v. Ne. Cellulose, Inc., 545 F. Supp. 1200 (D. Mass. 1982) (applying New Hampshire and Massachusetts law to different claims).[8] The mere fact that the doctrine has not yet been applied in a Massachusetts libel case—or that the courts here have not used a particular (and obscure) legal term of art—does not render it "inapplicable."[9]

Plaintiff also asserts that the California anti-SLAPP law is inapplicable because this case is not about a "matter of public interest." His novel argument is that Defendants went "beyond the issue of who invented email" when they waged an "attack" on his reputation by calling him a "liar" who made "bogus" claims. (Opposition, Doc. No. 31, at 18.) This Court should reject Plaintiff's attempt to parse the statements about which he complains. California's broad anti-SLAPP law protects all acts—including the use of vigorous epithets—"in furtherance" of "the right of . . . free speech" in connection with a public issue. Carver v. Bonds, 135 Cal. App. 4th 328, 360 (2005) (affirming allowance of special motion to strike where defendant called plaintiff a "liar"); Rosenaur v. Scherer, 88 Cal. App. 4th 260, 288 (2001), as modified (Apr. 5, 2001) (affirming allowance of special motion to strike claim based on use of words "thief" and "liar");

---

[8] Plaintiff cannot dispute that Massachusetts follows Restatement Section 145. Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643, 646 (1994) ("Section 145 of the Restatement provides the general principle applicable to all torts and to all issues in tort."). That section embodies the principle that choice-of-law determinations should be made issue by issue. Restatement (Second) of Conflict of Laws, Section 145, cmt. d ("The courts have long recognized that they are not bound to decide all issues under the local law of a single state.").

[9] In the only case Plaintiff cites that arguably supports his position, Adelson v. Harris, the court held that the substantive defamation law of the plaintiff's domicile would apply, and assumed that its anti-SLAPP law would apply along with it. 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) ("It is therefore Nevada's defamation law that will be applied in this action."). The Adelson decision did not address Global Relief Foundation, Chi, or the other cases that have applied dépeçage as to these issues. However, even Adelson refutes Plaintiff's contention that Restatement Section 150(2) is determinative: "[I]n cases where a defamatory statement is published nationally, there is only a 'presumptive' rule that the law of plaintiff's domicile applies, which 'does not hold true . . . if "with respect to the particular issue, some other state has a more significant relationship to the issue or the parties."'" Adelson, 973 F. Supp. 2d at 477, quoting Davis v. Costa–Gavras, 580 F. Supp. 1082, 1091 (S.D.N.Y.1984), and Restatement (Second) of Conflict of Laws § 150 cmt. e.

see also Gardner v. Martino, 563 F.3d 981 (9th Cir. 2009) (dismissing claim based on statement that plaintiff was "lying," under similar Oregon anti-SLAPP statute).

## II.     PLAINTIFF HAS FAILED TO IDENTIFY ANY PROVABLY FALSE FACT IN THE BLOG POSTS.

Plaintiff's opposition papers confirm that his quarrel with Defendants has nothing to do with the facts surrounding his development of an electronic mail computer program. Instead, his claim is grounded entirely on his assertion that to accuse someone of being "a liar and a fraud" can never constitute mere opinion.[10] (Opposition, Doc. No. 30, at 8-9.) Plaintiff cannot so easily brush aside the many cases holding that these exact terms are protected opinions, especially where—as here—they do not imply the existence of undisclosed defamatory facts. Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 730 (1st Cir. 1992) (holding "fake," "rip-off," "fraud," "scandal," "snake-oil job" to be non-actionable opinions); see Floor64 Memo at 12-13.

Plaintiff relies on *dicta* in McKee v. Cosby, No. CV 15-30221-MGM, 2017 WL 652452, at *8 n.13 (D. Mass. Feb. 16, 2017), suggesting that whether someone lied about being sexually assaulted is "an objective fact capable of being proved true or false." Id. (discussing Hill v. Cosby, 2016 WL 7229817 (3d Cir. Dec. 14, 2016)). Unlike such an accusation, however, there is no "core of objective evidence" with which one can assess the statement that Plaintiff lied about inventing email.[11] Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990), cited in McKee, 2017

---

[10] Defendants did not, in fact, call Plaintiff "a fraud." The only statement using that particular term is a third-party post by an anonymous commenter. (Compl. Ex. S.) As explained elsewhere, Defendants are immune from suit for that statement under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. (See Memorandum in Support of Leigh Beadon's Motion to Dismiss, Doc. No. 28, at 4-8.) Defendants did state that Ayyadurai took some comments from a RAND report "so out of context to be borderline fraudulent," (See, e.g., Compl. ¶ 47(e), Ex. T), but they made "full disclosure of the facts underlying [that] judgment." See Phantom Touring, 953 F.2d at 724 (opinions are non-actionable where defendant makes "full disclosure of the facts underlying his judgment").

[11] Plaintiff's reliance on McKee is curious, considering the court found the allegedly defamatory statement—a six-page letter by an attorney calling into question the credibility of the plaintiff—to be

WL 652452, *8 n.13 (statement that plaintiff lied under oath concerning fight at high school wrestling match was actionable because its truth could be tested); <u>CrossFit, Inc. v. Mustapha</u>, No. CIV.A. 13-11498-FDS, 2014 WL 949609, at *2–3 (D. Mass. Mar. 10, 2014) (Saylor, J.) (holding certain statements reviewing sports club were opinion and hyperbole, but others, which stated club owner engaged in "triple charging" and forged name on a lease, could "be proved true or false").[12] For Plaintiff to prove that he is not a "liar," he would have to somehow show by a preponderance of the evidence that he truly is the "inventor" of email. That proposition, however, depends entirely on one's "personal judgment" of what the essential qualities of "email" are. <u>Gray v. St. Martin's Press, Inc.</u>, 221 F.3d 243, 248 (1st Cir. 2000); <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 775 (1986) ("[A] public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation."). Just as it cannot be proven that Elvis Presley's "That's All Right" was the first rock 'n' roll record ever recorded,[13]

---

[12] Likewise, in <u>North Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC</u>, 491 F. Supp. 2d 111 (D. Mass. 2007), to which Plaintiff also cites, the court found that the statement that plaintiff was "not to be trusted" was not an opinion because it was based on the defendant's allegedly false claim that the plaintiff had wrongly "disseminated confidential information." As the court explained, that was a factual assertion that could be proven true or false. <u>Id.</u> at 127. The court did not hold, as Plaintiff appears to suggest, that merely attacking someone's credibility is defamatory.

protected opinion because the lawyer's credibility assessment was "not capable of being objectively verified or disproven," and the lawyer "adequately disclosed the non-defamatory facts underlying the opinions so as to 'immunize his [opinions] from defamation liability.'" <u>Id.</u> at *7. The court placed "particular importance" on the "breadth" of the letter, "which is six pages long and heavily footnoted with citations to articles and other sources supporting the author's view"—just like the Techdirt articles. If anything, this case presents a stronger candidate for protection because the articles here include hyperlinks to materials supporting plaintiff's point of view, including his website, inventorofemail.com, whereas the letter in <u>McKee</u> did not include "information from which readers might draw contrary conclusions." <u>Id.</u> at *9 (internal quotation marks omitted).

[13] <u>See</u> Christopher John Farley, "Elvis Rocks. But He's Not the First," *Time,* July 6, 2004 (decrying decision by City of Memphis to declare 2004 the "50th Anniversary" of rock 'n' roll by virtue of Presley's 1954 recording, and opining that "Rocket 88," recorded in 1951 by Ike Turner and his band, is a better contender for that title).

or that Jelly Roll Morton "invented" jazz,[14] so Plaintiff cannot prove to a jury that he "invented" email. Scholz v. Delp, 473 Mass. 242, 251 (2015), cert. denied, 136 S. Ct. 2411 (2016) (holding "subjective view[s]" not actionable).

Furthermore, as the First Circuit explained in Phantom Touring, opinions are non-actionable where the defendant makes "full disclosure of the facts underlying his judgment." 953 F.2d at 724. There is only one statement that Plaintiff tries to argue was unsupported by facts: the claim that Plaintiff "has built up his entire reputation" on his claim to have invented email. (Opposition, Doc. No. 30, at 13.) Even if this phrase amounted to a factual statement and not mere "imaginative expression" and "rhetorical hyperbole," Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997), still it would not be actionable because the articles plainly set forth the basis for the opinion. Those underlying facts include a screenshot of Plaintiff's Twitter bio, which at the time read: "Inventor of Email. Systems Scientist. Entrepreneur." (Compl. Ex. H.) The articles explain that Plaintiff's "entire Twitter stream is about him claiming to have invented email. Tweet after tweet after tweet are just about those claims. He has an entire website called 'the inventor of email.' He's written a book about email, which claims on the front page that he's 'the inventor of email.'" (Ex. H.)[15] In light of this information, a reader "could not reasonably conclude that [Defendants'] comments were based on undisclosed defamatory facts." Pritsker v. Brudnoy, 389 Mass. 776, 779 (1983).

---

[14] See Scott Yanow, "Jelly Roll Morton, Biography" (noting that Morton claimed "to have invented jazz in 1902") (available at http://www.allmusic.com/artist/jelly-roll-morton-mn0000317290/biography); Stuart Miller, "Telling the Story of Buddy Bolden, the Man Who 'Invented Jazz,'" Newsweek, Nov. 23, 2014 (reporting on film about cornetist Buddy Bolden, who "blended gospel, blues, ragtime and improvisation in a unique style that was loud and fearless," though "[i]t might be a tad hyperbolic to claim Bolden invented jazz.")

[15] News accounts demonstrate that Plaintiff's claim of inventing email is central to his popular biography. See, e.g., Eric Garcia, "Man Who Claims He Invented Email Files to Challenge Warren," Roll Call, March 29, 2017; Nik DeCosta-Klipa, "Cambridge man who says he invented email says he will challenge Elizabeth Warren in 2018," Boston.com, Feb. 28, 2017.

## III. PLAINTIFF FAILS TO PLEAD FACTS PLAUSIBLY DEMONSTRATING "ACTUAL MALICE."

There is an additional, independently sufficient, reason that the Court must dismiss the Complaint. Plaintiff fails to set forth "well-pled facts" showing that Defendants published the allegedly defamatory statements with actual malice. Schatz v. Republican State Leadership Comm., 669 F.3d 50, 56-58 (1st Cir. 2012) (holding that "to make out a plausible malice claim, a plaintiff must . . . lay out enough facts" from which knowing or reckless falsity "might reasonably be inferred," not mere "actual-malice buzzwords" or "legal conclusions").

Plaintiff argues that he should be allowed to proceed to discovery even if he has "not sufficiently pled" actual malice, because "intent and knowledge can only be ascertained through discovery." (Opposition, Doc. No. 30, at 17, 19.) Controlling precedent, however, is to the contrary. In Schatz, the First Circuit held that "to access discovery mechanisms, a plaintiff must *first* produce a complaint that passes the plausibility test" on the question of actual malice—a procedure that protects defendants from "wasting time and money in discovery on 'largely groundless' claims." Schatz, 669 F.3d at 56 (emphasis in original), citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007). "[I]t does no good to suggest" that "a judge can cast aside complaints 'just shy of a plausible entitlement to relief' on summary judgment: because the high cost of litigation can scare defendants into settling even a weak case pre-summary judgment, a claim must have some degree of plausibility before the parties are put through their discovery paces." Id. (internal citations omitted).[16]

---

[16] Plaintiff cites one case in support of his (boldface) assertion that "pre-trial discovery" on actual malice "**must be permitted**" even on a motion to dismiss: National Assoc. of Gov't Employees v. Central Broadcasting Corp., 379 Mass. 220, 232-233 (1979). (Opposition, Doc. No. 30, at 17-18.) That case, however, said no such thing. Rather, it addressed the denial of a motion for summary judgment on actual malice grounds.

Turning to the allegations in his Complaint, Plaintiff contends Defendants must have spoken with knowing falsity when they called Plaintiff a "liar" because they have acknowledged he created some kind of email program in the 1970's. (Opposition, Doc. No. 30, at 18.) But Defendants never accused Plaintiff of lying about writing an *email program*. Rather, they used the words "liar" and "lie" only to characterize Plaintiff's assertion that he is the sole "inventor" of email.[17] (See Compl. Exs. G, H, I, J.) Plaintiff has alleged no facts to show Defendants made those statements (which in any event are protected opinions) with knowing or reckless falsity.

Plaintiff next points to Defendants' awareness of the "prominent and reliable sources" who "have supported Dr. Ayyadurai's claim to have invented email" (Opposition, Doc. No. 30, at 18), as if those individuals' opinions about the origins of email are relevant to discerning whether *the Defendants* subjectively "entertained serious doubts as to the truth of [their] publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968); Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 499 (1991) (actual malice requires showing of "deliberate or reckless falsification"); McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 179 (D. Mass. 2015) (Saylor, J.), aff'd, 835 F.3d 192 (1st Cir. 2016) ("The relevant inquiry is a subjective one as to [defendant's] attitude toward the truth or falsity of the statement rather than his attitude toward the plaintiff.") (internal quotations omitted). In fact, two of defendant Masnick's posts directly

---

[17] Plaintiff implies that to call him a "liar" for claiming to have invented "email" is tantamount to saying he is lying about writing his computer program in 1978. That, Plaintiff says, is because his program was the first to "comprise[] an electronic version" of paper "interoffice mail" and the first to be called "email," while all the earlier programs were mere "electronic messaging." (Opposition, Doc. No. 30, at 8 n.3.) Plaintiff, in other words, insists that only he has the right to define what the word "email" means. He thereby seeks to impose on this Court the meaning that he assigns to Defendants' articles, greatly facilitating his contention that the assigned meaning is false. See Lewis Carroll, *Through the Looking-Glass*, ch. 6 (1934) ("'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'"). The law, however, is to the contrary. The meaning of an allegedly defamatory statement is what a "reasonable reader" would think upon reading the statement. Amrak Prods., Inc. v. Morton, 410 F.3d 69, 72 (1st Cir. 2005). See also Pan Am Systems v. Atlantic Northeast Rails and Ports, 804 F.3d 59, 64 (1st Cir. 2015) (court should not "interpret words in the most negative … way imaginable") (internal quotation omitted).

address, link to, and dispute these individuals' conclusions. See, e.g., Compl. Ex. G (refuting

claims by Leslie Michaelson and Larry Weber that Plaintiff's copyright is the equivalent of a

patent and constitutes governmental recognition of inventor status); Ex. H (noting that Deborah

Nightingale article does not dispute that the essential components of email pre-existed Plaintiff's

program). Masnick's consideration of, and disagreement with, the views of these writers does not

show that he had "serious doubts" about the truth of what he wrote—if anything, it shows that he

was expressing his own sincerely held opinion based on disclosed facts.

Plaintiff also argues that Defendants' "failure to speak to Dr. Ayyadurai or the authors of

the various articles supporting his claims further evidences Defendants' malice." (Opposition,

Doc. No. 30, at 18-19.) Apart from the fact that the Complaint never alleges that Defendants

failed to contact those individuals, Plaintiff is, again, wrong on the law. It has long been settled

that mere "failure to investigate before publishing, even when a reasonably prudent person would

have done so, is not sufficient to establish reckless disregard."[18] Harte-Hanks Commc'ns, Inc. v.

Connaughton, 491 U.S. 657, 688 (1989), citing St. Amant, 390 U.S. at 733; Michel v. NYP

Holdings, Inc., 816 F.3d 686, 704 (11th Cir. 2016) (dismissing complaint because "failure to

investigate does not give rise to a finding of actual malice"); Stone v. Essex Cty. Newspapers,

Inc., 367 Mass. 849, 867-68 (1975) (availability of "information . . . which would cause a

reasonably prudent man to entertain serious doubts is not sufficient" for actual malice.).

---

[18] Plaintiff seriously misquotes Murphy v. Boston Herald, Inc., 449 Mass. 42, 60 (2007). He repeats the
Supreme Judicial Court's statement that "the purposeful failure to investigate known witnesses may be
proof of actual malice," (Opposition, Doc. No. 30, at 19), but omits the crucial opening phrase of that
sentence, which clarifies that such failure to investigate is relevant only "[w]hen substantial doubts have
been raised as to the veracity of a reporter's information." Id. at 60. Plaintiff has pointed to no facts even
suggesting, let alone showing, that "substantial doubts" had been raised prior to publication (or thereafter)
about the accuracy of any factual information contained in the articles.

IV.     **DEFENDANTS ARE IMMUNE FROM LIABILITY FOR THE THIRD-PARTY CONTENT CONTAINED IN THE NOVEMBER 6, 2016 POST.**

In his opposition to defendant Leigh Beadon's motion to dismiss, and in an effort to evade the strict bar of the Communications Decency Act, Plaintiff advances several contradictory characterizations of the authorship of Beadon's "Funniest/Most Insightful Comments of the Week" post. (Compl. Ex. S.). He first states that Beadon "took an anonymous user's statements . . . and . . . published them in a body of a new article." (Opposition, Doc. No. 33, at 7-8.) Then, two pages later, he alleges that "the defamatory statements in the November 6 Article were authored by Beadon" himself. (<u>Id.</u> at 10.) Elsewhere he acknowledges that he "is not presently aware" of who wrote the statements, but "it is certainly possible" that it was Beadon. (<u>Id.</u> at 6 n.2.) Whichever version of the facts Plaintiff may ultimately choose to advance, Defendants are immunized from liability as a matter of federal law.

Section 230 protects Defendants from any claim based on their decision to re-post the third-party comment to another location on the website. Notwithstanding Plaintiff's unsupported assertions to the contrary, courts have uniformly held that mere verbatim re-posting of third-party content amounts to a decision "whether to publish, withdraw, postpone or alter content"— precisely the kind of "traditional editorial function" Section 230 was intended to immunize. <u>Universal Comm. Sys., Inc. v. Lycos, Inc.</u>, 478 F.3d 413, 422 (1st Cir. 2007), quoting <u>Zeran v. Am. Online, Inc.</u>, 129 F.3d 327, 330 (4th Cir. 1997). "Section 230 immunity," as one court in this circuit has summarized, "depends on the source of the *information* in the allegedly tortious statement, not on the source of the statement itself." <u>Doe v. Friendfinder Network, Inc.</u>, 540 F. Supp. 2d 288, 295–96 (D.N.H. 2008) (internal citations omitted). Where a third party is "the source of the allegedly injurious matter," the Defendants "cannot be held liable for 're-posting' [it] elsewhere without impermissibly treating them as 'the publisher or speaker of [ ] information

provided by another information content provider.' The CDA shields the defendants from precisely that kind of liability." Id. (internal citations omitted). On that basis, this federal court, affirmed by the First Circuit, recently rejected a plaintiff's claim that was based on a classified advertising website's creation of "sponsored" advertisements. Doe ex rel. Roe v. Backpage.com, LLC, 104 F. Supp. 3d 149, 157 (D. Mass. 2015), aff'd sub nom. Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12 (1st Cir. 2016), cert. denied, 137 S. Ct. 622 (2017). The court explained that "[t]he creation of sponsored ads with excerpts taken from the original [third-party] posts" did not render the website a content creator, because the content of those ads reflected "the illegality (or legality) of the original posts and nothing more." See also Roca Labs, Inc. v. Consumer Opinion Corp., 140 F. Supp. 3d 1311, 1320 (M.D. Fla. 2015) ("reposting allegedly defamatory comments authored by third parties does not preclude Section 230 immunity"). Plaintiff cites no authority for his assertion that verbatim re-posting of a comment turns a website into a "content creator" under Section 230, because none exists.[19]

Defendants have already explained why Plaintiff cannot circumvent Section 230 immunity by baldly asserting that Beadon, and not a third party, "authored" the comment. (Memorandum, Doc. No. 28, at 7-8); Kimzey v. Yelp! Inc., 836 F.3d 1263, 1268 (9th Cir. 2016)

---

[19] Plaintiff misleadingly points to Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1166 (9th Cir. 2008), to support his incorrect contention that re-posting a third party's comment makes a website a "developer" of its content. In fact, the only reason the Ninth Circuit denied Section 230 immunity in Roommates was because the roommate-matching website there required users to make selections from prescribed menus about their gender, sexual orientation, and whether they lived with children, and to indicate their preferences about living with others based on the same criteria, in alleged violation of fair housing laws. 521 F.3d at 1161. By mandating the posting of discriminatory preferences, the site was "materially contributing to [the] alleged unlawfulness" of the content at issue. Id. at 1168. Roommates, later courts have observed, "carved out only a narrow exception" to immunity that "turned entirely on the website's decision to force subscribers to divulge the protected characteristics and discriminatory preferences as a condition of using its services." Goddard v. Google, Inc., 640 F. Supp. 2d 1193, 1198-99 (N.D. Cal. 2009) (internal quotation marks omitted). Indeed, the Roommates court held that the website *was* entitled to immunity as to content on a second part of the website, which allowed users to post "Additional Comments" of their own choosing. 521 F.3d at 1174. That is the portion of the decision that applies here, because there is no allegation (nor could there be) that Defendants "forced" or "required" the third-party commenter to say anything.

("threadbare allegations of fabrication of statements are implausible on their face and are insufficient to avoid immunity under the CDA"). In response, Plaintiff relies on <u>Huon v. Denton</u>, 841 F.3d 733 (7th Cir. 2016), but fails to note that the complaint in that case devoted more than *four pages* of plausible allegations to the website's control over comments. These allegations included an explanation of the basis for believing that the defendants' employees "might have anonymously authored comments," and their economic motivations for doing so. <u>Id.</u> at 742. Plaintiff, by contrast, has offered only a threadbare, conclusory assertion, which fails to "raise a right to relief above a speculative level." <u>Twombly</u>, 550 U.S. at 555.

## V. THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR LEAVE TO AMEND HIS COMPLAINT.

Finally, as an "alternative" to dismissal, Plaintiff requests that he be given leave to amend. (Opposition, Doc. No. 30, at 23.) However, he offers no reason for the Court to believe that amendment would render his claims viable. "[W]here, as here, a request to file an amended complaint consists of nothing more than 'boilerplate sentences stating the well-settled "freely given" standard under which a request for leave to amend is generally analyzed,' a district court 'act[s] well within its discretion when completely disregarding the request.'" <u>U.S. ex rel. Ge v. Takeda Pharm. Co.</u>, 737 F.3d 116, 128 (1st Cir. 2013), quoting <u>Silverstrand Investments v. AMAG Pharmaceuticals, Inc.</u>, 707 F.3d 95, 107-108 (1st Cir. 2013) (affirming denial of amendment where plaintiff did not do "the necessary leg work" of "set[ting] forth the factual and legal predicate for the remedy sought").

Plaintiff cannot alter the content of the Techdirt articles by amending his complaint. If any facts existed that could cause his "already fatally flawed claim" to "spring back to life," he presumably would have exercised his right to amend within 21 days of the filing of Defendants' motion to dismiss. <u>Silverstrand Invest.</u>, 707 F.3d at 108; Fed. R. Civ. P. 15 (a party may amend

its pleading "once as a matter of course within . . . 21 days after service of a motion under Rule 12(b)"). Particularly as Plaintiff has admitted that he is using this meritless lawsuit to try to achieve the "shutdown" of Techdirt.com (Ex. A), there is no reason for the court to exercise its discretion to permit amendment.

<u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in Defendants' memoranda in support of their motions to dismiss and to strike, Defendants ask that their motions be allowed, that this case be dismissed, and that Defendants be awarded their reasonable attorneys' fees and costs.

FLOOR64, INC., MICHAEL MASNICK, and LEIGH BEADON,

By their attorneys,

*/s/ Robert A. Bertsche*
Robert A. Bertsche (BBO #554333)
*rbertsche@princelobel.com*
Jeffrey J. Pyle (BBO #647438)
*jpyle@princelobel.com*
Thomas Sutcliffe (BBO #675379)
*tsutcliffe@princelobel.com*
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, Massachusetts 02110
Dated:  April 13, 2017                    Tel:  (617) 456-8018

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first class mail to any non-registered participants.

*/s/ Robert A. Bertsche*
Robert A. Bertsche



 **V.A. SHIVA** ✔
@va_shiva

 Follow ⌄

Great analysis by @drjaniceduffy on why #FakeNewsMedia like TechShit need to be shutdown for their FAKE NEWS.
drjaniceduffy.com/2017/02/ayyadu … .


**Ayyadurai v Techdirt: The latest in the Litigation v Masnick**
As a point of clarification, I am no fan of Techdirt because they used their Google page rank power to decimate and ridicule me after I won on liability v Google over another online extortion w...
drjaniceduffy.com

RETWEETS
**6**

LIKES
**7**

     

7:21 PM - 19 Feb 2017

↩ 1      ⇄ 6      ♥ 7

B

☰    Navigation

Contact Us

# Internet Defamation: A Case Blog

## Ayyadurai v Techdirt: The latest in the Litigation v Masnick

by **Janice** on 19/02/2017 in **Blog**

Tweet

As a point of clarification, I am no fan of Techdirt because they used their Google page rank power to decimate and ridicule me after I won on liability v Google over another online extortion website (Ripoff Report) in October 2015. I pleaded with Masnick to refrain from increasing the hurt and remove the comments that I am a criminal. But he simply dissed me.

However, when a most probably true review about his business was published on the website Pissed Consumer, Masnick, who supported this website in a litigation, simply 'pulled rank' and got it removed.

In January 2017 Masnick and Techdirt were sued by the inventor of email, Dr V.A. Ayyadurai. They not only refuted his claim but made serious and derogatory statements about him. Defamation is the communication of a false statement that harms the reputation of an individual person, business, product, group, government, religion, or nation.

The statements about Dr Ayyadurai that were made by Masnick and his writer were not only of a poor journalistic standard, but designed to defame and ridicule him in a series of cruel blog posts. The aim of Techdirt was, as always, to incite it's readers into a mob rule against Dr Ayyadurai. Techdirt is not known for the intelligence of its readers and they have made a series of threats against me in response to Masnick's diatribes.

It appears that Masnick's legal team have now asked the Court to dismiss the claim based upon the argument that Dr Ayyadurai is "seeking to use the muzzle of a defamation action to silence those who question his claim to historical fame". But this is a red herring and an attempt to impute blame upon Dr Ayyadurai.

In the motion to dismiss Techdirt did not question the legitimacy of Dr Ayyadurai's claim using methods of rigorous academic debate: Techdirt's lawyers attempted to make light of their client's aim to decimate his character and ridicule him for the purposes of entertaining its audience.

In December 2011 Google filed a similiar strikeout motion for the purpose of disposing my claim. After a court hearing His Honour Master Blumberg stated in his decision:

> There is no possible basis for striking out the entire second statement of claim (as sought in paragraph 4 of FDN 23) and I therefore do not consider that proposed order further.

Four years later I took the case to trial and won.

Masnick wrote in a blog post asking for donations to Techdirt's survival fund:

*In the end, this isn't a debate about facts. It has taken up a significant amount of my time (and the time of others who work here) over the last month and delayed multiple projects that we were working on, and even forced us to pass on writing about many stories we would have liked to cover.*

Well, tell someone who cares! Techdirt's 'work' is not serious and informative journalistic debate. Far from it! It is basically tabloid level gossip designed to profit from hurting people. There is a difference between reporting facts and completely decimating a person to feed the needs of what appears to be an audience of tabloid level readers with corresponding intelligence levels!

But Dr Ayyadurai's lawsuit is not only about his invention of email. It is a fight about standing up to online defamation and the right to be free of the power of entrenched interests and attacks by its mob rule mentality.

According to Masnick, "the fight itself is incredibly distracting and burdensome". Seriously Mikey? Try losing your quality of life and ability to work to the Google supported power of online page rank. Oh and grow a heart, a soul, or some balls – whatever!

Responsible journalism is about reporting the facts in an unbiased manner. Masnick and his cronies 'embellish' the facts to the point of inflicting further distress on individuals.

I do not know Dr Ayyadurai. But I applaud him for taking a stand. Hopefully Masnick and Techdirt will now understand the exhaustion and powerlessness that one faces when confronted with attempting to regain ones's life from these opportunistic vultures.

I would like to think that Masnick will see sense and learn that integrity and compassion are necessary when one wields such power. But I doubt that will occur while Techdirt remains in its present capacity as a highly ranked website that believes it can act with impunity. Welcome to my world! Maybe Masnick will learn that there are more important things in life than profiting from hurting people.

But what Masnick and Techdirt do not realise is that they are already irrelevant. It is NOT about them for the supporters. A quick perusal of the comments on the article calling for legal fighting funds shows that Masnick does not get it: They will go under and the commentators will find another blog to express their disaffected garbage.

After all, Denton is now irrelevant, is flopping around in obscurity and his company has been sold. Gawker lives on but hopefully in a format in which ethical journalists will write about important issues. Do I wish this to happen to Techdirt. Hell yes! there is a obviously an important role for critical online debate that respects and promotes free speech. Techdirt is not such a format.

In the meantime, "Masnick declined to comment beyond his court filings and blog post". Masnick always has something to say so I guess he is being 'silenced' to a large degree by his lawyers. Since Masnick likes to parade his ability to hurt people at the top of Google this 'gagging' must be the worse sanction of all. Karma mate, Karma!!!

🏷 **Criminal, Defamation, Free Speech, Google, Harassment, Legal Cases, Mike Masnick, Techdirt, Victory for Victims**

‹ Ayyadurai v Masnick: The Law in the USA and Australia      Darren M Meade California Craigslist Conman Beware ›

Comments are closed.

## Submit Google Search Supression Request

Simply enter the search phrases that display unfavorable results in Google Search and choose your country:

For example, John Doe    | USA/Global (www.google.com)    ▼ |    NEXT STEP

(Disclosure)

## Latest Posts

- Darren Meade Ripoff Report Reputation Hitman
- Siamack Yaghobi, Ed Magedson's Special Friend
- Ed Magedson's Dinner
- The Great Darren Meade tries to get a Date
- Calvary Chapel: Darren Meade Rapist & Thief is a Pastor?
- Darren Meade Recalcitrant Copyright Thief
- Darren M Meade California Craigslist Conman Beware
- Ayyadurai v Techdirt: The latest in the Litigation v Masnick
- Ayyadurai v Masnick: The Law in the USA and Australia
- Dr Shiva Ayyadurai sues Techdirt and Mike Masnick for Defamation
- Mike Masnick of Techdirt Sued for Defamation: Gawkered!
- Adam Kunz Ripoff Report Attorney and Bagman
- Danny Scalf: Harassment and Extortion for Ripoff Report
- Former Ed Magedson & Ripoff Report Protege Eric Skelling is a Criminal
- Ripoff Report and John B Richter Tries to Spook and Fails
- Siamack Yaghobi Extortion
- Milorad Trkulja Loses a Defamation Appeal to Google in an Australian Supreme Court
- Ripoff Report, Ed Magedson and his Paid Employee, Darren M Meade Sued for USD$60 million: Gawkered!
- Ed Magedson of Ripoff Report: A History of Harassment and Extortion
- Darren M Meade Ripoff Report Paid Writer: Harassment and Extortion

## 🔊 Fair Search (US)

- FairSearch comment on filing of OIP complaint on Android
- Statement by Thomas Vinje, counsel to FairSearch:
- It is time to end Google's abuse of its Android monopoly

## 🔊 Search Neutrality (UK)

- Implementing and Monitoring a Non-Discrimination Remedy
- Lifting the Veil on Google's 3 November Blog Post
- Foundem's Statement on Today's SSO to Google
- The Microsoft-Google Truce
- An Analysis of Google's Public Response to the EC's Formal Charges

- The European Commission Issues a Statement of Objections to Google
- Open Letter to Commissioner Almunia and College of Commissioners

## Sookman Internet Law (Can)

- Computer and Internet Updates for 2017-04-11
- Computer and Internet Updates for 2017-04-10
- Computer and Internet Updates for 2017-04-09
- Computer and Internet Weekly Updates for 2017-04-08
- Information location tool and fair dealing copyright defenses rejected: Trader v CarGurus
- Computer and Internet Updates for 2017-04-07
- Computer and Internet Updates for 2017-04-06

## Tweets

Follow @drjaniceduffy

## Tweets

## The Precursor (USA)

# Tweets by @drjaniceduffy



**Janice Duffy**
@drjaniceduffy

Melania Trump was vilified bc of a respectable job & her marriage like in 1950s. She fought back & won, way to go Melania, @realDonaldTrump

5h



**Janice Duffy**
@drjaniceduffy

shiva4senate.com Can't vote bc not American but this guy is an Indian American who has fought 4 ordinary people against #fake & won

**Shiva Ayyadurai for US Senate | Be the Light!**
Massachusetts ignited the American Revolution. Let's BE THE LIGHT & FIGHT for the American Dr…
shiva4senate.com

5h



**Janice Duffy**
@drjaniceduffy

Dr Ayyadurai stands up to the vested interests in power – he wins, the world is a better place because he looks after ordinary people

6h

Janice Duffy Retweeted



**German Shepherds**
@BestOfShepherds

Police dog is given retirement presents from the community on his last day on the job



Embed

View on Twitter

- Why Title II Net Neutrality Directly Conflicts with Consumer Privacy
- Trump Administration Implications for Google Antitrust in EU, US & Markets
- On PBS NewsHour Gigi Sohn & I Discuss End of FCC Broadband Privacy Order

- Congress right to save consumers from net neutrality privacy rules The Hill Op-ed
- NetCompetition: FCC BDS Deregulation Will Spur Infrastructure Investment
- Google Antitrust Implications of Makan Delrahim as DOJ Antitrust Chief
- NetCompetition Statement on Senate CRA of FCC Broadband Privacy Order

## Defamation Watch AU

- Trkulja III not as good as the originals: Google Inc v Trkulja [2016] VSCA 333
- Strip club owner is no brothel madam: Hardie v Herald & Weekly Times [2016] VSCA 103
- Barrister's internet defamation: He fought the law and the law won: Dods v McDonald [2016] VSC 201
- Dank v Nationwide News Pty Ltd [2016] NSWSC 295. Number of days in Stephen Dank's defamation trial – 20. Judgment Awarded – Priceless
- Artists' appeal upheld, record verdict set aside and re-trial ordered: Vakras v Cripps [2015] VSCA 193

## Inforrm Law & Media

- Facebook's 'fake news' plan is doomed to failure: social media must do more to counter disinformation – Tom Felle
- The Supreme Court decision in Flood, Miller and Frost: a defence lawyer's perspective – Keith Mathieson
- With 'no-win-no-fee' deals harder to get in libel cases, government must choose whether to back the corporate press or the ordinary citizen – Brian Cathcart
- CFAs and ATE premiums out of the running in freedom of expression cases – Nicola Cain
- News: Supreme Court dismisses newspapers' Article 10 CFA appeals

*Powered by WordPress. Designed by* **WOO THEMES**