UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHIVA AYYADURAI, an individual,  )
                    Plaintiff    )
                                 )  Civil Action
                                 )
vs.                              )  No. 17-10011-FDS
                                 )
FLOOR64, INC., a California      )
corporation d/b/a TECHDIRT;      )
MICHAEL DAVID MASNICK, an        )
individual; LEIGH BEADON, an     )
individual; and DOES 1-20,       )
                    Defendant    )

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

MOTION HEARING

John Joseph Moakley United States Courthouse
Courtroom No. 2
1 Courthouse Way
Boston, MA 02210

April 20, 2017
2:00 p.m.

Valerie A. O'Hara, FCRR, RPR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The Plaintiff:

    Harder, Mirell & Abrams, by DOUGLAS E. MIRELL, ESQ.,
132 S. Rodeo Drive, Beverly Hills, California 90212;

    Cornell Dolan, P.C., by TIMOTHY CORNELL, ESQ.,
One International Place, Boston, Massachusetts 02110;

For the Defendants:

    Prince Lobel, by JEFFREY J. PYLE, ESQ., ROBERT A.
BERTSCHE, ESQ., and THOMAS R. SUTCLIFFE, ESQ.,
One International Place, Boston, Massachusetts 02110.

ALSO PRESENT:  Dr. Shiva Ayyadurai
                  Michael Masnick, Leigh Beadon

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Thank you.  Please be
seated.  Court is now in session in the matter of
Dr. Shiva Ayyadurai vs. Floor64, Inc., Civil Action
Number 17-10011.

Would counsel please identify themselves for the
record.

MR. CORNELL:  Good afternoon, your Honor,
Timothy Cornell for the plaintiff.

MR. MIRELL:  Good afternoon, your Honor,
Douglas Mirell also for the plaintiff, and with us is
Dr. Ayyadurai.

THE COURT:  Good afternoon.

MR. PYLE:  Good afternoon, your Honor,
Jeffrey Pyle.  Mr. Beadon and Mr. Masnick are in the
courtroom today.  With me at counsel table is my partner,
Rob Bertsche, and my associate, Thomas Sutcliffe.

THE COURT:  All right.  This is the hearing on a
motion to dismiss.  Mr. Pyle, it's your motion, I'll hear
from you first.

MR. PYLE:  Thank you, your Honor.  There are
three well-established First Amendment principles that
require the dismissal of this case.

The first is a statement has to be provably
false to be the subject of a libel claim.  The defendants

here are being sued for their opinion that Shiva Ayyadurai

isn't the inventor of e-mail.  The defendants say that

other people developed the fundamentals of e-mail long

before plaintiff wrote his 1978 computer program, and

their personal judgment that it's those earlier systems,

and not the plaintiff's system that deserves to be called

the first e-mail system, is a nonactionable opinion

protected by the First Amendment.

The second principle is that a public figure

libel plaintiff, as Mr. Ayyadurai admits he is, has to

show that the defendants published with knowing falsity or

reckless disregard for the truth.  That being said, even

if there were some provably false statement in the

article, the plaintiff has to allege facts, and not mere

buzz words and labels and conclusions, showing actual

malice.

The third principle is that a court proceeding

cannot be used as a vehicle to punish or chill the

exercise of free speech.  That principle derives from the

First Amendment, and it's expressed in the California

anti-SLAPP law, which applies here under Massachusetts

choice of law principles.

The articles here constitute the exercise of

free speech on a public issue, and the plaintiff hasn't

shown a probability of success on the merits of his

claims.  For that reason, we've brought motions to strike the complaint under the California anti-SLAPP law.

With the Court's permission, I'd first like to address the issue of opinion.  Most of the 84 allegedly defamatory statements identified in the complaint amount to various ways of saying that plaintiff is falsely holding himself out to be the inventor of e-mail.

The articles don't say that the plaintiff misrepresented anything he actually did.  They acknowledge he created an e-mail program in 1978, when he was 14 years old, and they congratulate him for that.

The defendants just dispute the significance of that accomplishment and say it doesn't make him the inventor of e-mail, and that's because of these earlier computer programs that allowed users of networked computers to send textural messages to each other using the familiar protocol of name, @ symbol and computer name.

The plaintiff, of course, disagrees with that. He says those earlier programs are mere electronic messaging and his is the first program that could properly be called e-mail, but what's striking about this case is that there's very little dispute, there's actually no dispute over the underlying facts.

Plaintiff acknowledges what the ARPANET researchers did in the 1960's and '70's, the defendants

1    acknowledge what the plaintiff did when he was 14 years

2    old.  The debate really boils down to a disagreement about

3    what the significance of those facts are, and that is the

4    kind of personal judgment that the *Gray* case and the

5    *Phantom Touring* case and *Milkovich* says is not susceptible

6    to proof one way or the other.  You can't prove a

7    subjective personal judgment true or false.  That's what

8    this case is about.

9              Now, plaintiff points out that the articles use

02:06PM 10    words like "liar" and "fake e-mail inventor" and "bogus,"

11    and he argues that those kinds of words are always

12    provably false.

13             Well, first of all, we've cited numerous cases

14    where those exact same words have been held to be

15    nonactionable opinions.  They're on pages 12 and 13 of our

16    main memorandum on the 12(b)(6) motion.  You have to look

17    to what the article said the plaintiff supposedly lied

18    about to determine if the statement is provably false or

19    as opposed to being just the speaker's subjective

02:07PM 20    conclusion, and here the articles say without exception

21    that plaintiff lied about being the inventor of e-mail.

22             So that means that if he were to try to prove

23    his case, and the *Hepps* case says that if a plaintiff like

24    him, who's a public figure, has to prove the statement to

25    be false, the plaintiff would have to prove that he really

and truly is the inventor of e-mail, and that takes you

right back to the very subjective question about what are

the defining fundamental characteristics of e-mail, which

is a personal judgment call.

The statements are also protected under our

First Amendment case law because the defendants

articulated the exhaustive, non-defamatory factual bases

for their conclusions, and they cited and even repeatedly

and extensively hyperlinked to documents articulating the

plaintiff's side of the story, too, and under

*Phantom Touring* and other cases, that renders them First

Amendment protected opinions, and with the Court's

permission, I'd like to hand up just one example of this

extensive articulation of the non-defamatory facts.

This is Exhibit G to the complaint, which is the

first in the series of the allegedly defamatory articles.

I've handed up a highlighted copy, and as the Court can

see, it's quite a long article.  It's five pages,

single-spaced, and in the second paragraph, it sets forth

precisely what I've just said, that there's no dispute

Mr. Ayyadurai was apparently a very bright 14 year-old who

wrote an e-mail software program for the University of

Medicine and Dentistry in New Jersey.

By all accounts, it was a perfectly decent

e-mail system.  No one doubts that he received a copyright

1   registration, but the problems are, this article says,

2   that e-mail was created before 1978, and in the next

3   paragraph, it goes through and details exactly what

4   existed before 1978, including hyperlinks to

5   documentation, including the source code for these prior

6   e-mail systems.

7        You go onto the next page, and this article

8   acknowledges he has a copyright registration.  We have a

9   screen shot of the copyright registration.  He cites to

02:09PM 10  supporters of Mr. Ayyadurai's arguments that the copyright

11  makes him the inventor of e-mail and explains why

12  copyright is different than a patent and that a copyright

13  is really just a registration, it's not a declaration that

14  anybody invented anything.

15       On the next page, there is further statements

16  that the plaintiff alleges to be defamatory, which is that

17  Mr. Ayyadurai in the defendant's opinion misquoted and

18  misrepresented the content of a RAND report from the 1970s

19  to support his view that his program was the first e-mail

02:10PM 20  claim.  He says that one of these earlier researchers

21  claimed that e-mail was impossible to create.

22       This article explains why that's a misreading of

23  the report and hyperlinks to the report so that readers

24  can actually read it for themselves.  That is then

25  repeated again on the next page, and on the final page, 6

1    of 7 on this printout, the article says, "Ayyadurai has

2    built up his entire reputation around the entirely false

3    claim he invented e-mail.  His bio Twitter feed and his

4    website position himself as having invented e-mail."

5           It takes you down to a website Mr. Ayyadurai

6    set up called, "inventorofemail.com" where he makes these

7    claims, and it hyperlinks to that website so that readers

8    can see for themselves what his side of the story is.

9           The article concludes by saying, "Mr. Ayyadurai

02:11PM 10   should be proud of what he wrote in 1978.  He may have

11   made some incremental improvements on what else was

12   already out there, but that is not inventing e-mail."

13   None of the evidence he has put forward makes him the

14   inventor of e-mail in Mike Masnick's opinion.

15          So when you go back to the first page of this

16   exhibit, you see the stated undisputed, non-defamatory

17   bases for the personal judgment reflected in the headline,

18   "Why is the *Huffington Post* running a multi-part series to

19   promote the lies of a guy who pretended to invent e-mail?"

20          In context, reading the article as a whole,

21   which was required in this analysis, the epithet "lies" is

22   not used to imply undisclosed, defamatory facts suggesting

23   deceit or lying, it is intended to a reasonable reader

24   means only that this is the subjective characterization

25   and opinion of Mike Masnick.

1        And on this point, the *Phantom Touring* case is

2   particularly instructive.  That case involved a newspaper

3   column questioning whether a comedy production called,

4   *"Phantom Of The Opera"* was in marketing itself trying to

5   intentionally deceive customers into thinking they were

6   buying tickets for the Andrew Webber musical, which was

7   very popular back then in 1986.

8        The Court said, "Of greatest important is the

9   breadth of the articles, which not only discussed the

02:13PM 10   facts underlying the writer's view but also gave readers

11   information from which they might draw contrary

12   conclusions."

13        The articles contained the sort of

14   self-contained give and take, a verbal debate, within the

15   article.  That's exactly the case with Exhibit G.  That's

16   exactly the case with the other articles.  An insertion of

17   deceit, which was made in *Phantom Touring* in that case,

18   reasonably could be understood only as the writer's

19   personal conclusion about the information presented, not

02:13PM 20   as a statement of fact.  That is this case also.

21        The First Amendment also protects rhetorical

22   hyperbole, the use of imaginative expression, rhetorical

23   hyperbole, even vituperative and unpleasant attacks on

24   public figures.  Accusation of lying and equivalent

25   remarks have been held to be rhetoric in many cases, such

as in the *Underwager* case of the Ninth Circuit, where a
direct allegation of lying was held strictly to be
rhetorical hyperbole, a vigorous epithet used by those who
considered the plaintiff's position extremely
unreasonable.

Plaintiff takes exception to statements that he
stakes his entire reputation on being the inventor of
e-mail, but, again, no reasonable reader could have
understood that to actually convey a provable fact one way
or the other.

In any event, the articles talk about how his
Twitter bio describes himself in the first line as
"inventor of e-mail," how all of his Tweets are about
inventing e-mail, registering inventor of "e-mail.com" for
himself, and the overall tenor of all these articles and
the tone of these articles very clearly signal to a
reasonable reader that the writer is offering up opinion.
They include subheads, like from the "That's just wrong
department," and titles like, "The View from Bogustan."
This clearly signals to a reader that these are opinions
that are being offered of the reader.

The second principle I mentioned why this case
must be dismissed is on the question of actual malice.
Even if there were some factual, provably false statement
in this case, the complaint would still fail to state a

1    claim because under the *Schatz* case of the First Circuit,

2    a complaint has to contain facts plausibly suggesting

3    actual malice for a plaintiff to proceed to the discovery

4    phase.

5         These have to be facts that satisfy *Iqbal* and

6    *Twombly* on this question, not just conclusions and legal

7    buzz words, and the allegations in the complaint do not

8    come close to that standard.

9         The only fact set forth in the complaint that

02:15PM 10   purports to show knowing falsity or reckless disregard for

11   the truth is that the website, "Gawker," a different

12   website, having nothing to do with the defendants, settled

13   a case with the plaintiff after 10 of the 14 articles on

14   Techdirt had already been published, but, of course,

15   actual malice looks to the suggestive state of mind of the

16   defendant at the time of publication and learning facts

17   about something after you've published says nothing about

18   subjective state of mind, and even as to the four articles

19   that came after the Gawker settlement, the fact that there

02:16PM 20   was a compromise without admission of liability of a

21   different claim based on a different article written by a

22   different defendant on a different website in the context

23   of a bankruptcy says nothing about Mike Masnick's state of

24   mind at the time he wrote the articles at issue in this

25   case.

1       In responding to our motion to try to show

2    actual malice, plaintiff points to the fact that the

3    defendants didn't try to talk to him before publication.

4    First of all, he doesn't point to any fact that he could

5    have cleared up had the defendants spoken to him, but,

6    beyond that, it's settled law that mere failure to

7    investigate does not show actual malice.  That's the

8    *Harte-Hanks vs. Connaughton* case.

9       Plaintiff points to the fact that Techdirt has

10   acknowledged he created some kind of an e-mail program, so

11   Mr. Masnick must have been speaking with knowledge of

12   falsity when he called plaintiff a liar, but the article

13   never accused him of not inventing an e-mail program, they

14   repeatedly acknowledged that he did so.

15      Finally, plaintiff points to his supporters and

16   said, "I have renowned supporters who support my claim and

17   agree with my opinion," but that, again, says nothing

18   about Mike Masnick's state of mind as to the truth of the

19   facts that he reported.  All it shows is that there's a

02:17PM 20   disagreement between plaintiff's supporters and

21   Mr. Masnick.

22      The failure to plead facts showing actual malice

23   is, of course, fatal to the plaintiff's complaint under

24   the *Schatz* case and given the important First Amendment

25   interest in protecting speech about public figures.  That

1     is perfectly appropriate.

2           Without that rule, public figures would be able

3     to subject their critics to the burdens of discovery when

4     there's no reasonable likelihood of demonstrating an

5     important constitutional element of their claim.

6           Finally, I'd like to address our motions to

7     strike under the California anti-SLAPP law.  Under

8     Massachusetts choice of law principles, which

9     Massachusetts adheres to the restatement second of

02:18PM 10     conflict of laws, the question of which states anti-SLAPP

11     law to apply boils down to which state has the greater

12     interest in the particular question at issue.

13           The weight of authority applying those

14     restatement principles is that the anti-SLAPP law of the

15     state where the speaker is located should control, at

16     least where the speech emanated from that jurisdiction, as

17     it did here, as you can see in the affidavit of

18     Mike Masnick, submitted in support of the motion to

19     strike.

02:18PM 20           That is the holding of numerous cases we cite in

21     the brief, such as the *Chi* and *Palermo* cases from the

22     Northern District of Illinois, *Global Relief* out of the

23     Southern District of New York, the *Filer* case from Utah,

24     and the *Sarver* case of the Ninth Circuit.  All of these

25     decisions apply the anti-SLAPP law of the speaker's

1    jurisdiction, not the plaintiff's jurisdiction.

2          That's because a state has a great interest in

3    protecting its citizens from strategic lawsuits against

4    public participation, an interest that outweighs any

5    interest of the plaintiff's jurisdiction in SLAPP law

6    application.

7          Now, plaintiff objects and points to cases and

8    principles that speak to the substantive law of defamation

9    that should apply, and Restatement Section 150 discusses

02:19PM 10   that in cases of widespread defamation via movies or other

11   means of mass communication, you look to the plaintiff's

12   jurisdiction.

13         The Courts have held that applies to conduct

14   regulating rules, such as the rules of substantive

15   defamation, not to a question of immunity.

16         Anti-SLAPP laws are statutes of immunity.

17   Immunity is of a different character.  There are different

18   interests at play, and under the restatement principles,

19   you look to the speaker's jurisdiction as to what

02:20PM 20   anti-SLAPP law to apply.  Here, that's California.

21         Assuming the Court does apply the anti-SLAPP law

22   of the State of California, it should grant the motions to

23   strike.  Publication of these articles meets the statutory

24   standard in that statute of acts in furtherance of the

25   exercise of the constitutional right of free speech in

1    connection with an issue of public interest and who should

2    be credited with creation of a

3    fundamentally-transformative technology of human

4    communication is an interest of public interest, as

5    California courts have defined that material.

6          Plaintiff doesn't really dispute that.  He tries

7    to make a distinction between that issue, which all the

8    articles are about, and attacks on his reputation, which

9    he says are not protected.

02:21PM 10          Well, there's no authority for that point of

11    view.  As a matter of fact, there are many California

12    cases where the same kinds of epithet the plaintiff

13    objects to are held to be protected by the anti-SLAPP law.

14    That means that the burden shifts to the plaintiff to show

15    a probability that he'll succeed on the merits of his

16    claims.

17          That is a very high standard.  That means he has

18    to establish evidentiary support for his claims at this

19    stage of the litigation.  So, especially as to the actual

02:21PM 20    malice question, there has been no competent, admissible

21    evidence introduced to show that any defendant published

22    any fact with knowing falsity or reckless disregard.

23          They haven't even stated a claim of actual

24    malice, let alone established admissible evidence that

25    shows a probability they'll succeed in showing actual

1   malice by clear and convincing evidence, which is the

2   constitutional standard.  That means that plaintiff has

3   failed to sustain his burden under the motions to strike,

4   and they should be allowed.

5       There are a few other issues in controversy in

6   the case, but unless the Court has particular questions

7   about them or about anything else, I have said I would

8   rest on the papers on the other issues except to say that

9   in conclusion, three principles require dismissal of this

02:22PM 10   case:  No false statement, no provably false statement; no

11   allegation showing actual malice; and this is a SLAPP case

12   under California law.

13       THE COURT:  All right.  Thank you.

14       MR. PYLE:  Thank you, your Honor.

15       THE COURT:  All right.  Who's going to take the

16   lead for the plaintiff?  Mr. Mirell.

17       MR. MIRELL:  Yes, if I may use the podium?

18       THE COURT:  Yes.

19       MR. MIRELL:  Your Honor, may it please the

02:23PM 20   Court, for 27 months through an integrated series of 14

21   defamatory articles, all of which are made available on a

22   single web page, Techdirt has undertaken a vendetta

23   against the personal and professional reputation of our

24   client, Dr. Shiva Ayyadurai.

25       Techdirt is a purveyor, your Honor, of mendacity

1    under the guise of its bogus claims that the 14 defamatory

2    articles it published contain only opinion or rhetorical

3    hyperbole.  In truth, however, the articles published by

4    Techdirt contain enumerable materially false statements of

5    facts:

6          First, whether Dr. Ayyadurai invented e-mail is

7    a question of fact, not opinion or rhetorical hyperbole.

8          THE COURT:  Let me stop you there.

9          MR. MIRELL:  Yes.

02:24PM 10          THE COURT:  You say he invented e-mail requires

11    that we define "e-mail," does it not?

12          MR. MIRELL:  It does, your Honor.

13          THE COURT:  And how do we do that?  I mean, in

14    patent cases, we face this problem constantly, even where

15    you have a patent and it has an elaborate statement of the

16    claim of what you invented.  We still have claim

17    construction.  I mean, it's a very elaborate process to

18    define what is the invention, and if reasonable people

19    could disagree on what is e-mail, you know, even assuming

02:24PM 20    that they agree that he invented some piece of it, how is

21    that a provable fact?

22          I mean, let's take, for example, if he didn't

23    invent the "@" symbol, a lot of people would say, well,

24    that's a critical component of e-mail, and if he didn't

25    invent that, how can you say he invented e-mail, or if he

1    didn't invent sending text from one computer to another,

2    which apparently he did not?

3         MR. MIRELL:  So, your Honor, what we have done

4    in our complaint is clearly identified what we believe are

5    the components of e-mail.  We have identified those in

6    paragraphs 13 and 18 of the complaint, and we have said

7    that those are the critical components that identify what

8    e-mail is.  There is no necessary reason to take the

9    Court's example why the use of an "@" symbol is necessary

02:25PM 10    in order to accomplish an e-mail transmission.

11         THE COURT:  Isn't that an opinion?  In other

12    words, you say that's what constitutes e-mail?

13         MR. MIRELL:  Well, your Honor, the question

14    ultimately is a question for the jury, and the question

15    for the jury is whether or not the components that we have

16    identified in our complaint as constituting the requisite

17    components for establishing what is commonly understood by

18    those jurors, by reasonable people, to be e-mail, is in

19    fact what "e-mail" is and is in fact what Dr. Ayyadurai in

02:25PM 20    fact invented.

21         THE COURT:  All right.  Please continue.

22         MR. MIRELL:  So if I can suggest to your Honor

23    that what the plaintiffs -- what the defendants in this

24    case have done is that they have essentially said that

25    Dr. Ayyadurai is not responsible for any aspect of e-mail,

1   and they do that instead of referring you to Exhibit G of

2   our complaint, I'd refer you to the November 3rd article

3   from 2016, which I believe to be Exhibit R.

4   And in that case -- yes, it is Exhibit R.  In

5   that case, the claim is made, and I'm quoting directly,

6   and I apologize for the language I'm using, your Honor,

7   "Shiva Ayyadurai's claim that he invented e-mail is

8   complete bullshit.  It's not true, not even remotely."

9   Your Honor, that is the theme of these articles.

02:27PM 10   That is the theme of the vendetta that has been waged by

11   Techdirt against my client.  What they are saying is that

12   he played no meaningful role whatsoever, and the fact that

13   they acknowledge that he accomplished certain tasks when

14   he was working in New Jersey is not -- does not derogate

15   from the fact that the invention that he created is an

16   invention that is commonly known and understood by the

17   public as e-mail.

18   And we have, your Honor, presented to the Court

19   statements from 12 experts in this field who have provided

02:27PM 20   us with testimony, and their statements are included

21   within the complaint itself that indeed my client invented

22   e-mail.

23   Now, beyond that question is the question of

24   what else they have said about him.  They have said that

25   Dr. Ayyadurai lied, committed fraud or made bogus claims

1    concerning the circumstances surrounding his e-mail

2    creation efforts, and those, your Honor, too, are all

3    questions of fact.  They are not opinion or rhetorical

4    hyperbole.

5           In the November 6th article from 2016, Exhibit S

6    to our complaint, the statement is made, "Ayyadurai is a

7    liar, he is a fraud, he is a charlatan."

8           Now, it remains to be seen, your Honor, and we

9    acknowledge this, whether a reasonable jury would conclude

02:28PM 10    that defendant's claim that Dr. Ayyadurai is a fraud is

11    tantamount to a criminal accusation, which would be per se

12    defamatory or simply a shorthand form of false invective

13    that is ruinously damaging to his personal and

14    professional reputation and thus defamatory per quad, but

15    there are other claims that they have made.

16           They claim in their articles that my client has

17    deceived reporters into writing articles attributing the

18    creation of e-mail to him, and that, too, is a question of

19    fact, not opinion or rhetorical hyperbole.

02:29PM 20           They assert that he has built his entire

21    reputation upon his e-mail creation efforts.  That, too,

22    is a question of fact, not opinion or rhetorical

23    hyperbole, and this is a man whose career spans 40 years,

24    and the fact that he mentions this aspect of his career in

25    his Twitter bio or that he did so in the context of a book

1   that he wrote where the subject of the book is e-mail in

2   no way means that his "entire -- " to use the defendant's

3   phrase, " -- reputation was built upon this."

4        In any event, your Honor, this is clearly grist

5   for the discovery mill.  The defendants have never couched

6   their own statements about my client as mere opinions, and

7   that's a significant fact, although it certainly wouldn't

8   be dispositive as the *Milkovich* Court has identified.

9        The defendants do not state all facts upon which

02:30PM 10  they rely to make their factual statements, and let me

11  give one very clear example of that.  In Defendant

12  Beadon's November 16th, 2016 article, he quotes an

13  anonymous commenter who writes without citing any support

14  whatsoever that, "Shiva Ayyadurai did not invent e-mail."

15       Beadon's article introduces this comment by

16  saying that it reiterates a quote, to use his words,

17  "simple fact," a fact, not an opinion, not rhetorical

18  hyperbole.

19       And, your Honor, your colleague on this court,

02:30PM 20  Judge Mastroianni, in February noted in his opinion in

21  *McKee vs. Cosby* that calling someone a "liar," as

22  defendants repeatedly do, indeed, they repeatedly called

23  him a "liar" on approximately a dozen occasions, calling

24  him a "faker" or a "falsifier" on 42 occasions, calling

25  him a "bogus purveyor of this concept" on 17 occasions and

1    claiming that he didn't invent e-mail on 23 occasions,

2    with respect to the accusation that one is a liar, that is

3    defamatory, Judge Mastroianni concluded, and while *McKee*,

4    while the *McKee* case that he decided acknowledges the

5    existence of contrary, non-First Circuit authority, as

6    defendants' counsel has pointed out, although he points

7    out no contrary Supreme Court authority on the subject,

8    the *McKee* case correctly describes the interpretation and

9    application of defamation law as complex and dizzying, but

02:31PM 10    given that characterization, assuming that were a true

11    characterization, it would be both inappropriate and

12    irresponsible to dismiss my client's claims at this very

13    earliest stage without providing him the opportunity

14    either to conduct discovery or to amend his complaint if

15    there is any aspect of it which the Court believes to be

16    inadequate.

17          I'd like to sort of begin in reverse order, if I

18    could, by addressing the anti-SLAPP motion issue because

19    defendant's motion to strike is a pure unadulterated

02:32PM 20    exercise in SLAPP law shopping.

21          To the best of our knowledge, your Honor, and

22    this is important, no state court in Massachusetts and no

23    federal court within the First Circuit has ever applied

24    California's anti-SLAPP statute, and certainly none of the

25    defendants here have cited such a case, whether in the

1   defamation or any other context.  Doing so here, we

2   submit, would therefore be both unprecedented and

3   fundamentally wrong.

4         Indeed, your Honor, as you may be aware, among

5   the Judges within the Ninth Circuit itself, there is a

6   significant split concerning whether the extensive

7   procedural provisions of this statute, including its

8   explicit provision under Subdivision I, mandating an

9   interlocutory appeal of any ruling granting or denying an

02:33PM 10   anti-SLAPP motion, whether that interferes with the

11   extensive procedural provisions of the Federal Rules of

12   Civil Procedure in violation of the Supreme Court's

13   *Hanna vs. Plumer* decision of 1965.

14         Defendants really in this case have relied very

15   heavily upon the Ninth Circuit's *Sarver* decision, and that

16   was mentioned here by my colleague shortly before I spoke.

17   That decision, the *Sarver* case, is obviously not binding

18   authority in this jurisdiction and far from holding that

19   the speaker's jurisdiction should control.

02:34PM 20         *Sarver* actually acknowledged the following, and

21   I quote from page 898:  "In cases of defamation, the

22   second restatement factors normally would call for the

23   application of the law of the plaintiff's domicile."

24         Now, the only reason the *Sarver* Court chose to

25   apply the anti-SLAPP law of California was because the

1    evidence presented by the plaintiff was in the Court's

2    words, "insufficient to establish the state of New Jersey

3    as his legal domicile," and the Court held that, "merely

4    being stationed in New Jersey for two years," as

5    Sergeant Sarver was, "was insufficient to create

6    domiciliary status, and, in any event, military personnel

7    during their enlistment period retain the domicile they

8    possessed prior to entering the service."

9        Now, defendants recognize that there is no basis

02:34PM 10   whatsoever for bringing an anti-SLAPP motion against my

11   client under Massachusetts law.  They say that he likely

12   is not subject to that law, and that's so, of course,

13   because the Massachusetts anti-SLAPP statute,

14   Section 59(h) of Chapter 231 speaks only to the right to

15   petition governmental bodies, which obviously is wholly

16   irrelevant to my client's claims in this case.

17       Moreover, that statute was first enacted two

18   years after the passage of California's anti-SLAPP law,

19   thus the Massachusetts legislature, I think can

02:35PM 20   conclusively be presumed to have been well aware of the

21   broad contours of other states' anti-SLAPP statutes and

22   should be presumed to have deliberately decided to

23   constrict the breadth of its own anti-SLAPP law, so what

24   defendants are asking you to do is to reach across the

25   continent to glom onto a more far-reaching statute that

1    allows them a shot at delaying the prompt adjudication of

2    this litigation by imposing a stay upon discovery and by

3    creating an opportunity for a costly and time-consuming

4    interlocutory appeal.

5         And they do so, your Honor -- and this is

6    fascinating -- they do so without even mentioning that one

7    of the defendants sitting here in the courtroom today,

8    Leigh Beadon, is not only not a Californian, but he's not

9    even a resident of the United States.  He lives in and

02:36PM 10    presumably wrote the November 6th article that I

11    previously referred to from his home in Toronto.

12         Section 150, Sub 2 of the Restatement Second of

13    Conflict of Laws contains the presumption that the law to

14    be applied hasn't and can't be overcome by these

15    defendants, and that's the restatement section that is

16    referred to explicitly and discussed in *Sarver* and the

17    conclusion reached that Sergeant Sarver could not prove

18    himself to a domiciliary of any state, much less

19    New Jersey.

02:36PM 20         Certainly -- and that provision of the

21    restatement says that, "When a natural person claims that

22    he has been defamed by an aggregate communication,"

23    there's no dispute that this is that, this is an aggregate

24    communication, "the state of most significant relationship

25    will usually be the state where the person was domiciled

1    at the time if the matter complained of was published in

2    the state," so there's nothing unusual about this case

3    that would take it outside the parameters of this

4    presumption and rule.

5         There's also no dispute that Techdirt's articles

6    were and remain available for reviewing in Massachusetts,

7    and there are also no particular issues implicated by this

8    litigation within the meaning of Comment B to Section 150,

9    and defendants have identified none.

02:37PM 10         Instead, your Honor, this is a classic garden

11   variety, multi-state defamation of an individual plaintiff

12   who unquestionably is a Massachusetts domiciliary and has

13   been such for well more than three decades, and since

14   defendants have not contested that, I'm not going to

15   explore all the ways in which we've demonstrated that my

16   client is indeed a Massachusetts domiciliary.

17        What defendants seek to do though is to ask this

18   Court to ignore the time-tested maxim of jurisprudence

19   that particular expressions qualify those which are

02:38PM 20   general, and instead of focusing upon the restatement

21   provision that is applicable to this case, that involving

22   the tort of multi-state defamation, defendants seek to

23   divert this Court's attention to a provision that speaks

24   to tortious conduct in general, that's Section 145, and

25   when that fails, to a provision which speaks to no

1    specific cause of action, which is Section 6 of the

2    restatement.

3         In any event though, defendants present nothing

4    to suggest that California has any more significant

5    relationship to either the occurrence or to the parties

6    implicated by this litigation than does Massachusetts,

7    and, indeed, the fact that two of the three defendants may

8    be domiciled in California is really only a matter of

9    happenstance since, as we all know, this article could

02:38PM 10   have easily been written, just as easily written on a

11   Wi-Fi-enabled desert island in the middle of the Pacific

12   Ocean.

13        Now, even if resort were had to Section 145 or 6

14   of the restatement, Massachusetts still clearly has the

15   more significant relationship to the defamatory statements

16   to the injuries that are suffered by Dr. Ayyadurai and to

17   the significant monetary damages resulting therefrom,

18   including to the ongoing business dealings of his five

19   operating Massachusetts companies, those that he currently

02:39PM 20   owns or operates.

21        Moreover, should there ever be a question about

22   the role that M.I.T. as an institution may have played

23   either in the life of Dr. Ayyadurai or in the creation of

24   e-mail, as these defamatory articles repeatedly suggest,

25   that's yet another reason why Massachusetts has the more

1    significant relationship to this litigation.

2          With respect to the statute itself, if it were

3    to be found applicable, your Honor, Dr. Ayyadurai's

4    complaint and the supporting declarations we submitted

5    clearly establish that his claims at least have the

6    requisite minimal merit, which is the standard, and

7    satisfy the requirement that he demonstrate a reasonable

8    probability of prevailing on the merits, and I don't

9    intend to go into that in any great detail because I think

02:40PM 10   it is quite clear that the California statute does not and

11   cannot apply in this case.

12          Defendants talked about the *Phantom Touring*

13   case.  Let me spend a moment talking about that.  With

14   respect to -- and they cite it with respect to trying to

15   demonstrate that the statements made by our client are

16   opinion.

17          Well, the fact is that the 14 defamatory

18   articles, unlike the story that was at issue in that case,

19   do not embody subjective aesthetic judgments found in a

02:41PM 20   newspaper's theater column, which according to the opinion

21   itself was, "known to contain more opinionated writing

22   than the typical news report."

23          And this was a case, too, about the production

24   of a musical comedy that was sought to be passed off as

25   the acclaimed Broadway drama, but unlike the *Phantom* case,

Techdirt's stories don't present, "all sides of the issue."  They are a one-sided and defamatory rant without any "give and take."

What they have in fact done -- because they did not speak to Dr. Ayyadurai and because they did not speak to any of the individuals who wrote any of the articles that predated any of the postings by Techdirt, including the story in *TIME* magazine that's an exhibit to our complaint, including, *The Wired Story*, that's likewise an exhibit to our complaint, as well as other stories that were published during the course of the defamatory string of publications -- all of those, in all of those cases, there are statements that are made that do not allow the Court to conclude that this is opinion as opposed to factual statements.

He is not -- our client is not given the opportunity to refute the claims that are being made by the defendants in the articles that they published.  He is not, for example, was never asked why M.I.T.'s 1965 mailbox system is not e-mail, never given an opportunity to refute that assertion.

He was never given the opportunity to explain why the advances by Mr. Tomlinson, including the use of an @ symbol, are or are not e-mail, or why the folders that were created by Larry Roberts in 1975 are or are not

1    e-mail, or why the MS personal messaging system is not

2    e-mail, or why the ARPANET is not e-mail, or why the use

3    of a BCC in the 1997 RFC -- RFC, by the way, stands for

4    "request for comment --" why that is not e-mail, or why

5    the 1977 RAND report by Mr. Crocker doesn't undermine my

6    client's claims.

7         None of those -- all of those are statements

8    that our client was never given an opportunity to respond

9    to, and the issue of whether or not Techdirt has failed to

02:43PM 10   investigate I think is spoken to profoundly by that

11   failure because what it demonstrates is the fact that our

12   client was not given that opportunity, and that as a

13   consequence, the failure to investigate can constitute

14   willful disregard for the truth of a matter, and that

15   speaks, too, to the actual malice question that was

16   addressed by my colleague.

17        THE COURT:  Do you agree that he is a public

18   figure for these purposes?

19        MR. MIRELL:  Your Honor, we have not contested

02:44PM 20   that at this time.  We don't believe that that issue has

21   been resolved yet.  We don't believe it necessarily needs

22   to be resolved because we believe he satisfies the

23   requirements of *New York Times*' constitutional malice.

24        We believe that the failure to investigate can

25   be and in this case is proof of the purposeful avoidance

1   of the truth, and we believe this is particularly true

2   where Techdirt not only did not speak with my client, but

3   he also did not speak -- they also, the authors of those

4   articles, did not speak with any of the authors of the

5   prior articles, including the *TIME Magazine* and *The Wired*

6   *Story*.

7        To the extent that these issues have not been

8   fully fleshed out in the complaint, leave to amend should

9   be freely granted, and in the case that was cited in the

02:45PM 10   reply papers, the *Schatz* case is readily distinguishable.

11   In our case, unlike that case, there is more than a

12   plausible claim of actual malice.

13        Here we have, at the very least, a failure to

14   investigate, which can be proof of purposeful avoidance

15   under the Supreme Court's *Harte-Hanks'* decision, and it's

16   ludicrous to assert that we've not passed that

17   plausibility test.

18        Turning to another issue, with respect to the

19   Rule 12 motion that was submitted, if the Court believes

02:46PM 20   that any cause of action was inadequately pled, my client

21   should be given leave to amend.

22        With respect to the defamation claim and

23   assuming arguendo that Dr. Ayyadurai is a public figure

24   who will have to prove constitutional malice, that can be

25   proven by inference, since the defendants do not -- since

defendants, according to the Supreme Court's decision in *Bose Corp. vs. Consumers Union*, don't readily admit to willful or reckless behavior, and I'm sure that the Court will understand that that is in fact the way of the world.

Discovery has to be permitted and a motion to dismiss denied. In the *National Association of Government Employees'* case that we cited, the plaintiff had, in the words of the Massachusetts Supreme Court, "Available to it the instruments of pretrial discovery to seek out proof of the crucial state of mind," because discovery was permitted after the denial of a motion to dismiss and before the entry of summary judgment in that case.

And that decision, the *National Association* decision cites to *Herbert vs. Lando,* the Supreme Court's seminal 1979 decision in which the Court held that the plaintiff, and I'm quoting here, "The plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability on the part of the publisher. If plaintiffs in consequence now resort to more discovery, it would not be surprising." Indeed not, your Honor.

Discovery is the sine qua non of what must occur in the context of a case in which actual malice is an element that needs to be proven. The *Behunin* case from California is one that establishes that proposition as

1    well, and the inferential support for finding that actual

2    malice already exists in this case as a result of the

3    defendant's own acknowledgement in its own articles

4    concerning the numerous, prominent and reliable sources,

5    *TIME*, *Wired*, *CBS*, who support my client's claims that he

6    indeed and did invent e-mail, and those are bolstered by

7    the fact that we have in paragraphs 22 through 33 of our

8    complaint identified prominent individuals who likewise

9    support those claims.

02:48PM 10        Let me just speak to the question of when actual

11   malice is or ought to be analyzed.  Not only does that

12   question apply when the article is first published, but it

13   also is applicable when the article remains available to

14   the public, as it does in this case on the Internet, and

15   when requests to take down have been refused by Techdirt,

16   we believe that it's appropriate for the Court to consider

17   all of the evidence that the defendants have available to

18   it and that plaintiffs have identified up until this very

19   hearing in order to determine whether or not they are

02:49PM 20   responsible for publishing with actual malice by refusing

21   to take down any of the 14 defamatory articles that we're

22   complaining about, all of which remain available for the

23   public to view today, and it certainly is the case that

24   the damage that occurs to our client's personal and

25   professional reputation and to his business interests is

1  continuing on a day-to-day basis.

2      At least, and I'm familiar with this case

3  because our firm represented the plaintiff, at least in

4  the *Hulk Hogan* case, *Gawker* had the decency, at long last,

5  to take down its postings after they were available for

6  viewing by 7 million individuals.  Techdirt has not yet

7  shown the same degree of care or responsibility.

8      If I may briefly address the question of the

9  Section 230 argument that was raised by Mr. Beadon.  In

02:50PM 10  the article that he authored, Mr. Beadon republished on

11  November the 6th certain statements that first appeared in

12  a comment to the November 3rd article:

13      "He is thus an information content provider as

14  to that article."  He deserves no immunity under

15  Section 230; moreover, he editorialized in his November 6th

16  article.

17      As I said at the outset, he introduced the comment

18  that our client, "Did not invent e-mail," by saying that the

19  anonymous poster was reiterating, "The simple fact."

02:50PM 20      Again, not an opinion, not rhetorical hyperbole, but a

21  fact, and we should take Mr. Beadon at his word that he regards

22  the claim that our client did not invent e-mail as a pure

23  statement of fact.

24      Your Honor, to do anything less would open the

25  flood gates because defendant's argument taken to its

logical extension is that Section 230 immunizes the
authors of articles for every statement contained in those
articles that were first authored by someone else on a
website on social media or on another Internet platform,
and that assertion runs contrary to long-standing common
law principles and to Section 578 of the Restatement
Second of Torts regarding republication, a provision that
has been adopted in the State of Massachusetts, and that
provision provides that essentially at common law, "One
who republishes a defamatory statement is deemed thereby
to have adopted it and so may be held liable together with
the person who originated the statement for resulting
injury to the reputation of the defamation victim."

And as we pointed out, we still do not yet know
that Mr. Beadon himself is not the author of the
defamatory comments that he republished, and that, too, is
grist for the discovery mill.

The *Roommates*' case from the Ninth Circuit that
we have cited establishes that, "The unprotected
development includes materially contributing to its
alleged unlawfulness." *Roommates* holds that, "An
interactive computer service can simultaneously also be an
information content provider within the meaning of
Section 230 of the Communications Decency Act," and that
is indeed what we believe has occurred here.

1    We believe Mr. Beadon's usage in this case is
2    far more analogous to the unprotected use of content
3    originally provided by third-party users and later
4    published for a different purpose in a different context
5    at a different time in the *Perkins* and *Fraley* cases that
6    we discussed in our opposition papers and which defendants
7    interestingly don't even cite, much less distinguish in
8    their reply papers.

9    And the case that they do cite, *Doe vs.*
02:53PM 10   *Friendfinder* out of the District Court of New Hampshire,
11   that's a case that is not only not controlling, but we
12   believe it is wrongly decided.

13   Moreover, we believe that the reposting of
14   imposter profiles that are not a part of any article
15   written by a website author, such as Techdirt's Beadon,
16   are irrelevant to the Court's decision in this case.

17   And that decision, of course, is absolutely
18   irreconcilable with the recent Ninth Circuit case of
19   *Perkins* and *Fraley* that we discussed and that defendants
02:53PM 20   ignored.

21   To the extent that the Court has any additional
22   questions or concerns, I would be more than happy to
23   address those at this time.

24   THE COURT:  Let me turn back to Mr. Pyle.  Any
25   response?

1          MR. PYLE:  Thank you, your Honor.  Mr. Mirell

2     said that these articles have no give and take, they're

3     all one-sided and don't express Dr. Ayyadurai's point of

4     view, and his best example for that was Exhibit R to the

5     complaint where he read you a line that began, "For almost

6     five years now, we've been among those explaining why

7     Shiva Ayyadurai's claim that he invented e-mail is

8     complete bullshit.  It's not true, not even remotely."

9     Mr. Mirell stopped there.

02:54PM 10          What it goes on to say is, "What does appear to

11     be true is that as a fairly bright kid, Ayyadurai was

12     working for a small college in New Jersey, and he wrote an

13     electronic messaging program for the school, which he

14     named Email.  It was not the first, it was not the last,

15     it was nothing special."

16          That exemplifies what the plaintiff is trying to

17     do here, pull lines and quotes and words out of context

18     and argue that they are defamatory, that they allege

19     deceit, when they only express opinions.

02:55PM 20          The law is the Court must review the words in

21     context, in their whole context, and on that point, the

22     parties agree that all these articles are archived on

23     Techdirt.com in a list, and the plaintiff has said the

24     Court should read all the articles together.

25          They said that in footnote 1 to their main

1    opposition paper, so even to the extent that they were to

2    claim that this particular article didn't include all

3    facts that might be favorable to Mr. Ayyadurai, the other

4    articles do, and they agree they ought to be considered by

5    the Court altogether in the same context.

6         Another example he pointed to was Exhibit S

7    where he says that Mr. Beadon said Mr. Ayyadurai is a

8    fraud.  Well, Exhibit S is the copied and pasted

9    third-party comment from an anonymous commenter.  All

02:56PM 10    Mr. Beadon did was copy and paste that comment into

11    another post.

12         That is squarely protected by Section 230.

13    Section 230 says that, "A user of a website," such as

14    Mr. Beadon, cannot be held liable for information that

15    originates from another information content provider

16    defined to be another user of the website.

17         Another user of the website posted this comment.

18    Mr. Beadon copied and pasted it in there.  Mr. Mirell

19    says, well, we don't know, Mr. Beadon could have written

02:56PM 20    this himself and done so under the guise of an anonymous

21    commenter, but there's a good reason why the *Kimzey vs.*

22    *Yelp* case out of the Ninth Circuit says, "That's not

23    enough.  Implausible allegations of fabrication of

24    third-party comments would eviscerate the immunity that's

25    established by Section 230."

1          Talk about opening the flood gates, all the

2     plaintiff would have to do is allege that a third-party

3     content was actually written by the website, and they'd

4     get around what Congress intended to be and what the

5     First Circuit has called a "very broad immunity to suit,"

6     not just a defense to liability.

7          The position is taken that Mr. Beadon by copying

8     and pasting this user-generated post is liable as a

9     content developer himself under Section 230.  I would

02:57PM 10    commend the Court's attention to the decision by

11    Judge Stearns in the *Doe vs. Backpage* case, which my

12    partner Rob Bertsche and I were involved in.

13         In that case, the Court held that there was a

14    classified ad website where people could upload classified

15    ads to the site, and the site automatically generated

16    sponsored ads.  Judge Stearns said these sponsored ads

17    generated by the website, even though they put them in a

18    different format, in a different location on the website

19    simply reflects the legality or illegality of the

02:57PM 20    underlying ad and do not make backpage.com a developer of

21    content liable in and of itself within that exception to

22    Section 230.  Mr. Mirell doesn't mention that case because

23    that case directly refutes the point.

24         The *Perkins* and *Fraley* cases I didn't mention in

25    the reply brief because they're completely unlike this

1    case.  In the *Perkins* case, which involved LinkedIn, there

2    were e-mail messages sent out by LinkedIn without the user

3    of LinkedIn's consent where the e-mail message implied

4    that the plaintiffs, the users, were promoting LinkedIn to

5    their friends, and the plaintiffs found that to be

6    annoying.  That's nothing like this case.

7         This is a straight up case of copying and

8    pasting third-party content into another part of the cite,

9    and the case law has been uniformed.  Mr. Mirell can point

02:58PM 10    you to no case holding that the copying and pasting of

11    third-party content somewhere else in the cite verbatim is

12    content development under Section 230.

13         As far as the other 12(b)(6) implications of

14    that Exhibit S, the third-party content, Mr. Mirell points

15    to the *McKee* case and suggests that Judge Mastroianni held

16    that it's always defamatory to call somebody a liar.  He

17    did not say that in the *McKee* case, as we explain in our

18    reply brief, he said that in relation to an allegation

19    that someone lied about being sexually assaulted.  That's

02:59PM 20    entirely different from this case.  To lie about being

21    sexually assaulted, there may be objective facts that is

22    susceptible to prove one way or the other.

23         Whether or not somebody invented e-mail, and as

24    the Court's question implies, "What is e-mail," is not the

25    sort of thing that is subject to being proven true or

1    false one way or the other.

2         On the issue of the motion under the California

3    anti-SLAPP law, there's been the suggestion that we're

4    shopping for law in the hopes of getting an interlocutory

5    appeal.

6         Well, for one thing, we haven't brought an

7    interlocutory appeal yet.  It's not even before the Court,

8    but, regardless, the proposition we're advancing is that

9    the law of the speaker should control.

03:00PM 10         Far from advancing forum shopping, I would argue

11   that that reduces the prospect of forum shopping because

12   otherwise you could have people who live in California or

13   in other states who are subject to strong anti-SLAPP

14   protection being sued in far-off places based on Internet

15   speech and won't be able to be figure out what exactly

16   their level of protection is because they can't anticipate

17   where they might be sued if they publish on the Internet.

18         The policies of the Second Restatement, Second

19   Restatement, Section 50, which Mr. Mirell mentions

03:00PM 20   cross-references Section 145 and Section 6.

21         Section 6 looks to the issue of the protection

22   of justified expectations, and all the Court would be

23   doing in ruling that California law applies here is that a

24   California publisher has a justified expectation that the

25   California publisher is protected by the California

anti-SLAPP law.  There's nothing so odd about that.

Discussion was made of the *Sarver case* of the
Ninth Circuit, and Mr. Mirell again repeated, he says the
only reason *Sarver* held California anti-SLAPP law to apply
is that the plaintiff couldn't establish his residence in
New Jersey.  That's not true.

The Court after saying that goes on to say that,
"Even assuming that Sergeant Sarver lived in New Jersey,
we still would apply the California anti-SLAPP law because
the balancing of interests here points toward California
because that is the location of the majority of the
defendants."

Mr. Mirell mentioned Mr. Beadon's residence
outside of this country in Canada.  The mere fact that the
alleged author of one of the 13 of the 14 blog posts
resides outside of either California or Massachusetts
doesn't change the dichotomous choice that the Court has,
do you apply California or Massachusetts anti-SLAPP law?

And, in any event, all that would do would
justify denying Mr. Beadon's anti-SLAPP motion, which is
separate from the anti-SLAPP motion of Floor64 and
Mike Masnick, which pertains to 13 of the 14 articles at
issue.

There is much made of the fact that Mr. Masnick
did not speak to the so-called experts that Mr. Ayyadurai

1    cites to support his claim to have invented e-mail, but he

2    addresses the views of those experts in the articles,

3    discusses them, cites to them, quotes them, and hyperlinks

4    to their primary articles.

5         We're talking here about commentary on published

6    articles.  One is allowed to comment on a published

7    article without calling up the author of the article and

8    asking them what they meant.

9         There is no question of failure to investigate

03:02PM 10   being sufficient to establish actual malice here.  First

11   of all, again, failure to investigate is not sufficient to

12   establish actual malice.

13        Under controlling case law, failure to

14   investigate only comes into question when substantial

15   doubts as to the truth of the facts being reported have

16   already been raised to the defendant, then a failure to

17   investigate may be relevant in determining actual malice,

18   and that is a quote that the plaintiff leaves out from his

19   quote of the *Murphy* case from the SJC.

03:03PM 20        There is no requirement that there be any such

21   investigation when you're talking about commentary on

22   published articles and commentary on statements made

23   publicly by the plaintiff himself.

24        Also, Mr. Mirell mentioned a lot about how

25   they'd like to take discovery.  Well, discovery and the

discovery process has a major chilling effect on the exercise of free speech in cases where the discovery and the complaint fails to state a claim. The *Schatz* case and the *Biro* case out of the Second Circuit make this point very clear.

It is a significant First Amendment interest that the plaintiff articulate showing actual malice before activating the discovery machine. That is the whole purpose for which the Court applies *Iqbal*/*Twombly* to this question, and they even say searching examination of actual malice on the 12(b)(6) question is critically important to protect free speech.

Mr. Mirell also suggested, I was surprised to hear that you need not look only to the defendant's state of mind at the time of publication but could also consider that they kept the articles up on the Internet. There's no such tort as failure to remove defamatory content from the Internet. Defamation is not a continuing tort.

The single publication rule says that the defamatory speech happens the moment it's first published, and there's no authority that I'm aware of that says that you can establish actual malice from the fact that a defendant failed to take down a post from the Internet. That just isn't the law.

Finally, jumping back to Exhibit S, the article

1    that's protected by Section 230 where Mr. Beadon

2    introduced the article, they certainly didn't plead that

3    Mr. Beadon's minimal editorializing around the article

4    somehow made him liable for what the third-party commenter

5    said, and the law, particularly from the *Jones vs. Dirty*

6    *World* case says that, "Even statements that ratify

7    third-party comments or agree with third-party comments do

8    not constitute creation of content that gets you into the

9    Section 230 exception for that kind of activity."

03:05PM 10         That's all I have.

11         THE COURT:  All right.  Mr. Mirell, last word.

12         MR. MIRELL:  All right.  Your Honor, I will be

13    brief.  What I think we need to focus on is the notion

14    that when you are asked in a context such as this to

15    determine whether or not a statement has been made that is

16    materially false, then when an individual who has made the

17    claim, such as our client has, that he invented e-mail,

18    that is a factual statement that needs to be explored and

19    needs to be made the subject of discovery, needs to be

03:06PM 20    made the subject of continuing proceedings and cannot be

21    simply dismissed on the pleadings.

22         That is a statement along with the claims that

23    essentially accuse him of criminality by calling him a

24    fraud, by calling him a fraudster.  That is not simply the

25    kind of loose invective that this Court recognized in the

*Feld* case.  This is not a crazy individual, this is not a
claim that someone is, in the words of that case, "a --"
and, again, I apologize for using the phrase "-- fucking
crazy."

This Court was correct when in that case it
concluded that that invective, that use of a term, was
clearly meant to be not taken in the literal sense of
calling someone "psychotic" or something of that
character, and the Court looked to the overall context of
the stories.

In this case, if the Court is going to look at
the overall context of the lengthy 14 defamatory articles
that were published, it will see 17 instances of bogus
being used to refer to our client's invention, it will see
23 times that the claim is made that he did not invent,
and that is what, by the way, just so we're clear with
respect to Exhibit S, the quote that I was referring to is
the quote that appears on page 3 of 4 in the docket on
that exhibit where the statement is made, "Another
anonymous commenter reiterated the simple fact:"  Those
are Mr. Beadon's words, and then he proceeds to quote,
"Shiva Ayyadurai did not invent e-mail."

In addition in this case, there are 8 instances
where my client is alleged to be a fake, where his claims
are alleged to be false or falsehoods 34 times.

1          Your Honor, this is not a single instance where

2     there has been loose hyperbolic invective thrown at my

3     client.  What has happened in this case is that Techdirt

4     has decided to create a factual issue about whether or not

5     my client did what he has said he has done, and it is up

6     to a jury to make that determination, and it is up to this

7     Court to conclude not only that the Rule 12 motion has to

8     be denied but also that there is absolutely no basis, and

9     the only case, the only other case that I would call the

03:09PM 10    Court's attention to is the *Godin* case.

11          There is absolutely no basis for believing that

12    this Court can reach out and adopt the California

13    anti-SLAPP statute and apply it to the circumstances in

14    this case when it is absolutely clear that when you are an

15    aggregate defamer, when you are engaged in the multi-state

16    defamation of individuals, you have to be expected to be

17    hailed into court anywhere where those statements appear

18    and remain.

19          That too, your Honor, is a principle I think

03:10PM 20    that is easily derivable from the Supreme Court's *Calder*

21    *vs. Jones* case.  That, obviously, is a case that involved

22    jurisdiction, but clearly where Shirley Jones lived in

23    California when she was defamed by the Florida-based

24    *National Enquirer*, the U.S. Supreme Court clearly said

25    that Ms. Jones' reputation and her work were in

California, that's where she was entitled to bring her

action for defamation against the Florida publisher.

We didn't have to go -- she didn't have to go

where the speaker spoke because the speaker spoke to her

in her own state, and that's what's happened here in this

case.

Dr. Ayyadurai is a proud resident of the

Commonwealth of Massachusetts.  He has been so for

decades.  There's no question of his transient presence,

as there was in the *Sarver* case, and we believe this Court

is obligated to uphold the rights and the privileges of

citizenship of this state and allow him to continue to

pursue this action here.

THE COURT:  All right.  Thank you.  All right.

I'm going to take it under advisement.  Thank you.  It was

very well argued on both sides, and, again, I'll take it

under advisement and safe travels to all.

MR. MIRELL:  Thank you, your Honor.

MR. PYLE:  Thank you, your Honor.

THE CLERK:  All rise.

(Whereupon, the hearing was adjourned at

3:11 p.m.)

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6              I do hereby certify that the foregoing transcript,

7    Pages 1 through 50 inclusive, was recorded by me

8    stenographically at the time and place aforesaid in Civil

9    Action No. 17-10011-FDS, SHIVA AYYADURAI, an individual vs.

10   FLOOR64, INC., a California corporation

11   D/b/a TECHDIRT, MICHAEL DAVID MASNICK, an individual; LEIGH

12   BEAON, an individual; and DOES 1-20 and thereafter by me

13   reduced to typewriting and is a true and accurate record of the

14   proceedings.

15              Dated April 27, 2017.

16

17                         s/s Valerie A. O'Hara

18                    _____

19                    VALERIE A. O'HARA

20                    OFFICIAL COURT REPORTER

21

22

23

24

25