# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————

| | | |
|---|---|---|
| **SHIVA AYYADURAI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **17-10011-FDS** |
| **FLOOR64, INC. d/b/a TECHDIRT,** | ) | |
| **MICHAEL DAVID MASNICK, LEIGH** | ) | |
| **BEADON, and DOES 1-20,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

—————————————————————————

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE

**SAYLOR, J.**

This is a tort action arising out of allegedly defamatory statements that the plaintiff falsely claimed to be the inventor of e-mail. Plaintiff Shiva Ayyadurai is a scientist and entrepreneur. In 1979, at the age of 14, he created an electronic-mail system for use at the University of Medicine and Dentistry of New Jersey. On the basis of that creation, he has since claimed to have invented e-mail, and has received some positive media attention on the basis of that claim. Defendants Floor64, Inc., Michael Masnick, and Leigh Beadon operate or write for a website called "Techdirt." Defendants posted a series of 14 articles disagreeing with Ayyadurai's claim, stating, among other things, that he is "a liar," that his claim is "fake," and that he has made several misrepresentations in support of his claim.

Ayyadurai then brought this action, asserting claims for libel, intentional interference with prospective economic advantage, and intentional infliction of emotional distress.

Jurisdiction is based on diversity of citizenship.

Defendants have moved to strike the complaint pursuant to the California anti-SLAPP statute and to dismiss the complaint for failure to state a claim upon which relief can be granted, for improper service of process, and, with respect to one of the 14 articles, on the ground that the claim is barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1).  For the reasons stated below, the motions to strike will be denied and the motions to dismiss will be granted.

I.    **Background**

    A.    **Factual Background**

        1.    **The Parties**

According to the complaint, Shiva Ayyadurai "is a world-renowned scientist, inventor, lecturer, philanthropist, and entrepreneur."  (Compl. ¶ 1).  He "has been recognized internationally for his developments in early social media portals, email management technologies, and contributions to medicine and biology."  (*Id.* ¶ 2).  He has four degrees from the Massachusetts Institute of Technology, including a B.S. in Electrical Engineering and Computer Science and a Ph.D. in Biological Engineering.  (*Id.* ¶ 1).  He is a resident of Massachusetts, where he operates the International Center for Integrative Systems (a research and education center) and serves as the Chairman and CEO of CytoSolve, Inc.  (*Id.* ¶ 2).

Floor64, Inc., is a California corporation that operates a website called "Techdirt." (Compl. ¶ 6).  Michael Masnick is a California resident and the founder and CEO of Techdirt, as well as an editor of the website.  (*Id.* ¶ 7).  Leigh Beadon is a resident of Toronto, Canada, and a writer at Techdirt.  (*Id.* ¶ 8).

### 2.     Ayyadurai's Electronic Mail System

According to the complaint, in 1978, while working as a Research Fellow at the University of Medicine and Dentistry of New Jersey, Ayyadurai "created email." (*Id.* ¶ 13). The complaint defines his creation as "a computer program that created an electronic version of a paper-based interoffice mail system, which allowed mail to be sent electronically and consisted of the Inbox, Outbox, Drafts, Folders, Memo, Attachments, Carbon Copies, Blind Carbon Copies (*i.e.*, "To:," "From:," "Date:," "Subject:," "Body:," "Cc:," Bcc:"), Return Receipt, Address Book, Groups, Forward, Compose, Edit, Reply, Delete, Archive, Sort, Bulk Distribution, etc." (*Id.*). He named the program "email," because it was "the 'electronic' (or 'e') version of the interoffice paper-based 'mail' system" that was used by physicians at the medical school. (*Id.* ¶ 16). According to the complaint, he was the first person to use that term. (*Id.*). In 1982, he obtained copyright registrations for his e-mail code and user's manual, which he contends were the first two works registered under the title "email." (*Id.* ¶¶ 17, 23).

### 3.     Ayyadurai's Recognition as the Inventor of E-Mail

A variety of sources, both academic and in the popular press, have recognized Ayyadurai as the inventor of e-mail. (*Id.* ¶¶ 18-21). In 2011, *TIME* magazine published an article titled "The Man Who Invented Email," which stated that "email—as we currently know it—was born" when Ayyadurai created his electronic-communication system in 1978. (Compl. Ex. E). In the article, Ayyadurai recounted how he created functions such as "cc," "bcc," and the ability to attach documents in order to replicate the functions that doctors were already using in the paper-based interoffice mail system at the University of Medicine and Dentistry. (*Id.*).

In 2012, *Wired* magazine published an article titled "Who Invented Email? Just Ask . . . Noam Chomsky." (Compl. Ex. F). The article began by stating, "Who invented email? That's a

question sure to spark some debate."  It recounted the debate concerning the creation of e-mail, providing an overview of the various electronic messaging systems that could be considered the "original" e-mail, and quoted Tom Van Vleck, the creator of one of those systems, stating that "[t]here seems to be little disagreement over who wrote what, and approximately when. . . . The argument is over what to call things."  (*Id.*).  The article noted that Chomsky was "putting his weight behind V.A. Shiva Ayyadurai," but stated that "the debate will no doubt continue."  (*Id.*).

According to the complaint, Ayyadurai was recognized as the creator of e-mail in a 2015 CBS television program, as well as in statements and publications by various individuals, including Leslie Michelson, the Director of the High Performance Computing Center at Rutgers University; Desh Deshpande, the Founder of Sycamore Networks and Co-Chairman of the National Advisory Council on Innovation and Entrepreneurship; and Deborah Nightingale, a former professor of engineering systems at MIT.  (*See* Compl. ¶¶ 21, 22, 25, 27).

### 4.  Techdirt's Allegedly Defamatory Articles

Between September 2014 and November 2016, Techdirt published 14 articles about Ayyadurai.  Thirteen were written by Mike Masnick and one was written by Leigh Beadon.  (*See id.* ¶¶ 34-47).  The article written by Beadon consists primarily of re-posted comments submitted by readers in response to other articles on Techdirt, along with some commentary by Beadon.  (*See* Compl. Ex. S).

The complaint identifies 84 allegedly defamatory statements contained within the 14 articles.  (*See* Compl. ¶¶ 34-47).[1]  Most of the allegedly defamatory statements are statements to the effect that Ayyadurai's claim to have invented e-mail is false.  For example, one article states that Ayyadurai is "perpetuating a 'fake story'"; another states that he "and his friends

---

[1] The statements identified in the complaint are set forth in Appendix A to this Memorandum and Order.

"misrepresent reality [and] they fraudulently make claims that are easily debunked"; and another states that "Ayyadurai's claim that he invented email is complete bullshit.  It's not true.  Not even remotely."  (*Id.* ¶¶ 34(c), 36(a), 45(a)).

Other statements identified in the complaint suggest that Ayyadurai has misrepresented the significance of a copyright registration and has misrepresented a 1977 RAND report on electronic messaging written by Dave Crocker.  For example, one article states that Ayyadurai "misrepresents what a copyright registration means"; another states that it is "absolutely false" that "the 'US government officially recognized Ayyadurai as the inventor of email' in 1982"; and another states that Ayyadurai's claim to have invented e-mail "prey[s] on . . . an almost fraudulent misquoting of Dave Crocker."  (*Id.* ¶¶ 34(f), 36(b), 37(b)).  There are also statements that Ayyadurai's claim has changed over time; that his entire identity is based upon his false claim; and that he accuses his opponents of racism (he is originally from India).  (*See, e.g., id.* ¶¶ 36(h), 41(b), 41(g)).

### B.   Procedural Background

Ayyadurai filed the complaint in this action on January 4, 2017.  The complaint asserts three claims, each against all three defendants:  libel (Count One); intentional interference with prospective economic advantage ("IIPEA") (Count Two); and intentional infliction of emotional distress ("IIED") (Count Three).

On February 17, defendants Floor64 and Masnick moved to strike the complaint pursuant to the California anti-SLAPP statute and to dismiss for failure to state a claim upon which relief can be granted.  On March 14, defendant Beadon also filed separate motions to strike and to dismiss.

## II.   <u>Legal Standard</u>

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## III.   <u>Analysis</u>

### A.   <u>Motions to Strike Pursuant to California Anti-SLAPP Statute</u>

Defendants first contend that the complaint should be struck pursuant to the California anti-SLAPP ("strategic litigation against public participation") statute, Cal. Civ. Proc. Code § 425.16.  Plaintiff contends that under the applicable choice-of-law principles, Massachusetts law applies, and therefore the California statute is irrelevant. [2]  The parties agree that if Massachusetts law applies, the conduct alleged does not fall within the scope of the

---

[2] In *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010), the First Circuit held that the Maine anti-SLAPP statute can be applied in federal courts.  *Id.* at 88, 92.  In *Bargantine v. Mechanics Co-op Bank*, 2013 WL 6211845 (D. Mass. Nov. 26, 2013), the court recognized that *Godin* "has not been extended to the anti-SLAPP laws of other states within the First Circuit."  *Id.* at *3.  It applied *Godin's* holding to the Massachusetts anti-SLAPP statute on the basis that it is "in all respects identical to the Maine statute."  *Id.*  Because the Court finds that under Massachusetts choice-of-law rules the California statute does not apply, it does not reach the question of whether that statute could be applied in federal courts under *Godin*.

Massachusetts anti-SLAPP statute.

The "initial task of a choice-of-law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). Here, there is a clear conflict between the California and Massachusetts statutes. Under the Massachusetts statute, parties may move to dismiss any claims against them that are based on that "party's exercise of its right of petition under the Constitution of the United States or of the commonwealth." Mass. Gen. Laws ch. 231, § 59H. *See North Am. Expositions Co. v. Corcoran*, 452 Mass. 852, 862 (2009) (defining "petitioning" to include "statements made to influence, inform, or at the very least, reach governmental bodies—either directly or indirectly" (internal quotation marks omitted)). The California statute, by contrast, is considerably broader, and allows parties to move to strike whenever they are sued for an "act in furtherance of a person's right of petition *or free speech* under the United States or California Constitution in connection with a public issue" or "an issue of public interest." Cal. Civ. Proc. Code § 425.16(e) (emphasis added).

Next, the Court must apply Massachusetts choice-of-law principles to determine which state's law should apply.[3] "Massachusetts state courts apply 'a functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.'" *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 5 (1st Cir. 2004) (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985)). That approach is guided by the Restatement (Second) of Conflict of Laws (1971), and considers factors such as those set forth in § 6 of the Restatement. *See Bushkin Assocs.*, 393 Mass. at 632, 634 ("Factors under § 6 that are said to be relevant to the choice of the applicable rule of law include: '(a) the

---

[3] Because this is a diversity action, the Court will apply the choice-of-law principles of the forum state. *See Auto Europe, LLC v. Connecticut Indem. Co.*, 321 F.3d 60, 64 (1st Cir. 2003).

needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the

relevant policies of other interested states and the relative interests of those states in the

determination of the particular issue, (d) the protection of justified expectations, (e) the basic

policies underlying the particular field of law, (f) certainty, predictability and uniformity of

result, and (g) ease in the determination and application of the law to be applied.'" (quoting

Restatement (Second) of Conflict of Laws § 6(2) (1971))).  In addition to those factors,

Massachusetts courts "feel free . . . to borrow from any of the various lists to help focus our

attention on the considerations particularly relevant to the case before us."  *Id.* at 634.

Section 150 of the Restatement applies to claims involving multistate defamation.  It

provides that "[t]he rights and liabilities that arise from defamatory matter in any . . . aggregate

communication are determined by the local law of the state which, with respect to the particular

issue, has the most significant relationship to the occurrence and the parties under the principles

stated in § 6."  Restatement (Second) Conflict of Laws § 150(1).  It further states that "[w]hen a

natural person claims that he has been defamed by an aggregate communication, the state of

most significant relationship will usually be the state where the person was domiciled at the time,

if the matter complained of was published in that state." *Id.* § 150(2).  Thus, there is effectively a

presumption that the law of the state of the plaintiff's domicile will apply unless some other state

"has a greater interest in the determination of the particular issue," as determined in accordance

with the factors set forth in § 6 and "the purpose sought to be achieved by [the interested states']

relevant local law rules and of the particular issue involved."  *Id.* § 150 cmt. b (citing *id.* § 145

cmts. c-d).

Applying § 150 here, there is a presumption that the law of Massachusetts will apply.[4]

---

[4] Contrary to defendants' contentions, § 145 of the Restatement does not compel a different conclusion.
Section 145 sets forth "general . . . principles" to consider when deciding a choice-of-law issue in a tort action.

First, defendants published allegedly defamatory statements in a form of aggregate communication, a website.  Second, plaintiff was domiciled in Massachusetts at the time. Finally, the website, which is accessible by anyone anywhere with an Internet connection, was published in Massachusetts.

The Court must next determine whether another state has a greater interest in the particular issue presented, according to the factors set forth in § 6.  In this context, the most significant of those factors appears to be the relevant policies of the states.  *See Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313, 1321 (D. Utah 2015).  Here, each state has a strong, and conflicting, interest.  As to California, it has clearly "expressed a strong interest in enforcing its anti-SLAPP law to 'encourage continued participation in matters of public significance' and to protect against 'a disturbing increase in lawsuits brought primarily to chill the valid exercise' of constitutionally protected speech."  *Sarver*, 813 F.3d at 899 (quoting Cal. Civ. Proc. Code § 425.16(a)).  That interest would presumably be disserved by applying Massachusetts law and permitting this case to proceed.  Massachusetts, on the other hand, has an interest in protecting its citizens from tortious conduct.  By enacting an anti-SLAPP statute that applies only to claims involving a person's exercise of his or her right of petition, and not to claims involving a person's exercise of free-speech rights more generally, Massachusetts has attempted to balance the encouragement of protected speech with the desire to protect those who are harmed by

---

*Sarver v. Chartier*, 813 F.3d 891, 897 (9th Cir. 2016).  Those four factors are "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Restatement (Second) Conflict of Laws § 145(2).  Defendants rely heavily on *Sarver* to support their assertion that § 145 requires this Court to apply California's anti-SLAPP statute.

In *Sarver*, the Ninth Circuit found it compelling that the plaintiff, an army sergeant, failed to establish that he was a resident of New Jersey.  *Sarver*, 813 F.3d at 898.  Rather, the record suggested that his alleged injuries occurred in multiple jurisdictions.  *See id.* at 898-99.  Therefore, none of the § 145 factors weighed strongly in favor of applying New Jersey law.  *Id.*  Here, by contrast, there is no question that Ayyadurai resides in Massachusetts, and no reason to abandon the basic framework of § 150.

defamatory statements.  *See Cardno ChemRisk, LLC v. Foytlin*, 476 Mass. 479, 487 (2017)

("[T]he anti-SLAPP statute . . . protects those looking to 'advance[e] causes in which they

believe, as well as those seeking to protect their own private rights" (citation omitted)).  That

interest would be disserved by applying California law and striking the complaint.  Under the

circumstances presented here, there is no reason to favor California's policy over that of

Massachusetts.

None of the other factors under § 6 are sufficient to overcome the presumption favoring

application of Massachusetts law.  The parties each have justified expectations that their

respective home-state laws would apply; plaintiff is a Massachusetts resident with no apparent

ties to California; and the alleged tortious conduct occurred in California.  In addition, ensuring

the "certainty, predictability and uniformity of result" and "ease in the determination and

application of the applicable law" favors adhering to the presumption set forth in § 150(2).

Restatement (Second) Conflict of Laws § 150 cmt. b (citing *id.* § 6).

In summary, defendants have not overcome the presumption that Massachusetts law

should apply.  Accordingly, the motions to strike will be denied, and the Court will apply

Massachusetts law to the claims.

### B.      Libel (Count One)

All defendants have moved to dismiss the libel claims against them for failure to state a

claim on which relief can be granted.[5]  They contend that the complaint fails to make plausible

---

[5] Floor64 has also moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(5) for improper service.  The complaint and summons addressed to it were served on Sunnia Lin, Masnick's wife, at their home address.  The corporation contends that such service is improper under Fed. R. Civ. P. 4(h)(1)(B), which requires that corporations be served "by delivering a copy of the summons and of the complaint to an officer" of the company.  However, California law permits service on corporations by "leaving a copy of the summons and complaint . . . at [the corporation's agent's] usual mailing address . . . with the person who is apparently in charge thereof, and by thereafter mailing a copy of the summons and complaint by first-class mail . . . ."  Cal. Code Civ. P. § 415.20(a).  Accordingly, it appears that Floor64 was properly served pursuant to California law, which constitutes

allegations that the statements at issue are false; that the statements are protected under the First Amendment; and that the complaint fails to plausibly allege that the statements were made with actual malice.  Defendant Beadon has also moved to dismiss the libel claim based upon the article that he authored on the ground that it is barred by § 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1).

### 1.   Legal Framework

"Modern defamation law is a complex mixture of common-law rules and constitutional doctrines."  *Pan Am. Sys., Inc. v. Atlantic Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015).  Under Massachusetts law, "[d]efamation is the publication, either orally or in writing, of a statement concerning the plaintiff which is false and causes damage to the plaintiff."  *Yohe v. Nugent*, 321 F.3d 35, 39-40 (1st Cir. 2003) (citing *McAvoy v. Shufrin*, 401 Mass. 593, 597 (1988)).

To establish a defamation claim, a plaintiff must satisfy four elements.  First, to be "defamatory," the statement must "hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community, at least to his discredit in the minds of a considerable and respectable class in the community."  *Id.* at 40 (quoting *Tartaglia v. Townsend*, 19 Mass. App. Ct. 693, 696 (1985)) (internal quotation marks omitted); *Phelan v. May Dep't. Stores Co.*, 443 Mass. 52, 56 (2004).  Second, to satisfy the "publication" element, "the statement must have been [made] to at least one other individual other than the one defamed."  *Yohe*, 321 F.3d at 40 (citing *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56 (1966)); *Phelan*, 443 Mass. at 56.  "Third, where the speech is a matter of public concern, a defamation plaintiff

---

proper service under the federal rules.  *See* Fed. R. Civ. P. 4(e)(1), 4(h)(1)(A).  The motion to dismiss for improper service will therefore be denied.

must prove not only that the statements were defamatory, but also that they were false." *Yohe*, 321 F.3d at 40 (citing *Dulgarian v. Stone*, 420 Mass. 843, 847 (1995)).[6] Fourth, "the plaintiff must show that he suffered special damages and must set forth these damages specifically." *Id.* (citing *Lynch v. Lyons*, 303 Mass. 116, 119 (1939)).  However, "the imputation of a crime is defamatory per se, requiring no proof of special damages." *Phelan*, 443 Mass. at 56.

"On the constitutional side, the Supreme Court—reading the First Amendment (made binding on the states through the Fourteenth)—'has hedged about defamation suits' with lots of 'safeguards designed to protect a vigorous market in ideas and opinions.'" *Pan Am. Sys.*, 804 F.3d at 65 (quoting *Desnick v. Am. Broad. Co.*, 44 F.3d 1345, 1355 (7th Cir. 1995)).  First, as already noted, in cases involving matters of public concern, the plaintiff bears the burden of showing that the communications at issue are false.  *See Philadelphia Newspapers*, 475 U.S. at 776.  Second, because statements must be false to be actionable, "defamatory statements are not punishable unless they are capable of being proved true or false." *Pan Am Sys.*, 804 F.3d at 65. Accordingly, subjective statements and statements of opinion are protected under the First Amendment as long as they do not "present[] or impl[y] the existence of facts which are capable of being proven true or false." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990).  Similarly, vague language that is subject to multiple interpretations is generally not actionable.  *See Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000); *Levinsky's Inc.*, 127 F.3d at 129.  Third, the First Amendment also protects "statements that cannot 'reasonably [be] interpreted as stating

---

[6] That additional element in cases involving matters of public concern derives from First Amendment principles.  *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (holding that, where the speech at issue is a matter of public concern, there is a "constitutional requirement that the plaintiff bear the burden of showing falsity").  That constitutional requirement has superseded traditional common-law rules that truth was an affirmative defense and that the defendant, therefore, bore the burden of proving the statement was true.  *See id.*; *Pan Am Sys.*, 804 F.3d at 66.

actual facts' about an individual," including "imaginative expression" and "rhetorical hyperbole." *Milkovich*, 497 U.S. at 20 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)) (alteration in original).  Finally, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth," or, in other words, with "actual malice." *Id.*

Here, the principal dispute is not whether plaintiff has satisfied the traditional, common-law elements of a defamation claim, but on whether the speech at issue is protected under the First Amendment.

### 2. Whether the Heightened Standards for "Public Figures" and "Matters of Public Concern" Apply

As a preliminary matter, the Court must determine whether plaintiff is a public figure and whether the subject matter of the statements at issue is a matter of public concern.

#### a. Public Figure

In the interest of protecting public debate, the First Amendment prohibits public officials or public figures from recovering damages for defamatory statements unless they can "prove[] that the statement[s] [were] made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (applying that standard to public officials); *accord Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (applying same standard to public figures); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).  "Public officials" are generally limited to high-level government employees, *see Stone v. Essex Cnty. Newspapers, Inc.*, 367 Mass. 849, 863 (1975), while "public figures" include those who "command[] sufficient continuing public interest and [have]

13

sufficient access to the means of counter-argument to be able to expose through discussion the falsehood and fallacies of the defamatory statements." *Curtis Publ'g Co.*, 388 U.S. at 155.

Public figures can be either "general-purpose public figure[s]"—those who have achieved "such pervasive fame or notoriety" that they are public figures "for all purposes and in all contexts"—or "limited-purpose public figure[s]"—those who "voluntarily inject[]" themselves or are "drawn into a particular public controversy" and thereby become public figures "for a limited range of issues" defined by their "participation in the particular controversy giving rise to the defamation." *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 13 (1st Cir. 2011) (quoting *Gertz*, 418 U.S. at 351-52). The controversy at issue "must predate the alleged defamation." *Id.* at 14.

The parties do not dispute that plaintiff is at least a "limited-purpose" public figure for the purpose of the controversy over who invented e-mail. Through his own actions, including publishing books, participating in interviews, and posting on his own website, he has clearly "thrust [himself] to the forefront" of the controversy "in order to influence the resolution of the issues involved" in it. *Gertz*, 418 U.S. at 345. Furthermore, the complaint itself alleges that he "is a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur." (Compl. ¶ 1). Accordingly, because plaintiff is a public figure, the complaint must plausibly allege actual malice.

### b. <u>Matter of Public Concern</u>

The First Amendment also requires that if the statements at issue relate to matters "of public concern," then the "plaintiff[] must shoulder the burden of showing that the comments are false." *Pan Am Sys.*, 804 F.3d at 66. "To qualify as a matter of public concern, the speech (based on the content, form, and context) must touch on issues in which the public (even a small

slice of the public) might be interested, as distinct, say, from purely personal squabbles." *Id.*

Matters of public concern are "those that can be 'fairly considered as relating to any matter of

political, social, or other concern to the community." *Levinsky's*, 127 F.3d at 132. "[T]he

relevant community need not be very large and the relevant concern need not be of paramount

importance or national scope. Rather, 'it is sufficient that the speech concern matters in which

even a relatively small segment of the general public might be interested.'" *Id.* (quoting *Roe v.

City of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997)).

Here, the record clearly establishes that the statements at issue involve a matter of public

concern. The complaint refers to numerous articles (in addition to those authored by defendants)

discussing plaintiff's claim to have invented e-mail. (*See* Compl. ¶¶ 18-21). Furthermore, a

number of the challenged comments were made in response to other articles and television

programs discussing, and supporting, plaintiff's claim. Finally, the number of reader comments

posted in response to defendants' articles indicates that at least "a relatively small segment of the

general public" is interested in the topic of who invented e-mail. *See Levinsky's*, 127 F.3d at

132.

Accordingly, the statements at issue relate to matters of public concern, and plaintiff

therefore bears the burden of establishing their falsity.

### 3.      Whether the Complaint Plausibly Alleges Falsity

To survive a motion to dismiss, a complaint challenging statements made about a matter

of public concern must not only allege that the statements are false, but also provide "factual

underpinning[s] to support that claim." *Pan Am Sys., Inc. v. Hardenbergh*, 871 F. Supp. 2d 6, 16

(D. Me. 2012) (holding that mere allegations that statements are false is insufficient under *Iqbal*

and *Twombly*). Here, the complaint alleges that plaintiff "created email: a computer program

that created an electronic version of a paper-based interoffice mail system," and that "[h]e was the first person to create [the term 'email']."  (Compl. ¶¶ 13, 16).

Whether those allegations are sufficient to satisfy plaintiff's burden to allege falsity with factual specificity is far from clear.  As set forth below, the articles at issue do not dispute that plaintiff created *an* e-mail system.  Rather, they dispute whether plaintiff should properly be characterized as *the inventor* of e-mail based on that creation.  Accordingly, it is not clear that the allegations in the complaint are sufficient to show that the statements at issue are false.  In any event, even assuming that the allegations of falsity are sufficient, the challenged statements are nonetheless protected under the First Amendment.

### 4.   Whether the Allegedly Defamatory Statements Are Protected Under the First Amendment

#### a.   Statements That Plaintiff Did Not Invent E-Mail

The majority of the allegedly defamatory statements identified in the complaint state, in various ways, that plaintiff's claim to have invented e-mail is false.  (*See, e.g.,* Compl. ¶¶ 34(c) ("fake"); 36(a) ("fraudulent[]"); 37(e) ("a lie"); 43(a) ("bogus")).  For the following reasons, those statements are protected because they are not provably false, are subjective statements that do not imply knowledge of objective facts, or are statements involving figurative language or hyperbole.

##### (1)   Statements That Are Not Capable of Being Proved True or False

"[D]efamatory statements are not punishable unless they are capable of being proved true or false."  *Pan Am Sys.*, 804 F.3d at 65.  The statements here are not capable of being so proved.

First, by its nature, the question of who invented e-mail is not subject to one, and only one, "true" answer.  The answer depends upon how "e-mail" itself is defined.  Plaintiff defines

"e-mail" to include features such as an inbox, outbox, folders, a "to:" line, a "from:" line, a "subject:" line, the body of the message and the ability to include attachments, and the ability to copy ("cc") or blind copy ("bcc") other recipients.  (*See* Compl. ¶ 13).  However, that is not the only definition.  For example, the online Merriam-Webster dictionary defines "e-mail" in far more general terms as "a means or system for transmitting messages electronically (as between two computers on a network."  *E-mail*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/e-mail (last visited Aug. 31, 2017).  Similarly, in the context of a patent dispute, the Federal Circuit has held that "a person of ordinary skill in the art would have recognized that an electronic mail message must include a destination address and must have the capacity to include an address of an originating processor, message content (such as text or an attachment), and a subject."  *In re NTP, Inc.*, 654 F.3d 1279, 1289 (Fed. Cir. 2011).  Accordingly, whether plaintiff's claim to have invented e-mail is "fake" depends upon the operative definition of "e-mail."  Because that definition does not have a single, objectively correct answer, the claim is incapable of being proved true or false.

Second, many of the statements at issue are incapable of being proved false by virtue of the language that they use.  The First Circuit has held that whether something is a "fake" or a "phony" may be "unprovable, since those adjectives admit of numerous interpretations."  *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 728 (1st Cir. 1992); *accord Levinsky's*, 127 F.3d at 129-130 (holding that use of the word "trashy" to describe a clothing store is not actionable, and stating that "[t]he vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable").[7]  Similarly, in *McCabe*, the First Circuit held

---

[7] Whether words like "fake" or "phony" are imprecise is context-dependent.  *See Gray*, 221 F.3d at 248-49 ("Whether calling something a 'fake' is or is not protected opinion depends very much on what is meant and therefore on context.").   "To say that a dollar bill is a fake would, in most situations (but perhaps not all), be taken to mean that it was a counterfeit; and to say that the defendant was knowingly passing a fake dollar bill would surely

that because "the word 'scam' does not have a precise meaning[,] . . . the assertion "X is a scam"

[is] incapable of being proved true or false." *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir.

1987). There, an article referred to a timeshare resort development owned by the plaintiff as a

"scam." *Id.* at 840-41. In holding that the use of the word was not actionable, the court

explained:

> Rattiner extensively and accurately described his encounter with the resort
> salespeople, thereby disclosing the basis for his assertion that it was a scam.
> Readers may have disagreed with the conclusion that it was a scam, but they
> could not have said that the conclusion was false, because there is no core
> meaning of scam to which Rattiner's facts and allegations can be compared. Is it
> a scam to promise a lobster dinner and then only give it after protest? Is it a scam
> to gross approximately $9 million from a 25 unit resort? The answer depends on
> the meaning given to the word "scam."

*Id.* at 843.[8]

Here, even a reader who agrees with defendants' view that plaintiff should not be

credited as the sole inventor of e-mail may not agree that his claim is "fake" or "bogus." One

person may consider a claim to be "fake" if any element of it is not true or if it involves a slight

twisting of the facts, while another person may only consider a claim to be "fake" only if no

element of it is true. Thus, whether statements such as "Dr. Ayyadurai is perpetuating a 'fake

story' with respect to his claims of invention of email," (Compl. ¶ 34(c)), are provably true or

false depends not only on how one defines "e-mail," but also on how one defines "fake."

Because both terms, in this context, are imprecise, the statements are not actionable.

---

be actionable, if false. At the other extreme, where there were two productions of *Phantom of the Opera*, and the
defendant called one of them 'fake' and 'phony,' this court held that the adjectives were subjective aesthetic
judgments protected as opinion." *Id.* at 249 (citing *Phantom Touring*, 953 F.2d at 728). In the context of this case,
the imprecision inherent in words like "fake" is dependent upon the imprecision in the definition of "e-mail" itself,
and the resulting ambiguity as to who "invented" e-mail.

[8] As discussed below, disclosing the factual basis for a statement of opinion is a separate basis on which
statements may be protected under the First Amendment.

### (2)   Subjective Statements That Do Not Imply Knowledge of Objective Facts

The statements at issue are also protected as subjective statements.  "[E]ven a provably false statement is not actionable if it 'is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts . . . .'" *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (quoting *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000)) (second alteration in original). Thus, "defamation cannot arise where the speaker communicates the non-defamatory facts that undergird his opinion."  *Piccone vs. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015); *accord Riley*, 292 F.3d 282, 289 ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995)).

The articles at issue provide all of the relevant facts on which defendants rely in reaching the conclusion that plaintiff's claim is false.  For example, the September 2, 2014 article described the history of electronic messaging, including rudimentary systems that were created as early as 1965, and provided hyperlinks to relevant background information.  (Compl. Ex. G at 1).  The September 4, 2014 article similarly provided information on the history of the use of the word "email" as well as information concerning a change over time in how plaintiff defined the term on his website, again providing hyperlinks to relevant information.  (Compl. Ex. I).  In the November 3, 2016 post, Masnick wrote that plaintiff's claim is "not true" based on his observation that "[b]asically every feature that he put in the application was previously discussed on *open* mailing lists and RFCs [Requests for Comments] about the internet and the messaging systems that would be grafted onto it—sometimes many years earlier."  (Compl. Ex. R at 1)

19

(emphasis in original).[9]

By providing the full factual basis for his opinion, the articles cannot reasonably be interpreted to suggest that the author had access to information about plaintiff's claim that was not accessible to others.  As the First Circuit has explained, this is a "crucial distinction" between cases such as this and cases that reach an opposite result, such as *Milkovich*.  *See Phantom Touring*, 953 F.2d at 730-31.  In *Milkovich*, "the author of a newspaper column charging that a high school wrestling coach had lied about his behavior at a meet informed his readers that he was in 'a unique position' to know that the coach had lied because he had personally observed the relevant events."  *Riley*, 292 F.3d at 290.  Here, by contrast, as in *Phantom Touring*, there is nothing in the articles to "indicate[] that [the author], or anyone else, ha[s] more information about [plaintiff's claim] than was reported in the articles."  *Phantom Touring*, 953 F.2d at 731.

Furthermore, and significantly, it appears that the core underlying facts are not disputed. The articles repeatedly acknowledge that plaintiff did create an electronic messaging system that he called "email," that he did so at the age of 14 when he was a research fellow at the University of Medicine and Dentistry of New Jersey in 1978, that the program apparently worked well, and that he subsequently received a copyright for the program.  (*See, e.g.,* Compl. Exs. G, J, N, Q). In addition, plaintiff has not challenged the accuracy of the factual statements relied upon in reaching the conclusion that his claim is false.  For example, the complaint does not identify as false the statement that plaintiff's electronic-messaging system was "not the first" and that "[b]asically every feature that he put in [it] was previously discussed on *open* mailing lists and

---

[9] Not every article at issue fully explains the factual basis for the conclusion that plaintiff's claim is false. However, the articles that do not provide a full explanation refer to, and often provide hyperlinks to, the articles that do.  Furthermore, as plaintiff has recognized, the articles should be viewed together and are each relevant context for the others.  (*See* Pl. Opp. to Def. Beadon's Mot. to Dismiss at 1 ("All of Defendants' defamatory articles . . . must be considered collectively because all of the defamatory articles were part and parcel of an integrated, intentional campaign to destroy Dr. Ayyadurai's reputation.").

RFCs. . . ."  (Compl. Ex. R. at 1) (emphasis in original).  Nor does it dispute the accuracy of the statement that the definition of e-mail posted on plaintiff's website was changed in in 2012 to expand the number of elements necessary for a messaging system to be considered "e-mail."

Thus, while the complaint challenges the *conclusions* drawn from the available facts, it does not challenge the underlying facts themselves.  As noted in one of the articles that the complaint refers to in support of plaintiff's claim, "[t]here seems to be little disagreement over who wrote what, and approximately when[.] . . . The argument is over what to call things." (Compl. Ex. F at 4).  Accordingly, "[t]his is just the kind of subjective judgment that is only minimally about 'what happened' but expresses instead a vague and subjective characterization of what happened," and for that reason, that "is protected opinion."  *Gray*, 221 F.3d at 249 (holding that statement that plaintiff, an influential lobbyist, "faked his closeness with a number of senior administration officials" was "protected opinion" where the book at issue "made quite clear that Gray did have contacts at the highest levels" but implied that he "was exaggerating his 'closeness'").

In short, the articles disclose the non-defamatory facts on which they rely; make clear that the conclusions drawn from those facts are simply an interpretation of them; and do not rely on other, undisclosed and potentially defamatory facts that are not available to others.  *Piccone*, 785 F.3d at 771 (noting that such statements are "immun[]e . . . from defamation liability").  Furthermore, by providing hyperlinks to the relevant information, the articles enable readers to review the underlying information for themselves and reach their own conclusions.  *See Riley*, 292 F.3d at 289.  Accordingly, the statements are not actionable.

### (3) <u>Hyperbole</u>

Several of the statements at issue suggest that plaintiff's claim to have invented e-mail is

"fraudulent" or that plaintiff is a "fraud" or a "charlatan." (*See, e.g.,* Compl. ¶¶ 36(a), 37(c), 46(e)). Plaintiff contends that such statements are defamatory *per se*, because they suggest the commission of a crime. However, hyperbolic statements, or those using loose, figurative language, are protected as long as no "reasonable person could interpret the statement to provide actual facts about the individual . . . it describes." *Levinsky's*, 127 F.3d at 131. As the Supreme Court explained in *Milkovich*, "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are protected in order to "assur[e] that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." 497 U.S. at 20 (quoting *Falwell*, 485 U.S. at 50, 53-55).

Courts have repeatedly held that language such as "fraud," "snake-oil job," "rip-off," and "scam" is generally protected as hyperbolic speech. *See Phantom Touring*, 953 F.2d at 728; *McCabe*, 814 F.2d at 841-42; *Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d 1124, 1135 (W.D. Wash. 2007). In context, no reasonable reader would interpret the references to plaintiff's claim as "fraudulent" to suggest that plaintiff actually committed a fraud—that is, that he made a false statement, with knowledge of its falsity, for the purpose of inducing another to act on the representation, where the other relied on that representation to his or her detriment. It is clear, particularly from the surrounding language describing plaintiff's claims as "bogus" or "easily debunked," that the articles are simply using colorful and figurative language and are not making any fact-based accusation that plaintiff has actually committed a fraud. (*See, e.g.,* Compl. ¶¶ 36(a), 37(d)). Accordingly, the statements are protected.

### b.   Statements That Plaintiff Is Generating a Fake Controversy

Three of the allegedly defamatory statements identified in the complaint state that the

controversy over who invented e-mail is "fabricated," "manufactur[ed]" by plaintiff, or is a "faux controversy over something that is blatantly untrue." (Compl. ¶¶ 35(e), (g), (h)). Those statements are essentially just variations on the statements that plaintiff's claim to have invented e-mail is not true; the controversy is only "fabricated" or a "faux controversy" if one believes that plaintiff's claim is false. Accordingly, as with the statements discussed above, these statements are protected because they are both incapable of being proved true or false and are subjective statements that do not imply knowledge of objective facts. As to the latter point, it is significant that the September 3, 2014 article in which all three statements appear includes a link to the 1977 RAND report that Masnick claims demonstrates that "lots of folks were developing all sorts of components of an electronic interoffice mail system" at the time, and tells readers to follow the link and "[g]o read the primary documentation." (Compl. Ex. H at 3).

### c.    Statements That Plaintiff Misrepresented Copyright Law and the RAND Report

The statements that plaintiff has misrepresented both copyright law and the RAND report are likewise protected. When read in context, they are clearly subjective statements that do not imply the existence of objectively verifiable facts. The articles at issue do not simply state, without more, that plaintiff misrepresented copyright law and the RAND report. Rather, they fully explain the basis for their position, thereby enabling (and in some instances even directly inviting) readers to come to their own conclusions. For example, in the September 2, 2014 article, Masnick stated that Ayyadurai and his supporters misrepresent the meaning of a copyright when they state that "[o]n August 30, 1982, the US government officially recognized V.A. Shiva Ayyadurai as the inventor of email by awarding him the first US Copyright for 'Email." (Compl. Ex. G at 2). He then explained the basis for his conclusion:

[c]opyright was not, and has never been 'the equivalent of a patent.' Copyright

> and parents are two very different things.  Copyright protects specific expression.
> Patents protect inventions.  That's why copyright protected *only* the specific code
> that Ayyadurai wrote, rather than the concept of email.  While it's true that
> software wasn't considered patentable by many at the time, that doesn't, in any
> way, mean that a copyright on a particular piece of software was the equivalent in
> any way, to a patent at the time.

(*Id.* at 3).  By disclosing the non-defamatory facts on which he relied, Masnick made clear that

he was expressing his own subjective opinion and that he was not relying on other, nondisclosed

facts.  *See Piccone*, 785 F.3d at 771.

That same article stated that plaintiff "totally misrepresent[s]" a 1977 RAND report on

computer messaging.  (Compl. Ex. G at 4).  In the post, Masnick wrote:

> Here's what Ayyadurai, Weber and their friends claim Crocker said [in the 1977
> RAND report]:
>
> > At this time, no attempt is being made to emulate a full-scale, inter-
> > organizational mail system.  The fact that the system is intended for use in
> > various organizational contexts and by users of differing expertise makes
> > it almost impossible to build a system which responds to all users' needs.

(*Id.* at 3).[10]  He provided a link to the full report, telling his readers "you can read it here."  *Id.*

He explained his conclusion that plaintiff has misrepresented the report by noting that the two

sentences quoted come from different pages of the report, and by quoting sections of the report

that he contends belie plaintiff's claims.  (*See id.* at 3-4).  Again, by providing, and even directly

linking to, the relevant information on which Masnick draws his conclusion, he made it clear that

he was expressing his own interpretation of those facts and inviting his readers to come to their

own conclusions.

### d.   <u>Statements That Plaintiff's Story Has Changed over Time</u>

The same is true of several of the statements suggesting that plaintiff's story has changed

---

[10] Plaintiff does not appear to dispute that the quotation accurately represents the way that he has presented
the RAND report.

over time.  The September 4, 2014 article stated that "[c]omputer historian Thomas Haigh has

been tracking Ayyadurai's lies and misrepresentations for years, and alerts us to the fact that

Ayyadurai's story has *notably changed* over the years" and that he "has conveniently tried to

*rewrite his own history* to counter the debunkings" of his claim.  (Compl. Ex. I at 1-2).  In the

post, Masnick provided a link to a lengthy article by Haigh in which he explained his conclusion

in great detail, and also quoted extensively from that post.  As one example, Masnick wrote:

> [I]n 2011, [plaintiff] originally claimed that while he was 'challenged' to create
> an electronic interoffice messaging system in 1978, he didn't actually get it to
> work until 1980.  But, of course, by then email was much more widespread.  So,
> Ayyadurai changed the story, and pretended that he was both challenged and
> wrote his 50,000 lines of code and got it all working in 1978.

(*Id.* at 2).  The complaint alleges that the final sentence is defamatory, but does not appear to

challenge the accuracy of the first two.  Accordingly, once again, Masnick presented his own

conclusion that plaintiff had changed his story, but made it clear that he was expressing his own

subjective view by fully disclosing the facts on which that opinion was based.

### e.        Statements That Plaintiff Has Based His Entire Reputation on His Claim to Have Invented E-Mail

A number of the challenged statements suggest that plaintiff has based his entire

reputation or identity on his claim to have invented e-mail.  (*See, e.g.,* Compl. ¶¶ 44(a)

("[Ayyadurai] has staked his entire identity on the outright false claim that he invented email");

47(b) ("Ayyadurai . . . has built his entire reputation on the false claim" that he invented email)).

Plaintiff contends that those statements are demonstrably false, as he has many other

accomplishments on which his reputation is based.  However, as with the claims that he has

misrepresented copyright law or that his story has changed over time, those statements are

protected as subjective statements that do not imply knowledge of undisclosed, objective facts.

The statements at issue here are accompanied by full disclosures of the non-defamatory

facts on which they rely.  For example, in the September 3, 2014 post, Masnick included an image of plaintiff's Twitter page, which says "Inventor of Email.   Systems Scientist. Entrepreneur." directly under his name; states that his "*entire Twitter stream* is about him claiming to have invented email"; states that he has a website called "the inventor of email"; and provides an image of a book written by plaintiff called "The Email Revolution" that includes the phrase "The Inventor of Email" directly under his name.  (Compl. Ex. H at 2).  In light of those disclosed facts, no reasonable reader would believe that Masnick's statements were based on any other additional and undisclosed information.

Furthermore, plaintiff has not challenged the accuracy of any of the information Masnick cites in support of his position.  Accordingly, Masnick has "immunize[d] his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based," *Piccone*, 785 F.3d at 771, thus "making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions." *Riley*, 292 F.3d at 289.

### f.        Statements About Plaintiff's Accusations of Racism

A few of the allegedly defamatory statements challenge plaintiff's position that those who disagree with him are "racist."  (*See, e.g.,* Compl. ¶ 41(f) (stating that plaintiff has "sp[un] this bizarre and totally made up story of a big American defense contract wanting to rewrite history to write out someone with 'brown skin'"), ¶ 46(c) ("Ayyadurai is particularly annoying because of his bogus claim of racism.")).

Once again, these statements are protected because they are statements of opinion that do not imply knowledge of objective facts.  The March 8, 2016 article provided the non-defamatory information on which Masnick clearly relied in reaching his conclusion that plaintiff's "story" is

"bizarre and totally made up."  (Compl. Ex. N at 2).  For example, the article included a lengthy

excerpt from plaintiff's Twitter feed, including tweets challenging journalists who, following his

death, credited Ray Tomlinson (a former Raytheon employee) with creating e-mail and a tweet

stating that "[w]hite journalists since 2012 have joined in the lynching and whitewashing of facts

on email."  (*Id.* at 2-11).  It also included a link to plaintiff's response to those journalists, which

he posted on his own website, explaining his position:

> I have no doubt that my origin and ethnicity have strongly influenced [the]
> controversy over my invention of email.  This has also influenced the withholding
> of recognition for that invention, and for personal and racist attacks directed
> against me.  Such attacks have been facilitated by Raytheon, (Tomlinson's
> employer), one of the largest military contractors, which profits from spending
> millions, as we are seeing right now, to deliberately rewrite history as it serves to
> enhance their brand in the lucrative cyber-security market.

(Dr. V.A. Shiva Ayyadurai, *Correction: The Inventor of Email is Still Alive*, VA Shiva (June 30,

2016), http://vashiva.com/correction-the-inventor-of-email-is-still-alive/).  Finally, the article

also included links to information about work performed by Tomlinson in the area of electronic

messaging.  By providing all of that information, Masnick made clear that he is drawing his own,

subjective conclusion, and he enabled his readers to draw their own conclusions from the

information provided.  Furthermore, no reasonable reader would conclude that his statements

about plaintiff's claims of racism were based on any non-disclosed, objective information.

Accordingly, the statements are protected.

### g.    Statements of Motivation, Intent, or Purpose

The complaint also identifies a number of statements concerning plaintiff's state of mind

or his motivations.  For example, one article states that plaintiff is "deliberately

misrepresent[ing]" the RAND report.  (Compl. ¶ 36(f)).  Another states that he is "obsessed with

his false claim of creating email."  (*Id.* ¶ 44(b)).  Such statements are not capable of being proved

false and are also subjective statements that do not imply knowledge of objective facts.

A number of courts have recognized that a person's motivations "can never be known for sure," even by that person. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993); *accord Greenspan v. Random House, Inc.*, 859 F. Supp. 2d 206, 224 (D. Mass. 2012) (concluding that statement about a person's motivations for filing a lawsuit "cannot objectively be proven as true or false"); *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147 (8th Cir. 2012) (noting that statements concerning a person's motivations for committing suicide were not objectively verifiable); *Murray v. HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 886 (S.D. Ohio 2004) ("[T]here are no objective tests to determine [a person's] internal motivation."). *Haynes*, for example, considered statements in a book that implied that a man left his wife for another woman for financial reasons. *See* 8 F.3d at 1226. In holding that the statements were not actionable, the Seventh Circuit observed that the man's "motivations for leaving Ruby for Dorothy . . . can never be known for sure (even by [him]) and anyone is entitled to speculate on a person's motives from the known facts of his behavior." *Id.* at 1227. Accordingly, statements concerning a person's motivation or intent are not actionable because they are incapable of being proved true or false.

Similarly, such statements are subjective speculation that does not imply possession of objectively verifiable facts. *See id.*; *Gacek*, 666 F.3d at 1147-48 (holding that statements concerning a person's motivations for committing suicide express only a "'theory' or 'surmise'" and noting that "anyone is entitled to speculate on a person's motives from the known facts of his behavior"). In *Haynes*, addressing the statements implying that a man left his wife for financial reasons, the court observed: "Luther Haynes left a poor woman for a less poor one, and Lemann drew a natural though not inevitable inference. He did not pretend to have the inside

dope.  He . . . claim[ed] insight, not information that the plaintiff might be able to prove false in a trial."  8 F.3d at 1227.

The same is true here.  No reasonable person would read the statement "[Dr. Ayyadurai and his friends] are relying on the ignorance of reporters and the public about what a copyright is" to suggest that Masnick possesses undisclosed, inside information about plaintiff's motives. *See Greenspan*, 859 F. Supp. 2d at 224.  Rather, the statements are clearly subjective interpretations or theories drawn from disclosed facts and, as such, are protected.

**h.    The Context of the Posts**

Finally, the context in which the above statements were made reinforces the conclusion that they were subjective statements of opinion and not fact.  *See McCabe*, 814 F.2d at 843 (noting that the narrative style in which the article at issue was written "reinforces our conclusion that the statement was protected" because it was "unlikely to convey the impression that an imprecise and unverifiable statement is meant to be a statement of fact"); *Phantom Touring*, 953 F.2d at 729 ("The sum effect of the format, tone and entire content of the articles is to make it unmistakably clear that [the writer] was expressing a point of view only.  [Accordingly], the challenged language is immune from liability.").  The articles at issue include humorous bylines such as "from the *that's-just-wrong* dept.," "from the *really-now?* dept.," and "from the *what's-wrong-with-people-over-there* dept."  (Compl. Exs. G, H, J).  The use of such language indicates that the articles contain the personal views of their authors, rather than statements of fact.  *See Phantom Touring*, 953 F.2d at 729 ("[The writer's] snide, exasperated language indicated that his comments represented his personal appraisal of the factual information contained in the article.").

### 5.    Whether the Complaint Plausibly Alleges Malice

"[P]ublic officials and public figures may only recover if they can prove that the publication that harmed them contained a false statement of fact that was made with actual malice." *Fiacco v. Sigma Alpha Epsilon Fraternity*, 528 F.3d 94, 99 (1st Cir. 2008).  In this context, "actual malice" means "knowledge of or reckless disregard for the falsity of the statement." *Levinsky's*, 127 F.3d at 127.  To allege a plausible claim of "actual malice," the complaint must "lay out enough facts from which malice might reasonably be inferred." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012).

Here, the complaint fails to lay out such facts.  It alleges that defendants made the allegedly defamatory statements "with the knowledge that they were false," but fails to provide any specific factual allegations to support that conclusion.  (*See* Compl. ¶ 48).  It alleges only that defendants made the allegedly defamatory statements despite knowing that another website, Gawker.com, had settled a defamation claim brought by plaintiff concerning similar statements. (Compl. ¶ 51).  However, even assuming that the statements at issue in the Gawker litigation were substantially similar to the statements at issue here (although the complaint does not allege as much), a settlement is not a direct reflection of the merits of a claim.  *Cf. Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1975) (noting that, where court approval of settlement is required, the court should not "turn the settlement hearing 'into a trial or a rehearsal of the trial'" or determine to a certainty whether the claim at issue "is or is not worthless or valuable" (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Beame*, 67 F.R.D. 30, 33 (S.D.N.Y. 1975)). Accordingly, knowledge of the settlement does not establish knowledge of the falsity of the statements.  The complaint therefore fails to plausibly allege that the statements at issue were made with actual malice.

### 6.     Whether the Claim Based on Beadon's Article Is Barred by the Communications Decency Act

Defendant Beadon has also moved to dismiss the defamation claim against him (based upon the one article that he authored) on the ground that the claim is barred under the Communications Decency Act ("CDA").  The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," *id.* § 230(e)(3).  Beadon contends that because the only article identified in the complaint that he authored contains primarily content created by third-party users—along with minor editorializing comments created by him that are not identified as defamatory in the complaint—he is immune under § 230.

"Section 230 immunity should be broadly construed."  *Universal Commc'n. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *accord Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18 (1st Cir. 2016) ("There has been near-universal agreement that section 230 should not be construed grudgingly.").  "Congress enacted [the CDA] partially in response to court cases that held internet publishers liable for defamatory statements posted by third parties on message boards maintained by the publishers."  *Jane Doe No. 1*, 817 F.3d at 18.  The statute was intended to prevent tort liability from "chilling" online speech and to "remov[e] the disincentives to self-regulation that would otherwise result if liability were imposed on intermediaries that took an active role in screening content"—for example, by filtering or editing out obscene or otherwise inappropriate content.  *Lycos*, 478 F.3d at 418-19 (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)).  To give effect to those purposes, § 230 "shields website operators from being 'treated as the publisher or speaker' of material posted

by users of the site,' 47 U.S.C. § 230(c)(1), which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.'"  *Jane Doe No. 1*, 817 F.3d at 18 (quoting *Zeran*, 129 F.3d at 330).

Immunity under § 230 extends only to "information provided by another information content provider."  47 U.S.C. § 230(c)(1).  "Information content provider," in turn, is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  *Id.* § 230(f)(3).  Accordingly, users or providers of interactive computer services remain liable for their own speech, including speech that they are "responsible, in whole or in part, for the creation or development of."  The question here is thus whether the defendants are so responsible.

The article at issue, authored by Beadon and entitled "Funniest/Most Insightful Comments of the Week at Techdirt," includes re-postings of comments posted by Techdirt's readers.  (Compl. Ex. S).  The article includes hyperlinks to the original comments, which were all posted in the "Reader Comments" section of previous Techdirt posts, and also includes intermittent introductory and editorial comments written by Beadon.  All of the allegedly defamatory comments identified in the complaint are contained within the re-posted user comments.  (*See* Compl. Ex. S at 1-2).[11]  Whether defendants are immune under the CDA thus depends upon whether re-posting comments originally created by third-party users amounts to the "creation or development of information."

The leading case in this area is *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (*en banc*).  *See Jones v. Dirty World Ent.*

---

[11] In his opposition, plaintiff contends that there are also defamatory statements included in Beadon's commentary.  However, he has failed to identify a single such statement.

*Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) (identifying *Roommates* as the leading case). There, the Ninth Circuit "interpret[ed] the term 'development' as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." *Roommates*, 521 F.3d at 1167-68.  Accordingly, "a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Id.* at 1168.  Applying that standard, courts have found that "merely taking action that is necessary to the display of allegedly illegal content," including republishing and commenting upon user generated content, does not constitute "creation or development." *Jones*, 755 F.3d at 410.  In *Jones*, for example, the Sixth Circuit held that a website manager who had selected defamatory comments from among thousands of user submissions and posted those comments to his website, adding his own commentary, was immune under § 230.  *Id.* at 415-16. The court reasoned that simply selecting the comments for publication and adding commentary "did not materially contribute to the defamatory content of the statements." *Id.* at 416. Similarly, in *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), the Ninth Circuit held that the operator of a listserv was immune under § 230 when he made minor edits to and published, both to the listserv and to his website, an e-mail that he had received from a third party.  *Id.* at 1031.

Applying those principles here, it is clear that Beadon was neither the "creator" nor "developer" of the statements at issue.[12]  Beadon simply selected a user-submitted comment and re-posted it, without modifying the content of the comment.  Republishing an already-existing user-submitted comment, without altering the content of that comment, does not materially

---

[12] Plaintiff suggests that the comments, which were posted by an anonymous user, may have been posted by Beadon himself.  (*See* Pl. Opp. to Beadon's Mot. to Dismiss at 6 n.2).  However, the bare allegation that "it is certainly possible" that Beadon authored the comment is insufficient, particularly when presented as an argument in opposition papers rather than in the complaint itself.  *See Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."); *Coyne v. City of Somervill*e, 972 F.2d 440, 442-43 (1st Cir. 1992) (stating that, under Rule 12(b)(6), courts "take the well-pleaded facts *as they appear in the complaint*") (emphasis added).

contribute to its allegedly defamatory nature.  While Beadon arguably adopted or ratified the comments by selecting them for re-publication, "[a]n adoption or ratification theory . . . is not only inconsistent with the material contribution standard of 'development' but also abuses the concept of responsibility.  A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc*."  *Jones*, 755 F.3d at 415.  Accordingly, the defamation claim based on Beadon's article is barred by the CDA.

### D.    Intentional Interference with Prospective Economic Advantage (Count Two)

The complaint also asserts claims for intentional interference with a prospective economic advantage.  The IIPEA claim fails for First Amendment reasons as well as on its own terms.  The Supreme Court has made it clear that "a failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress."  *Shay v. Walters*, 702 F.3d 76, 83 (1st Cir. 2012) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56-57 (1988)).  A court in this district has extended that bar to include claims for IIPEA.  *See Piccone v. Bartels*, 40 F. Supp. 3d 198, 201-02 (D. Mass. 2014) ("[P]laintiffs cannot recover for the same statements on a theory of interference with advantageous business relations.").  Accordingly, the IIPEA claim, which simply recasts the defamation claim, cannot proceed.

Furthermore, even absent the First Amendment's bar, the complaint fails to state a claim for IIPEA.  To state a claim for intentional interference with advantageous relations, a plaintiff must allege that "(1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007).

Here, at a minimum, the complaint fails at the third prong.  An improper motive can be established by showing "retaliation or ill will toward the plaintiff."  *Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 658 (2006) (citing *Draghetti v. Chmielewski*, 416 Mass. 808, 817 (1994)). "Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation."  *Id.* (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817 (1990)).  The complaint does not allege an improper motive beyond the bare, conclusory allegation that defendants "acted solely out of malice" and that they "intended to harm Plaintiff by intentionally and unjustifiably interfering with his actual and prospective business relationships."  (Compl. ¶¶ 64-65).   Such conclusory allegations that "merely parrot the elements of the cause of action" are insufficient to state a plausible claim under Rule 12(b)(6). *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  As to improper means, the complaint alleges that defendants "used dishonest, unfair or improper means to interfere with Plaintiff's actual and prospective business relationships."  (Compl. ¶ 64).  However, as discussed above, plaintiff cannot establish that the statements at issue are false.  Under the circumstances, "[t]here is no indication that the [statements were made] for any reason other than the reporting on an issue of public concern," and, accordingly, there is "no indication that the [statements] w[ere] improper or carried on for any purpose other than journalism."  *Dulgarian v. Stone*, 420 Mass. 843, 852 (1995).

### D.     Intentional Infliction of Emotional Distress (Count Three)

Finally, the complaint asserts claims against each of the defendants for intentional infliction of emotional distress.  As noted above, "[t]he Supreme Court has made it pellucid that a failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress."  *Shay*, 702 F.3d at 83 (citing *Hustler Magazine, Inc*, 485 U.S. at 56-57).

*See also Soto-Lebron v. Federal Express Corp.*, 538 F.3d 45, 58 (1st Cir. 2008) (stating that libel claim "cannot be brought in the guise of an IIED claim, which would divorce it from the well developed law of defamation with its attendant privileges and defenses").  "[P]ublic figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true."  *Falwell*, 485 U.S. at 56.  Again, plaintiff is a public figure for purposes of First Amendment law, and the complaint fails to plausibly allege either falsity or malice.

Furthermore, and in any event, the complaint fails to plausibly state an IIED claim by its own terms.  To state a claim for IIED under Massachusetts law, a plaintiff must allege "'(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct . . . ; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community,' and '(3) that the actions of the defendant were the cause of the plaintiff's distress.'"  *Kennedy v. Town of Billerica*, 617 F.3d 520, 530 n.9 (1st Cir. 2010) (quoting *Howell v. Enterprise Publ'g Co.*, 455 Mass. 641, 672 (2010)) (alteration in original).  "[L]iability cannot be predicated upon 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)).  For that reason, "defamatory statements . . . cannot, as a matter of law, satisfy the 'extreme and outrageous conduct' requirement of the IIED claim."  *Soto-Lebron*, 538 F.3d at 59.

36

### E.   Plaintiff's Request to Amend the Complaint

Plaintiff has requested that as an alternative to dismissal, he be granted leave to amend the complaint.  In his opposition, he cites to the "liberal amendment policy of Rule 15(a)" and requests that "[i]f this Court believes that Dr. Ayyadurai has not [pleaded] any of his claims, it should grant him leave to amend."  (Pl. Opp. at 23).  However, "except perhaps in 'exceptional circumstances,' a bare request in an opposition to a motion to dismiss *does not constitute* a motion to amend for purposes of Rule 15(a)."  *United States ex rel Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 128 (1st Cir. 2013) (quoting *Gray v. Evercore Restructuring LLC*, 544 F.3d 320, 327 (1st Cir. 2008)).  "[W]here, as here, a request to file an amended complaint consists of nothing more than 'boilerplate sentences stating the well-settled "freely given" standard under which a request for leave to amend is generally analyzed,' a district court 'act[s] well within its discretion when completely disregarding the request.'"  *Id.* (quoting *Silverstrand Investments v. AMAG Pharms., Inc.*, 707 F.3d 95, 107-08 (1st Cir. 2013)).

A request for leave to amend requires a plaintiff to "set forth the factual and legal predicate for the remedy sought."  *Silverstrand Investments*, 707 F.3d at 107.  Here, however, plaintiff's opposition fails to set forth a single additional fact that would be included in the amended complaint.  Accordingly, plaintiff has failed to "do[] the necessary leg work," *id.*, and the request to amend will be denied.

## IV.   Conclusion

For the reasons stated above, the motion of Floor64, Inc. and Michael Masnick and the motion of Leigh Beadon to strike the complaint pursuant to the California anti-SLAPP law are DENIED.  The motion of Floor64, Inc. and Michael Masnick and the motion of Leigh Beadon to dismiss for failure to state a claim are GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor_____

Dated:  September 6, 2017                      F. Dennis Saylor IV
                                               United States District Judge

*Ayyadurai v. Floor64, Inc. et al.*, 17-10011-FDS
**Appendix A**

**<u>Alleged Defamatory Statements</u>**

1) The headline:  "Why Is Huffington Post Running a Multi-Part Series to Promote the Lies of a Guy Who Pretended to Invent Email?"  (Compl. ¶ 34(a), Ex. G)

2) ". . . [Dr. Ayyadurai's] continued false insistence that he invented email is reaching really questionable levels."  (Compl. ¶ 34(b), Ex. G)

3) "Dr. Ayyadurai is perpetuating a 'fake story' with respect to his claims of invention of email."  (Compl. ¶ 34(c), Ex. G)

4) "Dr. Ayyadurai and his friends 'totally misrepresent' a technical report relating to computer messaging."  (Compl. ¶ 34(d), Ex. G)

5) "[Dr.] Ayyadurai has built up his entire reputation around the (entirely false) claim that he 'invented' email."  (Compl. ¶ 34(e), Ex. G)

6) "[Dr. Ayyadurai] misrepresents what a copyright registration means."  (Compl. ¶ 34(f), Ex. G)

7) "But [Dr. Ayyadurai is] simply not telling the truth when he claims to have invented email."  (Compl. ¶ 34(g), Ex. G)

8) "[The Huffington Post article] is nothing more than a PR campaign for a liar." (Compl. ¶ 35(a), Ex. H)

9) "[The Huffington Post article] just repeats the same false claims (using nearly identical language) as Ayyadurai and his friends in their original posts."  (Compl. ¶ 35(b), Ex. H)

10) ". . . Ayyadurai is using one of the oldest trolling tricks in the book, in pretending that everything that he is actually doing is actually being done nefariously against him." (Compl. ¶ 35(c), Ex. H)

11) "Instead, the only one whose entire 'identity' is built off a fake claim to have invented email is . . . Dr. Ayyadurai."  (Compl. ¶ 35(d), Ex. H)

12) "The only fabricated controversy is by [Dr. Ayyadurai]."  (Compl. ¶ 35(e), Ex. H)

13) "[Dr. Ayyadurai] claims that those of us debunking his bogus claim refused to look at the primary documents."  (Compl. ¶ 35(f), Ex. H)

14) "There is no controversy other than the one that [Dr. Ayyadurai is] manufacturing." (Compl. ¶ 35(g), Ex. H)

15)   "The question is whether or not Huffington Post will recognize that it's being used as part of an effort to drum up a faux controversy over something that is blatantly untrue." (Compl. ¶ 35(h), Ex. H)

16)   "Not only do Ayyadurai and his friends misrepresent reality, they fraudulently make claims that are easily debunked."  (Compl. ¶ 36(a), Ex. I)

17)   ". . . [Dr. Ayyadurai's and his friends'] two biggest claims are (1) that the 'US government officially recognized Ayyadurai as the inventor of email' in 1982 and (2) that a leading analysis of electronic messaging in 1977, by Dave Crocker at RAND, claims that a full interoffice email system is 'impossible.'  Both of these claims are absolutely false."  (Compl. ¶ 36(b), Ex. I)

18)   ". . . [T]he first [claim] relies on blatantly misleading people about what a copyright is and what Ayyadurai copyrighted."  (Compl. ¶ 36(c), Ex. I)

19)   ". . . [T]he fact that [Dr. Ayyadurai] and his friends continue to pretend that a copyright is something it is not is farcical."  (Compl. ¶ 36(d), Ex. I)

20)   "[Dr. Ayyadurai and his friends] are relying on the ignorance of reporters and the public about what a copyright is."  (Compl. ¶ 36(e), Ex. I)

21)   "[Dr. Ayyadurai and his friends] deliberately misrepresent what Crocker said by taking two separate sentences, from different pages in the report, removing the context around them, and mashing them together to pretend they say something they do not."  (Compl. ¶ 36(f), Ex. I)

22)   "Computer historian Thomas Haigh has been tracking Ayyadurai's lies and misrepresentations for years, and alerts us to the fact that Ayyadurai's story has notably changed over the years, revealing additional misrepresentations and attempts to change history."  (Compl. ¶ 36(g), Ex. I)

23)   ". . . Ayyadurai has conveniently tried to rewrite his own history to counter the debunkings."  (Compl. ¶ 36(h), Ex. I)

24)   "So Ayyadurai changed the story, and pretended that he was both challenged and wrote his '50,000 lines of code' and got it all working in 1978."  (Compl. ¶ 36(i), Ex. I)

25)   ". . . Ayyadurai and his friends are now trying to rewrite history . . . ."  (Compl. ¶ 36(j), Ex. I)

26)   "[The Huffington Post article] is merely a repeating of Ayyadurai's lies."  (Compl. ¶ 36(k), Ex. I)

27) "We're curious if Ayyadurai would like to try to present any evidence that a giant defense contractor is paying us off to (1) explain basic copyright law and (2) point to the actual 1977 paper that Ayyadurai himself totally misrepresents." (Compl. ¶ 36(l), Ex. I)

28) The headline that Dr. Ayyadurai's claims with respect to invention of email are "blatantly false claims." (Compl. ¶ 37(a), Ex. J)

29) "The key arguments in [Dr. Ayyadurai's] claim are obviously false, and prey on (1) a misunderstanding or misrepresentation of copyright law and (2) an almost fraudulent misquoting of Dave Crocker . . . ." (Compl. ¶ 37(b), Ex. J)

30) ". . . [The Huffington Post] won't retract and renounce this series [about Dr. Ayyadurai] as a PR campaign for a series of blatantly fraudulent claims . . . ." (Compl. ¶ 37(c), Ex. J)

31) ". . . HuffPo Live . . . picked up on the completely bogus campaign and did a whole fawning interview with Ayyadurai, never once presenting the evidence that he's fraudulently misrepresenting basic facts." (Compl. ¶ 37(d), Ex. J)

32) ". . . HuffPo and HuffPo Live are . . . actually actively promoting a lie." (Compl. ¶ 37(e), Ex. J)

33) ". . . Huffington Post is actively claiming that a clearly false story is true." (Compl. ¶ 37(f), Ex. J)

34) The headline that refers to Dr. Ayyadurai as "Fake Email Inventor." (Compl. ¶ 38(a), Ex. K)

35) ". . . Huffington Post [allowed] Shiva Ayyadurai and his friends to post an entirely bogus 'history of email' series, all designed to make it look like Ayyadurai himself had invented email—a claim he's been making for a few years, despite it being entirely false, based on totally misrepresenting a number of things, including what copyright means, misquoting a 1977 research paper and playing 'no true scotsman' over what is a 'true' email system." (Compl. ¶ 38(b), Ex. K)

36) ". . . [The Huffington Post] allowed the series [on Dr. Ayyadurai] to go on with more false claims, and then told me it had 'added a clarification' that didn't clarify anything, but was a statement written by Ayyadurai, repeating the false claims." (Compl. ¶ 38(c), Ex. K)

37) "[The Huffington Post] admit[s] that [the series on Dr. Ayyadurai] was a 'blogger-generated series,' which is an attempt to distance the fake series, put together by Shiva Ayyadurai himself with PR guru Larry Weber, from Huffington Post's journalistic 'news' side." (Compl. ¶ 38(d), Ex. K)

38) "Ayyadurai and Weber had been banking on the fact that most people don't realize that the blogging side of HuffPo has no editorial controls to pretend that the series had some

sort of journalistic credibility.  They appear to be promoting the fake articles everywhere . . . ."  (Compl. ¶ 38(e), Ex. K)

39)   "There's no controversy at all.  Ayyadurai is simply making false claims . . . ."  (Compl. ¶ 38(f), Ex. K)

40)   ". . . '[G]oing to the people' is great, but historically [Dr. Ayyadurai has] done that with clearly bogus claims—such as misquoting Dave Crocker's 1977 research and pretending that his 1982 copyright on his EMAIL software is the equivalent of a patent for the concept of email."  (Compl. ¶ 38(g), Ex. K)

41)   The headline that refers to Dr. Ayyadurai as the "Fake Inventor of Email."  (Compl. ¶ 39(a), Ex. L)

42)   "Ayyadurai has built up quite a reputation around this false claim, even though it's been debunked over and over and over again."  (Compl. ¶ 39(b), Ex. L)

43)   "Ayyadurai keeps coming back, often moving the goalposts and changing his definitions, but still ultimately flat out lying in pretending to have 'invented' email."  (Compl. ¶ 39(c), Ex. L)

44)   "Ayyadurai, however, has cleverly used misleading (to downright false) claims to make what appears on its face to be a credible story, fooling a number of gullible reporters."  (Compl. ¶ 39(d), Ex. L)

45)   ". . . [M]any people [are] wondering if the whole HuffPo series [about Dr. Ayyadurai] was ramped up prior to [Ayyadurai's] 'wedding' to get the mainstream press to roll with the bogus claim."  (Compl. ¶ 39(e), Ex. L)

46)   "Ayyadurai has been trying to make this lie [regarding the invention of email] stick for years . . . ." (Compl. ¶ 39(f), Ex. L)

47)   ". . . [T]he mainstream press is repeating [Dr. Ayyadurai's] bogus claims as facts."  (Compl. ¶ 39(g), Ex. L)

48)   "UPI has an article that doesn't mention Ayyadurai's false claims in the text of the article, but does falsely call him 'email creator' in the headline . . . ."  (Compl. ¶ 39(h), Ex. L)

49)   "Headline and Global News 'reporter' Dina Exil repeatedly calls Ayyadurai the inventor of email and also claims he 'is known for being the first person to invent email,' except none of that is true.  He's known for pretending that."  (Compl. ¶ 39(i), Ex. L)

50)   ". . . Ayyadurai has been focused on using any and all press mentions as 'evidence' in his bogus campaign to declare himself the inventor of email . . . ."  (Compl. ¶ 39(j), Ex. L)

51)   ". . . [W]e have 'trusted' media like ABC and CBS repeating [Dr. Ayyadurai's] totally
       false claims . . . ."  (Compl. ¶ 39(k), Ex. L)

52)   ". . . Ayyadurai will continue to press his bogus claims again and again and again."
       (Compl. ¶ 39(l), Ex. L)

53)   The headline that refers to Dr. Ayyadurai as "A 'Fake' Brilliant Inventor."  (Compl. ¶
       40(a), Ex. M)

54)   The headline that refers to Dr. Ayyadurai as the "Guy Who Pretends He Invented Email."
       (Compl. ¶ 41(a), Ex. N)

55)   ". . . [Dr. Ayyadurai is] a guy who's basically staked his entire life on the misleading to
       false claim that he 'invented' email."  (Compl. ¶ 41(b), Ex. N)

56)   "Every couple of years [Dr. Ayyadurai] pops up again as he's able to fool some reporters
       into believing him."  (Compl. ¶ 41(c), Ex. N)

57)   "In 2012, [Dr. Ayyadurai] fooled the Washington Post and, astoundingly, the
       Smithsonian."  (Compl. ¶ 41(d), Ex. N)

58)   "Ayyadurai also totally misrepresents what copyright is, and insists that his copyright is
       just like a patent, because you couldn't patent software back then."  (Compl. ¶ 41(e), Ex.
       N)

59)   ". . . Weber, Chomsky and Ayyadurai could spin this bizarre and totally made up story of
       a big American defense contractor wanting to rewrite history to write out someone with
       'brown skin.'"  (Compl. ¶ 41(f), Ex. N)

60)   ". . . [W]hen some point out that he's lying, Ayyadurai yells at them that they're
       repeating 'racist lies'. . . ."  (Compl. ¶ 41(g), Ex. N)

61)   "[Dr. Ayyadurai] somehow got an entire series into the Huffington Post, which was
       clearly created as a PR exercise in trying to rewrite history."  (Compl. ¶ 42(a), Ex. O)

62)   "The mainstream press repeated [Dr. Ayyadurai's] bogus claims about inventing email
       after he married a TV star."  (Compl. ¶ 42(b), Ex. O)

63)   "[Dr. Ayyadurai's lawsuit against Gawker] lays out Ayyadurai's highly misleading
       version of history, insisting again that getting the copyright on a program called EMAIL
       is the equivalent of 'inventing' email.  He continues to conflate patent and copyright law
       and misleadingly claim that because you couldn't get a patent on software the time, a
       copyright is basically the same thing."  (Compl. ¶ 42(c), Ex. O)

64)    "We've discussed Ayyadurai and his bogus claims many times . . . ."  (Compl. ¶ 43(a),
       Ex. P)

65)     ". . . [Dr. Ayyadurai] has staked his entire identity on the outright false claim that he invented email."  (Compl. ¶ 44(a), Ex. Q)

66)     "Ayyadurai is . . . obsessed with his false claim of creating email . . . ."  (Compl. ¶ 44(b), Ex. Q)

67)     "[Dr. Ayyadurai is] blatantly misrepresenting history for his own personal aggrandizing." (Compl. ¶ 44(c), Ex. Q)

68)     ". . . Shiva Ayyadurai's claim that he invented email is complete bullshit.  It's not true. Not even remotely."  (Compl. ¶ 45(a), Ex. R)

69)     Dr. Ayyadurai is "hoping to confuse people who don't understand the difference between a copyright and a patent."  (Compl. ¶ 45(b), Ex. R)

70)     "Ayyadurai has spent many years falsely claiming to have invented email . . . ."  (Compl. ¶ 45(c), Ex. R)

71)     ". . . Ayyadurai has put out a self-congratulatory press release claiming that the settlement supports his blatantly false claims . . . ."  (Compl. ¶ 45(d), Ex. R)

72)     "[Dr. Ayyadurai's settlement with Gawker] is a victory for trying to rewrite history and smear the actual truth."  (Compl. ¶ 45(e), Ex. R)

73)     ". . . Ayyadurai's bogus, lying, totally false claims."  (Compl. ¶ 46(a), Ex. S)

74)     Characterizing Dr. Ayyadurai as a "fraudster."  (Compl. ¶ 46(b), Ex. S)

75)     "Ayyadurai is particularly annoying because of his bogus claims of racism . . . ." (Compl. ¶ 46(c), Ex. S)

76)     "Ayyadurai's claims are annoying and absolutely false."  (Compl. ¶ 46(d), Ex. S)

77)     "Ayyadurai is a liar.  He is a fraud.  He is a charlatan."  (Compl. ¶ 46(e), Ex. S)

78)     The headline that refers to Dr. Ayyadurai as "The Fake Creator of Email [who] Got Paid for His Bogus Claim."  (Compl. ¶ 47(a), Ex. T)

79)     ". . . Shiva Ayyadurai, a guy who didn't invent email but has built his entire reputation on the false claim that he did, was able to cash in on the settlement agreed to by Nick Denton to end all of the Charles Harder-related lawsuits against Gawker."  (Compl. ¶ 47(b), Ex. T)

80)     "Ayyadurai did not invent email by any stretch of the imagination, but likes to go around falsely claiming he did, and smearing those who actually did the work."  (Compl. ¶ 47(c), Ex. T)

81)     "[Dr. Ayyadurai's settlement with Gawker is] a victory for the opposite of truth and shows how abusing the legal system can get you paid out . . . ."  (Compl. ¶ 47(d), Ex. T)

82)     ". . . Ayyadurai took some comments from Crocker so out of context to be borderline fraudulent."  (Compl. ¶ 47(e), Ex. T)

83)     "Meanwhile, it appears that throughout all of this, Ayyadurai continues to fool people." (Compl. ¶ 47(f), Ex. T)

84)     "Either way, as long as Ayyadurai continues to falsely hold himself out as the inventor of email, when he is not, people should continue to call out that his claims are simply false." (Compl. ¶ 47(g), Ex. T)